UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
                                                                   :
FC HOLDINGS AB, as Assignee, and FOXITO PTE    :    09-CV-5466 (RJS)
LTD, PIKAPU PTE LTD, CHUPITA PTE LTD,          :
JUANSILU INVESTMENTS PTE LTD and               :    ECF CASE
FINTRADE LIMITED, Individually,                :
                                               :    **DEFENDANTS' NOTICE OF**
                 Plaintiffs,                   :    **MOTION TO DISMISS THE**
                                               :    **AMENDED COMPLAINT**
            -against-                          :
                                               :
WELLS FARGO & COMPANY, WACHOVIA                :
CORPORATION, G. KENNEDY THOMPSON,              :
THOMAS J. WURTZ, and DONALD K. TRUSLOW,        :
                                               :
                 Defendants.                   :
                                               :
------------------------------------------------------------------- x


        PLEASE TAKE NOTICE that upon (i) the accompanying Declaration of Courtney A.

Jean, dated July 14, 2010, the exhibits attached thereto, (ii) the Memorandum of Law in Support

of Defendants' Motion to Dismiss the Amended Complaint, (iii) the Amended Complaint

(attached hereto, pursuant to Judge Sullivan's Individual Practice Section (2)(B), without

exhibits), and (iv) all prior pleadings and proceedings had herein, Wells Fargo & Company,

Wachovia Corporation, G. Kennedy Thompson, Thomas J. Wurtz, and Donald K. Truslow

(collectively, the "Defendants") will move this Court, before the Honorable Richard J. Sullivan,

United States District Judge, in Courtroom 21C, Daniel Patrick Moynihan United States

Courthouse, 500 Pearl Street, New York, New York, on a date and at a time designated by the

Court, for an Order granting Defendants' Motion to Dismiss the Amended Complaint, filed in

this action on May 28, 2010, and granting such other and further relief as the Court deems just

and proper.

Dated: New York, New York
      July 14, 2010

                               FRIED, FRANK, HARRIS, SHRIVER
                                   & JACOBSON LLP

                               By:      */s/ Douglas H. Flaum*
                               Douglas H. Flaum (douglas.flaum@friedfrank.com)
                               Israel David
                               Eric A. Hirsch
                               John W. Brewer

                               One New York Plaza
                               New York, New York 10004-1980
                               Telephone:  (212) 859-8000
                               Facsimile:   (212) 859-4000

                               *Attorneys for Defendants*

# ATTACHMENT A

Daniel J. Kornstein (DK-3264)
Daniel A. Cohen (DC-8719)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
Tel.: (212) 418-8600

Paul D. Wexler (PW-9340)
Jeffrey H. Squire (JS-8910)
BRAGAR WEXLER EAGEL & SQUIRE, PC
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858

Attorneys for Plaintiffs


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
FC HOLDINGS AB, as Assignee,           :
and FOXITO PTE LTD, PIKAPU PTE LTD,    :
CHUPITA PTE LTD, JUANSILU              :
INVESTMENTS PTE LTD and FINTRADE       :
LIMITED, Individually,                 :
                                       :
                                       :    09-CV-5466 (RJS)
                                       :
              Plaintiffs,              :    **AMENDED COMPLAINT**
                                       :
                                       :
            - against -                :    **PLAINTIFFS DEMAND**
                                       :    **A JURY TRIAL**
WELLS FARGO & COMPANY, WACHOVIA        :
CORPORATION, G. KENNEDY THOMPSON,      :
THOMAS J. WURTZ, and DONALD K. TRUSLOW,:
                                       :
                                       :
              Defendants.              :
-----------------------------------------X

FC Holdings AB, as assignee of the Assignors described below, and Foxito PTE LTD, Pikapu PTE LTD, Chupita PTE LTD, Juansilu Investments PTE LTD and Fintrade Limited, individually (the individual plaintiffs and the Assignors, collectively, are referred to hereafter as the "Investors") for their Amended Complaint, by their counsel, allege:

1. This is an action for violation of the federal securities laws arising from purchases of more than three hundred million dollars of common stock issued by Wachovia Corporation ("Wachovia" or "the Company") on the secondary market occurring between July 10, 2007 and July 18, 2008, inclusive (the "Purchase Period").

2. In reliance on the integrity and stability of the U.S. capital and securities markets, and the disclosure requirements imposed by the federal securities laws as further strengthened by the Sarbanes-Oxley Act, the Investors made substantial purchases of Wachovia common stock on the basis of its public disclosures. Defendants betrayed the Investors' trust by misrepresenting and committing fraud, that is, making materially false, misleading and incomplete public disclosures about their fundamental business model and lending practices.

3. When that fraud was fully exposed, it had devastating financial consequences for the Investors, forcing them to liquidate millions of Wachovia shares that had once traded at $40-$50 for as little as $1.83 a share.

4. The Investors bought Wachovia securities looking for a conservative and stable investment with a steady dividend yield.

5. Defendants' frequent and repeated assurances as to the security of the dividend payments and Wachovia's excellent financial condition were essential elements in the Investors' decisions to purchase its securities. The Investors were also enticed into buying Wachovia stock by Defendants' assurances that the bank was not exposed to the mortgage crisis and that it had sufficient liquidity to weather the storm without cutting its dividend payments.

6. In the several months that preceded the Investors' decisions to purchase Wachovia stock, the Company's public disclosures portrayed its securities as a sound value investment: a financially stable bank that was amply capitalized and capable of paying a steady dividend. Moreover, because of its conservative and strict lending approach and underwriting practices, Wachovia portrayed itself as insulated from the problems in the housing market that were buffeting other lenders and investors in subprime loans. The reality was markedly different: Wachovia's adoption of reckless subprime lending practices, as well as its undisclosed exposure to subprime collateralized debt obligations ("CDOs"), virtually guaranteed Wachovia's financial disaster.

7. Wachovia knowingly and deliberately portrayed that false picture of itself throughout the Purchase Period; even on

2

those occasions when Wachovia was forced to let adverse financial results trickle out, Defendants continued to disseminate false and misleading information about Wachovia's loan portfolio and CDO holdings, thereby vastly understating its precarious financial condition.

8.    As a result, Wachovia's stock price was artificially inflated throughout the Purchase Period.

9.    In reliance on Wachovia's false and misleading disclosures, and upon the inflated market price of its stock, the Investors purchased approximately 8.1 million shares of Wachovia common stock during the Purchase Period at an aggregate price of approximately $312 million.  Exhibit A to the Complaint contains summary charts reflecting each Investor's relevant purchases and sales of Wachovia stock.  The charts reflect the settlement date for each trade, which is three business days after that trade occurred.

10.    On April 14, 2008, after the Investors had already made the bulk of their investments, Wachovia announced capital losses of $350 million, reduced its dividend, and announced that it would seek a capital infusion of $7 billion by issuing new shares, which would dilute existing shareholders.

11.    On April 22, 2008, Wachovia held a general shareholders' meeting in North Carolina.  In response to questions from the shareholders, Defendant G. Kenneth Thompson, CEO of Wachovia, continued to falsely represent the Company's

3

financial condition, insisting that Wachovia's revenue stream was sufficient to carry it through any of the economic crises that was gripping the housing market.

12. On or about May 8, 2008, Wachovia announced that Thompson had been removed from his position as Chairman of the Board, and on or about June 2, 2008, Wachovia announced that Thompson was forced to resign as CEO of Wachovia.

13. On July 10, 2008, Wachovia's announced further capital losses of $8.86 billion and an additional dividend cut. On or about September 29, 2008, just after the new CEO of Wachovia, Robert K. Steel, had remarked on CNBC's "Mad Money" program that Wachovia had "a great future as an independent company", Wachovia announced that Citigroup had agreed to buy Wachovia's banking operations for $1 per share in stock. At the beginning of the Purchase Period, Wachovia enjoyed a market capitalization of approximately $115.8 billion, which fell to $2 billion after this announcement.

14. On October 22, 2008, Wachovia posted $23.9 billion in additional losses.

15. The Investors' purchases of common stock were made in reliance on the misrepresentations made by Defendants which falsely portrayed Wachovia's financial situation. These purchases were made at inflated prices and resulted in aggregate gross losses of approximately $205 million after the Investors liquidated all of their Wachovia stock.

4

16.   Allegations about the Investors' own transactions are based on their personal knowledge.  All other allegations are made upon information and belief, based upon Wachovia's filings with the United States Securities and Exchange Commission ("SEC") and other regulatory filings and reports, securities analysts' reports, press releases and other public statements made or issued by Wachovia, and media reports about the Company. Plaintiffs also have relied on certain allegations of the Amended Class Action Complaint filed in <u>Lipetz v. Wachovia Corp.</u>, 08 Civ. 6171 (RJS) (the "Class Action Complaint") by various New York City employee pension funds who are serving as Lead Plaintiff.

17.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the false and misleading statements and omissions were made in or issued from this District.  Wachovia has a substantial presence in New York.  Many of the acts and transactions giving rise to the violations of law complained of occurred here.

20.   FC Holdings AB is the 100% owner of Financorp Group

International Corporation ("FGIC"), a broker-dealer that has its office in this District. Each of the Assignors and other individual plaintiffs purchased Wachovia stock throughout the Purchase Period through FGIC.

21. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

22. Discret Partners LLP, Lavanda Partners LLP, Lilas Partners LLP, Malva Partners LLP, FGIC, Ana Lopez, Francisco Lopez, Alejandro Mendoza, Juan Mendoza, Julio Pacheco, Morella Pacheco, Jose Pietri, and Oscar Pietri (collectively the "Assignors"), assigned their federal securities claims arising from their respective purchase and sales of Wachovia stock to FC Holdings AB. Exhibit B contains copies of the assignments.

23. At all relevant times, defendant Wachovia was a diversified financial services company that operated as a bank holding company. It engaged in capital management, and in general bank, wealth management, and corporate and investment bank businesses. Wachovia was incorporated and had its headquarters in North Carolina, but had retail banking offices in twenty-one states, including New York.

24. Defendant Wells Fargo & Company ("Wells Fargo") is a diversified financial services company that acquired Wachovia on

or about January 1, 2009.  Pursuant to the merger agreement between the banks, Wells Fargo acquired all of Wachovia's assets and obligations.

25.  Defendant G. Kennedy Thompson ("Thompson") served as Wachovia's Chief Executive Officer ("CEO") and President throughout the Purchase Period until his forced retirement on June 2, 2008.  Throughout that time, Thompson signed the Company's SEC filings.  As a senior executive officer of Wachovia, Thompson was responsible for day-to-day operations of the Company and, as such, he had actual knowledge or acted in reckless disregard of Wachovia's misconduct, as alleged herein.

26.  Defendant Thomas J. Wurtz ("Wurtz") served as Chief Financial Officer ("CFO") and Senior Executive Vice President of Wachovia throughout the Purchase Period.  Throughout that time, Wurtz signed Wachovia's SEC filings.  As a senior executive officer of Wachovia, Wurtz was responsible for day-to-day operations of the Company and, as such, he had actual knowledge or acted in reckless disregard of Wachovia's misconduct, as alleged herein.  On or about July 25, 2008, Wachovia announced the resignation of Wurtz as CFO of Wachovia.

27.  Defendant Donald K. Truslow ("Truslow") served as Chief Risk Officer ("CRO") throughout the Purchase Period.  Truslow reported to CEO Thompson, and was responsible for the oversight of Wachovia's operational, credit, interest rate, balance sheet and market risk.  On or about August 1, 2008, Truslow announced

that he would resign from Wachovia once a replacement could be found.  On or about September 16, 2008 Wachovia announced that Kenneth J. Phelan was going to succeed Truslow as Wachovia's CRO. As a senior executive officer of Wachovia, Truslow was responsible for day-to-day operations of the Company and, as such, he had actual knowledge or acted in reckless disregard of Wachovia's misconduct, as alleged herein.

28.  Thompson, Wurtz and Truslow are referred to collectively herein as the "Individual Defendants."

29.  It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Wachovia's public filings, press releases and other publications are the collective actions of the narrowly defined group of Defendants identified above.  Each of the Individual Defendants, by virtue of his high-level position with Wachovia, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; were aware, or disregarded with deliberate recklessness, that these false and

misleading statements were being issued regarding the Company; and approved or ratified these statements in violation of the federal securities laws.

30.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of Wachovia, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Purchase Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

31.   Each of the Defendants is liable as a participant in a scheme and course of business that operated as a fraud or deceit on the investing public by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the Investors regarding Wachovia's business, operations, management and the value of Wachovia's common stock; and (b) caused the Investors to purchase Wachovia's common stock at artificially inflated prices.

SUBSTANTIVE ALLEGATIONS

## DEFENDANTS' RISKY LENDING PRACTICES

### Wachovia's Acquisition of Golden West

32.  On October 1, 2006, Wachovia acquired Golden West Financial Corporation, the parent company of World Savings Bank, for $24.3 billion.

33.  Golden West's signature product was the "Pick-A-Pay" mortgage, which offered borrowers four payment options each month: (a) full payment of interest and principal sufficient to pay down the loan in a traditional 30-year term; (b) a higher payment that would pay off the loan in 15 years; (c) an interest-only payment; or (d) a minimum payment that did not cover all the necessary interest, with the unpaid interest added to the loan balance.

34.  Under the first option, the loan amortizes at the traditional 30-year pace; under the second, it amortizes more quickly still; under the third, the mortgage does not amortize at all, as only the interest is paid while no principal is paid off; under the fourth option, the mortgage experiences "negative amortization," i.e., with each "minimum" payment made, the outstanding principal balance of the loan actually grows.

35.  After Golden West was acquired, it was not integrated into Wachovia's residential mortgage unit.  Instead, the reverse happened.  According to a June 4, 2008 article in Business Week, "right after Wachovia bought Golden West, executives from [Golden

10

West] took control of all mortgage lending."

36. Golden West's portfolio of mortgages was very risky. Unknown to investors, and contrary to Defendants' public representations, Golden West, both before and after the acquisition, did little to verify buyers' ability to repay loans, choosing instead to gamble on the underlying collateral (*i.e.*, the house) maintaining its value.

37. Plaintiffs rely on the Class Action Complaint to the extent that it alleges facts that the class action Lead Plaintiff learned from confidential witnesses ("CW") who were privy to conduct by Wachovia and Golden West executives, were intimately involved in Wachovia's mortgage loan practices and have personal knowledge about the flourishing of Golden West's risky lending practices after the merger. The Class Action Complaint describes those witnesses in relevant part as follows:

> CW 1 was a sales strategist and Mortgage Banking Executive for Wachovia Mortgage from 2007 to October 2008. CW 1's responsibilities included overseeing loan origination and underwriting on the Pick-A-Pay loan program at three branch offices in North Carolina, one branch office in South Carolina, three branch offices in Ohio and one branch in Tennessee. . . . CW1 reported to Senior Mortgage Banking Executive Frank Fitzpatrick who, in turn, reported to Kim Kurkowski, the General Manager of the east coast.
>
> CW 2 was a workout specialist in Loss Mitigation from 2000 through 2004, and a loan servicing specialist from November 2004 through October 2007 for HomEq Servicing Corporation ("HomEq") in North Highlands,

11

California.  HomEq serviced portfolio loans, specifically subprime loans, which Wachovia aggressively sold to customers.  CW 2 reported that Wachovia received quarterly reports from HomEq on losses and costs associated with the company's collection efforts.

CW 3 was a loan officer and sales manager from 2004 through 2008 for Wachovia and sold many Pick-A-Pay loans after the merger with Golden West, and its mortgage subsidiary World Savings Bank ("World Savings").  As a Sales Manager at Wachovia CW 3 reported to Angela Marsano, a Wachovia Mortgage Director located in Charlotte, North Carolina.  In that capacity, CW 3 supervised ten to eleven Loan Officers.

CW 4 was an employee of World Savings and Wachovia Mortgage holding a variety of regional loan operations management positions for the two companies from 1996 through October 2008.  CW 4's responsibilities included training new loan officers on how to sell loans to customers.  As a Regional Manager of Retail Loan Operations, CW 4 oversaw 15 branch offices in New York and New Jersey.  In that position, CW 4 was primarily responsible for training loan officers.

CW 5 was a senior underwriter at World Savings in 2005 and continued with Wachovia after the merger until October 2008.  CW 5 was based in the southeast region and reported to Erin Schanuel, an underwriting manager in Boynton Beach, Florida.  Schanuel reported to the district underwriting manager, Anna Buonaiut.  CW 5 underwrote or approved Pick-A-Pay loans with a debt-to-income ratio guideline of 33% to 40%.

CW 8 was employed as the customer services section manager and senior district manager of portfolio retention for World Savings/Wachovia in San Antonio, Texas.  From 2006 through September 2007, CW 8 worked as a manager and senior district manager of underwriting and processing.  CW 8 reported to people within World Savings, who reported

12

to Herbert and Marion Sandler (co-founders of
World Savings/Golden West), who then reported
to management at Wachovia.

CW 9 was an underwriter, loan processor and
exception specialist for World Savings in
California until October 2007. As an
underwriter, CW 9 reported to Rachelle Sels,
who reported to Mark Peters, a First VP at
World Savings and a Senior VP at Wachovia
Mortgage FSB, who reported to Marcia
Wasserman, a Senior VP at World Savings and
Wachovia, who reported to Jim Judd, Chief
Operating Officer ("COO") for World Savings
and President and COO of Wachovia's mortgage
business division.

38. One of those witnesses, CW4, confirmed the change in
Wachovia's business culture after the Golden West acquisition:

CW 4's responsibilities included training new
loan officers on how to sell loans to
customers. After the merger, CW 4 observed
that Wachovia's loan officers solely relied
upon a computerized underwriting program to
determine whether to approve or reject a loan
application and did not have actual
underwriters on staff. For this reason, if a
Wachovia loan officer was asked to look at a
loan application and assess whether the loan
should be approved or not, the person would
not have any idea how to go about making the
assessment. CW 4 has direct knowledge that
the priority at Wachovia became selling Pick-
A-Pay loans and abandoning more conservative
Wachovia loans.

**Wachovia's Risky, Nontraditional Loan Products**

39. Before and during the Purchase Period, Wachovia made
repeated public representations about the quality of its and
Golden West's underwriting standards, and represented that
Wachovia and Golden West had little or no exposure to subprime

instruments.

40. The term "subprime" describes a borrower with credit risks that render the borrower riskier than "prime" borrowers; generally a borrower with a Fair Isaac Credit Organization ("FICO") score below 660 is considered subprime.

41. The term "subprime" also describes mortgages that have one or more underwriting characteristics that render such loans riskier than so-called conforming or prime loans, i.e., (a) high loan to value ratios; (b) zero or minimal down payment; (c) an adjustable rate mortgage ("ARM") loan with initial low "teaser" rates that quickly reset to higher amounts; (d) no documentation or verification of borrower income (i.e., "stated income" loans).

42. Wachovia failed to disclose that Golden West's lending practices, incorporated into Wachovia's business model after the merger, involved all of these aspects of subprime lending on a massive scale. Wachovia did not reveal until its April 2008 first quarter report that it had made $51 billion in Pick-A-Pay loans to borrowers with FICO scores below 660 -- i.e., subprime borrowers as defined by the Department of Housing and Urban Development -- of which $25 billion went to borrowers with FICO scores below 620.

43. Before the Golden West merger, Wachovia offered both traditional loans and nontraditional exotic loan products. The Class Action Complaint alleges that: "After the merger, however, Wachovia almost exclusively offered Golden West's signature

14

product, the Pick-A-Pay loan, and, according to CW 3, began to
heavily market and sell Pick-A-Pay loans directly to customers.
CW 4 stated that during this period, almost 100% of the loans
funded by Wachovia were Pick-A-Pay loans." Russell Kettell,
former CFO of Golden West's mortgage subsidiary, World Savings,
has admitted that Wachovia created "pressure" for "a pretty good-
sized increase in loan volume." Michael Moss and Geraldine
Fabrikant, Once Trusted Pioneers, Now Scrutinized, N.Y. Times,
Dec. 24, 2008.

44.   The Pick-A-Pay loans provided borrowers with four
payment options.  The "minimum payment" option was particularly
risky.  The minimum payment amount was calculated pursuant to a
low, fixed monthly rate operative for one year.  This rate
(typically, 1.5%-2.5%) was substantially lower than the actual
operative interest rate that applied to the mortgage (which was
6% or higher).  If a borrower selected this option and continued
to make minimum payments, the amount of the unpaid interest would
be "deferred" and added, each month, to the loan's principal
balance.  This result was known as "negative amortization."

45.   The payment rate on Pick-A-Pay loans reset annually.
Any increase in payment over the prior year was capped at 7.5%.
Over and above these annual rate resets, however, the Pick-A-Pay
mortgages were also subject to "recast."  Wachovia "recast" Pick-
A-Pay loans after either (a) 10 years, or (b) when negative
amortization reaches 110% or 125% of the loan's original balance.

15

On either of these events, the Pick-A-Pay mortgage recasts to become fully amortizing -- i.e., the monthly payment recasts to whatever level is necessary to pay off the mortgage in full during the remainder of its 30-year term.

46. Prior to and during the Purchase Period, Wachovia falsely represented that it was managing the risk associated with its Pick-A-Pay products by ensuring compliance with appropriate underwriting standards, appropriately monitoring loan performance and conducting risk modeling procedures, when in fact it was not doing so.

47. Vitally important to underwriting is the ability of borrowers to service their debt obligations in light of their sources of income. The vast majority of Wachovia's Pick-A-Pay loans were "stated income" loans, or in Wachovia's official parlance "Quick Qualifier" loans. To qualify for such a loan, a borrower's Debt-to-Income ("DTI") ratio must be less than 50%.

48. The Class Action Complaint alleges testimony from confidential witnesses that Wachovia eviscerated that requirement in practice (emphasis added):

> CW 3 explained that many of the Pick-A-Pay loans had a DTI of more than 50%. . . .
>
> To get the loans approved, CW 3 and other loan officers and sales managers were instructed to falsify the amount of stated income on the loan application. CW 3 recalled witnessing an incident where another loan officer was instructed to "bump up" an applicant's Social Security income so that the borrower "qualified" for the loan under

16

debt-to-income ratio tests. Indeed, CW 2
confirmed that while attempting to help
borrowers avoid foreclosure, it became clear
that many of the documents that supported the
original loan application were nonexistent or
were falsified by the borrower at the behest
of the loan officer.

Additionally, while any credit score below
660 is considered "subprime," CW 8, who
worked as a manager and senior district
manager of underwriting and processing,
reported that between 2005 and 2007, Wachovia
in fact routinely issued Pick-A-Pay loans to
borrowers with credit scores in the low
600's, and, at times, even lower than 600.
This exposed Wachovia to the very subprime
risks and "impacts" that Defendants
represented Wachovia had avoided.

\* \* \*

CW 3 was repeatedly instructed by managing
directors to sell prospective borrowers on
the Pick-A-Pay loan program by getting the
borrowers to overstate their actual income.
CW 3 has direct knowledge that upon receipt
of Pick-A-Pay loan files in the Quick
Qualifier program, the underwriters did not
verify the income or DTI levels.

49. Wachovia also offered a substantial majority of its
Pick-A-Pay loans on the basis of stated income that was not
verified by a third party. But Wachovia did not even publicly
acknowledge this fact -- and then only indirectly -- until April
2008, when it announced that it would change its standards to
require underwriters to "verify assets and employment" before
making loans. Wachovia Adjusts Mortgage Underwriting Guidelines,
Sacramento Bus. Journal, Apr. 11, 2008. Wachovia also did not
reveal until its October 2008 third quarter report that 85% of

17

its $120 billion Pick-a-Pay loan portfolio "was originated under a 'Quick Qualifier' program" that relied on unverified income and asset data self-reported by the borrower, and that only 15% "was originated with full documentation (verified assets and verified income)."  The Class Action Complaint offers the testimony of CWs that (emphasis added):

> CW 1, the northeast sales strategist and mortgage banking executive for Wachovia mortgage who was responsible for overseeing loan origination and underwriting on Pick-A-Pay loans at several branch offices, stated that at least 90% of the Pick-A-Pay loans that Wachovia funded were stated income or no documentation loans, meaning there was no verification of the borrower's income by examining their pay stubs, W-2s, bank statements, tax documents or other records. CW 3 confirmed the percentage of these types of loans. According to CW 1, for "Quick Qualifier" loans Wachovia would simply ask the borrower for his or her income and take any such representation at face value." Due to the lack of verification, stated income loans are particularly risky and are often referred to in the industry as "liar loans."

> In fact, a study by the Mortgage Asset Research Institute in Reston, Virginia found that 90% of stated income loans when checked against tax documents revealed overstatement of income by at least 5%, and nearly 60% of the stated amounts are exaggerated by more than 50%.

**Wachovia Exacerbated Risks
Inherent in Its Lending Practices**

50.  Although Wachovia and the Individual Defendants claimed that Wachovia had "careful[ly] manage[d] . . . the inherent credit risking of [its] portfolio," Wachovia actively took risky

measures to increase its volume of Pick-A-Pay loans.

51.  The risk inherent in Wachovia's widespread use of stated income or "liar loans" was exacerbated by its systematic failure to take routine measures to compare (a) the buyers' actual reported incomes to the IRS with (b) the inflated incomes borrowers routinely stated in their applications.  Wachovia's failure to verify prospective mortgage borrowers' actual incomes led to abusive overstatements of income.

52.  In addition, Wachovia reduced or abolished previous underwriting standards that required minimum FICO scores for borrowers, and limited the time for due diligence to a matter of hours.

53.  For example, Wachovia lending guidelines issued in October 2006 announced that "Complete Files received by 3:30 pm today can expect U/W response by End of Day"; advertised "Loan amounts to $3.5 million are now eligible," "100% CLTV to $650,000," "Enhanced LTVs/CLTVs," and "Increased Cash out limit"; and stated "Cash out now permitted on Stated Income loans."

54.  Similarly, a September 24, 2007 in-house Wachovia lending matrix states that there was no required FICO score for certain loans between $40K and $750K in value, and features a circle encapsulating the word 'FICO' with a line struck through it, reminiscent of 'no smoking' signs.

**Wachovia Aggressively Pushed Risky Loans**

55. Wachovia, at the direction of the Individual Defendants, established a system of financial rewards for originating higher risk loans, and corresponding negative consequences for those who did not toe the Company line. Wachovia loan production personnel were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier Pick-A-Pay loans.

56. The Class Action Complaint alleges that:

> CW 3 stated that commissions earned by Wachovia's employees who sold Pick-A-Pay loans were substantially higher than those resulting from the sale of more traditional products. The commission on a Pick-A-Pay loan was three basis points. This meant that a $100,000 Pick-A-Pay loan would yield a commission of $3,000. By contrast, the commission on $100,000 conventional fixed-rate loan would yield a commission of only $90. CW 3 stated that several loan officers and sales managers were motivated by these higher commissions. According to CW 3, in addition to loan officer commissions, sales managers received monthly bonuses that were based on the dollar volume of the Pick-A-Pay loans produced. The amount of these bonuses varied depending on the percentage of the monthly Pick-A-Pay sales goals that were met by the sales manager's team.
>
> CW 3 stated that those employees that did not meet their monthly Pick-A-Pay sales goals were sure to be reprimanded and ultimately fired if they did not increase such sales. Similarly, CW 4 states that "at Wachovia, it was all about the numbers" and that if a loan officer underperformed, "that's it, you're gone." In fact, CW 3 believes that he was terminated because he was unable to meet his sales goals. CW 3 had previously refused to

lie about the amount of a customer's income
so as to artificially increase his volume of
Pick-A-Pay loan originations.

57.   A January 26, 2008 news article corroborates that

testimony.   The article reported:  "A document obtained by the

Observer that was distributed to employees in a mortgage call

center this month showed a 'multiple' that awarded sales

representative 120 percent of their incentive pay for selling at

least four Pick-A-Payment loans in a month."  Rick Rothacker,

Wachovia Rewards Risky Loans, Charlotte News Observer, Jan. 26,

2008.

58.   At the time, Wachovia denied the allegation.  According

to the article, a Wachovia spokeperson "said that particular

document was incorrect and not an official Wachovia Mortgage

document.  He said the bank's compensation plans are confidential

for competitive reasons."  Id.

59.   Two months later, the Charlotte Observer again

reported:  "A former Wachovia mortgage consultant in Texas told

the Observer he was supposed to sell two Pick-A-Pay loans per

month, a requirement he didn't meet."  The consultant, who was

terminated for "production reasons," added:  "That's all we heard

about was Pick-A-Pay . . .  If you sold a 30-year fixed (rate

mortgage) they's day, 'Why didn't you sell Pick-a-Pay."  Rick

Rothacker, Wachovia Mortgage Program Stirs Concerns, Charlotte

News Observer, March 31, 2008.

60.   Wachovia, however, once again denied the allegation,

stating "we have not terminated anyone for not selling enough Pick-A-Pay loans and will not in the future." Id.

61. Wachovia's denials were false. An MSNBC broadcast on December 10, 2008 based on an interview with former Wachovia mortgage consultant Sharren McGarry, confirms that Wachovia used both sticks and carrots to prod its employees to maximize Pick-A-Pay loan originations, and used artifice to dupe naive borrowers:

> Sometime after Sharren McGarry went to work as a mortgage consultant at Wachovia's Stuart Fla., branch in July 2007, she and her colleagues were directed to market a mortgage called the "Pick A Pay" loan. Sales commissions on the product were double the rates for conventional mortgages, and she was required to make sure nearly half the loans she sold were "Pick A Pay," she said . . .
>
> Her job description included a requirement that she meet a monthly quota of Pick A Pay mortgages . . . . [H]er manager "frequently reminded me that my job requirement was that I do 45 percent of my volume in the Pick A Pay loan."
>
> In June 2008, her manager wrote a "Corrective Action and Counseling" warning, saying she wasn't meeting the banks "expectation of production" . . . .

John W. Schoen, "Pay Option" Loans Could Swell Defaults, MSNBC.com, Dec. 10, 2008.

62. As a result, many of these loans were made to people who had no realistic ability to meet the obligations inherent in the loans they were sold.

63. According to the March 31, 2008 Charlotte Observer

article described above, Wachovia's 14-page sample sales pitch
devoted only the first two pages to the variety of products
offered by Wachovia; the remaining 12 pages were "mostly about
Pick-A-Pay loans and how 'savvy homeowners can turn their
mortgages into smart financial planning tools' in today's
economy."

64. Sharren McGarry, in her December 10, 2008 interview
with MSNBC.com, confirmed that Wachovia employees were encouraged
to push Pick-A-Pay loans by downplaying the unsuitability of
negatively-amortizing loans for most borrowers:

> McGarry says she was encouraged to promote
> the idea that with Pick-A-Pay loan the
> borrower could pay less than the full monthly
> payment and set aside the difference for
> savings or investment. The pitch includes
> sales literature comparing two brothers. One
> took the Pick-A-Pay loan, made the minimum
> payment and put the payment in the bank. The
> second brother got a conforming loan. Five
> years later, both brothers needed to pay
> their children's college tuition.
>
> "(The brother with the conforming loan)
> didn't have the money in the bank," said
> McGarry. "And the brother that had the pay-
> option ARM could go to the bank and withdraw
> the money and didn't have to refinance his
> mortgage. That's how they sold it."
>
> McGarry said the sales pitch downplayed the
> impact of negative amortization. When the
> loan principal swells to a set threshold
> . . . the mortgage automatically "recasts" to
> a higher, set monthly payment that many
> borrowers would have a hard time keeping up
> with.

65. By engaging in such practices, Wachovia artificially boosted its short-term earnings without publicly disclosing the riskiness of its lending practices, the skewed nature of its employee incentives, and the looseness of its underwriting requirements. According to one confidential informant cited in the Class Action Complaint:

> CW 3 also recalled that the riskier Pick-A-Pay loans offered Wachovia a larger margin than the more conventional loans. Prior to the acquisition of Golden West and the adoption of the Pick-A-Pay loan program, Wachovia's loan closing costs were typically around $600, but once it started to sell the Pick-A-Pay loans, those same closing costs were around $4,800. These closing costs are almost 7-1/2 times larger than those associated with traditional mortgages. Knowing this, it becomes clear why the more conventional, less risky mortgage loans were all but abandoned. This expanded margin had an immediate impact on Wachovia's bottom-line. Without accounting for the extraordinarily higher added risk of fault by properly adjusting allowances for loan losses, to the investing public Wachovia appeared to be enjoying significant, although artificial, growth.

66. Wachovia's push to maximize its output of Pick-A-Pay loans at all costs marked a significant departure from even Golden West's prior practice. The Class Action Complaint alleges that:

> CW 4 explained that, prior to the merger, Golden West had cultivated relationships with several lenders that, unlike Golden West, offered conventional fixed rate mortgages, and would refer potential clients to such lenders when the Pick-A-Pay product was not

24

the "best fit."  CW 4 added that Wachovia
quickly dispensed with this philosophy and,
for the reasons discussed above, focused
solely on the numbers, i.e., the numbers of
Pick-A-Pay loans it could foist upon nearly
all customers who walked through its doors
regardless of "fit."

**Appraisals Relating to Wachovia's
Loans Were Improperly Inflated**

67.   The use of reliable home appraisals is fundamental to
the home mortgage industry.  Accurate appraisals are necessary
both to ensure that home loans at issue are adequately
collateralized and to assess the likelihood of default by the
borrower (who is more likely to default if the mortgage
obligation exceeds the value of the home).  Integral to assessing
these risks are Loan-to-Value ("LTV") ratios.  LTV ratios greater
than 80% expose lending institutions and by necessity, their
investors, to significantly greater risks than those loans with
lower LTV ratios.

68.   The LTV ratio depends entirely on the appraisal value:
for a given loan amount, the higher the appraisal, the lower the
LTV.  Without accurate appraisals, LTV ratios are subject to
manipulation, and borrowers may be issued larger mortgages than
they could realistically repay.  Artificially increased
appraisals produce artificially decreased LTV ratios, which make
a company's loan portfolio look less risky than it is in reality.

69.   The Class Action Complaint alleges that Wachovia's LTV
ratios were manipulated in this fashion:

25

After Wachovia's merger with Golden West, CW
2 served as a Loan Servicing Specialist until
October 2007. . . . .

CW 2 explained that the portfolio of loans
serviced by HomEq were all subprime loans
that Wachovia aggressively sold to its
customers.  CW 2 further stated during her
tenure in the Loss Mitigation Department, CW
2 reviewed many loans that "should not been
issued in the first place" and that it was
"common to see loans for properties that had
been over-appraised at origination."

Additionally, CW 4 explained that after
Wachovia's acquisition of Golden West,
Wachovia discontinued Golden West's policy of
exclusively employing in-house appraisers
with respect to Pick-A-Pay loans.  Instead,
Wachovia utilized outside, third-party
appraisers to value the property, and the in-
house appraisers were relegated to merely
reviewing the reports of the outside
appraisers.  CW 4 noted that this change
rendered appraisals less accurate because the
outside appraisers had a reputation for
assigning less conservative appraisals as
compared to Golden West's in-house
appraisers.

**Wachovia's Underwriting Standards Were
Weakened Under Defendants' Direction**

70.  The Defendants caused Wachovia's underwriting standards

to deteriorate significantly after the Golden West merger.  Even

as they did so, the Defendants created a false and misleading

appearance of conservative, quality-focused underwriting at

Wachovia through false and misleading public statements.

71.  Before and during the Purchase Period, Wachovia

misrepresented its purportedly "conservative" underwriting

standards in public filings, earnings calls, and investor

conferences.

     a. For example, Wachovia described its risk management in the following terms in each of its reports on Form 10-Q 2007: "[w]e continue to mitigate risk and volatility on our balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent." The Company further stated in its First Quarter and Second Quarter 2007 10-Q reports: "[t]he low level of charge-offs reflects a continuing solid credit environment, the highly collateralized nature of our loan portfolio and careful management of the inherent credit risking of our loan portfolio."

     b. Similarly, in conference calls and investor conferences before and during the Purchase Period, the Individual Defendants touted Wachovia's purportedly conservative standards and the purportedly low-risk mortgages produced by those standards.

72. Realizing that the Pick-A-Pay loan program boosted Wachovia's profit margins, Defendants actively took further steps to increase the sales volume of these toxic loans by implementing questionable procedures and encouraging Wachovia employees to engage in risky lending practices.

73. Wachovia aggressively pushed Pick-A-Pay loans to customers, regardless of whether the customers were particularly well-suited for such a loan. The Class Action Complaint alleges testimony of confidential witnesses who were privy to these

27

facts:

> According to CW 3, loan officers were instructed not to
> fully educate borrowers about the Pick-A-Pay loans.
> They were taught to aggressively sell the program and
> to emphasize to prospective borrowers the financial
> flexibility that accompanied the minimum amount option,
> but to omit information about the downsides of
> selecting this option, namely, the negative
> amortization.  Prospective borrowers were encouraged to
> use the extra money for their kids' college savings, to
> pay down credit cards, or for the purchase of a car or
> boat.

> CW 3 explained that after the merger, the underwriting
> process at Wachovia was nothing short of fraud.  As
> previously noted, the vast majority of Pick-A-Pay loans
> were stated income ("Quick Qualifier") loans. Even
> where the loan is stated-income, it is vitally
> important that a borrower's debt-to-income ratio
> indicates that he or she has the wherewithal to service
> the loan in light of his or her outstanding debt
> obligations. To qualify for Wachovia's Pick-A-Pay Quick
> Qualifier loan, a borrower's debt-to-income ratio had
> to be less than 50%. CW 3 explained that many of the
> Pick-A-Pay Quick Qualifier loans had a debt-to-income
> ratio of more than 50%.

> To get the loans approved, CW 3 and other loan officers
> and sales managers were instructed to falsify the
> amount of stated income on the loan application.
> According to CW 3, it was not uncommon for the
> following deceptive selling technique to take place:

>> Loan Officer: "Mr. X, you need to
>> make $300,000 a year to qualify for
>> this loan. Do you make $300,000 a
>> year?"  Borrower: "No, I make
>> $200,000 a year." Loan Officer: "I
>> want to make sure you understand
>> this, you have to make $300,000 a
>> year, so do you make $300,000 a
>> year?"  Loan Officers were to
>> continue this sort of exchange
>> until the prospective borrower
>> acquiesced that they did in fact
>> make the necessary sum of money.

> Indeed, CW 2 confirmed that while attempting to help

28

borrowers avoid foreclosure, it became clear that many of the documents that supported the original loan application were nonexistent or were falsified by the borrower at the behest of the loan officer.

These loans were already remarkably risky at origination because the "stated" information was not verified.  These loans were then made worse by the income falsification.

74.  The complaint filed in the related class action suit, In Re Wachovia Preferred Securities and Bond/Notes Litigation, 09 CV 6351 (RJS) ("Bondholder Complaint"), confirms these problematic practices.  According to Bondholder Complaint confidential witness CW 2 (an East Coast mortgage consultant for Golden West/Wachovia), Golden West salespersons were taught to fabricate income and employment information and borrower information and, further, "the falsification of borrower incomes which occurred at Golden West continued unabated after its acquisition by Wachovia."  Bondholder Complaint ¶¶ 152, 158. According to Bondholder Complaint confidential witness CW 5, a mortgage underwriter in Wachovia's operations center in its Charlotte, North Carolina headquarters, "loan salespeople routinely increased the borrower income listed on the loan application," and "underwriters were precluded from requesting proof of income even when they discovered that the borrower's income had been revised upward."  Id. ¶ 159.

75.  The Wachovia Bondholder Complaint similarly alleges that Wachovia routinely overrode its own underwriters' rejections of borrowers by deeming the loans "exceptions to policy," to the

29

point where the nationwide corporate policy simply was to make loans without regard to any underwriting standard. According to Bondholder Complaint confidential witness CW 2, "One of the things we were taught to sell was our underwriting, that we could make and break our own rules." Id. ¶ 153. According to Bondholder Complaint confidential witness CW 5, "Wachovia personnel continued to make use of the liberal 'Exception to Policy' or ETP protocol, and . . . approximately 30% of all loans were approved by salespeople or their superiors making exceptions to normal underwriting criteria." Id. ¶ 159.

76. According to Bondholder Complaint confidential witness CW6, a Golden/West Wachovia wholesale mortgage loan salesperson based in Connecticut, Wachovia "was always 'hyping up' the 'flexible' underwriting guidelines and its ability to make rampant exception, stating that the motto was 'Our guidelines are set in sand, not stone," and "approximately 50% of the loans he sold were approved pursuant to an exception." Id. ¶ 160. According to Bondholder Complaint confidential witness CW7, a Golden West/Wachovia underwriter in San Diego, "25% of the loans she underwrote were approved pursuant to an exception, and her decisions to reject loan applications were overriden approximately 70% of the time." Id.

77. According to Bondholder Complaint confidential witness CW 8, a Golden West/Wachovia Senior Vice President and Senior Underwriting Manager, "after the merger, underwriting managers

were instructed to use the ETP program to approve Pick-A-Pay loans that otherwise would have been denied" and "were instructed . . . to 'approve anything.'" Id. ¶ 161. According to Bondholder Complaint confidential witness CW 11, a Golden West/Wachovia Sales Manager and Assistant Vice President, "when a loan application couldn't pass muster under [Wachovia's] already lax underwriting standards, exceptions to those standards were regularly made in order to approve the loan - most commonly by waiving 'limits' (where applicable) on LTV ratios, minimum credit scores, and maximum loan amount," and "approximately 20% of all loans contained such exceptions." Id. ¶163. According to Bondholder Complaint confidential witness CW 13, a Golden West/Wachovia mortgage underwriting manager in California, "after the Golden West acquisition, the generous ETP program remained in place, and the number of exceptions to negative underwriting decisions denying the mortgage application increased." Id. ¶ 164.

### Wachovia Misrepresented the Risks Inherent in Its Practices

78. A Pick-A-Pay loan is also known in the industry as an "Option ARM," i.e., an adjustable rate mortgage ("ARM") that presents four monthly payment options.

79. Alt-A is a classification of mortgages whose risk profile falls between prime and subprime. The borrowers typically have better credit histories than a "subprime"

borrower, but the mortgage itself will generally have characteristics of a subprime mortgage, such as no income verification, low "teaser" interest rates subject to reset, or high LTV ratio.

80.  Before and during the Purchase Period, as detailed below, Defendants repeatedly maintained that their Option ARM product -- the Pick-A-Pay mortgage -- was different from and superior to other Option ARMs, Alt-A mortgages and subprime mortgages due to: (a) Wachovia's purportedly strict underwriting guidelines, including underwriting the mortgages at relatively low initial LTVs of approximately 70%; and (b) two structural features of Pick-A-Pays, namely (1) the 7.5% annual payment increase cap built into the Pick-A-Pay structure, which limited immediate "payment shock" from adjustable-rate resets, and (2) the 10-year delay before Pick-A-Pay mortgages "recast" to fully-amortizing rates.

81.  Mortgages with low LTVs experience lower risk of loss to lenders upon default than mortgages with high LTVs.  This is because a borrower with substantial equity invested in a home is less likely to default; conversely, a borrower with little or no equity in the property has less to lose upon default and thus is more likely to default.  In the extreme case, borrowers with "negative equity" in their homes -- i.e., borrowers who are paying down a loan each month whose amount is greater than the property's current value -- have little economic incentive to

continue making such payments, and are much more likely to
default.

82. Mortgages with low LTVs also experience lower (or no)
loss on defaults. A low LTV mortgage increases the likelihood
that the lender can recoup, through foreclosure sale and after
foreclosure costs, the full amount originally lent. For example,
a lender who makes a loan for purchase of a $100,000 property is
more likely to recoup its loan in a foreclosure sale if it loaned
$70,000 than if it loaned $95,000.

83. Defendants consistently touted the low initial LTV of
Wachovia's Pick-A-Pay loans -- approximately 71% -- as a primary
reason why Wachovia's Pick-A-Pay loans were experiencing lower
rates of default and loss than other Option ARMs, Alt-A mortgages
and subprime mortgages, and as justification for Wachovia's low
loss reserves.

84. In reality, and undisclosed to the investing public,
the LTV ratios of Wachovia's Pick-A-Pay loans were rising
dramatically from both the "L" end (the loan amount) and the "V"
end (the property value), so that they bore little resemblance to
the initial LTV ratios touted by Defendants. As the substantial
majority of Pick-A-Pay borrowers were picking the minimum payment
option, their loan amounts were actually rising (as, each month,
the amount of unpaid interest was added back to the loan's
principal amount). Simultaneously, property values were
declining, and declined most sharply in the very markets where

33

68% of Wachovia's Pick-A-Pay loans were originated (California and Florida). Defendants were aware ab initio that LTV ratios were thus being squeezed upwards from both ends (higher "Ls" and lower "Vs"). As LTV ratios increased, both the risks of default and the degree of loss severity also sharply increased.

85. Defendants concealed and misrepresented this rising LTV reality (and thus the reality of rising default risks and sharp loss severities) by representing Pick-A-Pay LTV ratios as lower than they were in fact. Defendants did so by citing the initial low LTVs (71%) and purported "updates" of those LTVs which represented that the LTV ratios had not materially changed since loan origination. But these updates themselves were outdated; in truth LTVs were dramatically higher than adverted, and were climbing higher still as property values continued to decline and as borrowers continued to pick the minimum payment options.

86. Defendants also consistently touted the product design of Wachovia's Pick-A-Pay loans -- and especially the 7.5% annual cap on payment increases -- as a primary reason why Pick-A-Pay loans were experiencing lower rates of default and loss than other Option ARMs, Alt-A mortgages and subprime mortgages, and as justification for Wachovia's low loss reserves.

87. In reality, the 7.5% cap did not obviate or eliminate the payment shock of Wachovia's mortgages, but merely delayed it. Across the market, subprime ARMs generally were experiencing skyrocketing delinquencies because their rates adjusted quickly

34

to fully-indexed rates: 80% of subprime ARMs had such rate resets occur after two or three years, causing a wave of subprime defaults that spiked upward in early 2007.

88.   Because – contrary to Defendants' representations – Wachovia's $120 billion portfolio of Pick-A-Pay mortgages involved the same risky subprime lending practices, the 7.5% annual payment cap did not make Wachovia's Pick-A-Pay mortgages any superior to these other mortgages, as Defendants represented, and did not justify Wachovia's low loss reserves, as Defendants claimed.   Rather, it merely meant that Wachovia's $120 billion of Pick-A-Pay mortgages would only later arrive at the levels of payment shock-inspired defaults that other subprime mortgages were currently experiencing.

89.   Compounding those misrepresentations, Wachovia failed to disclose that the Pick-A-Pay loans that it was pushing on sub-prime borrowers, pursuant to inflated appraisals and distorted employee incentives (all of which Wachovia also falsely denied), required an absurdly low annual minimum payment of 1% of the loan balance -- terms that not even World Savings had dared to offer. Floyd Norris, World Savings Bank Is Gone, but Its Loans Are Not, N.Y. Times, May 14, 2009.

90.   That means, for example, that on a $400,000 loan, with a nominal interest rate of 6% -- or $24,000 per annum -- the borrower could pay a mere $4,000 (or $333 per month) to avoid default, and simply allow the loan balance to increase by $20,000

(or \$1,666 per month); the next year, the borrower could pay a mere \$4,200 per year (\$350 per month) to avoid default, while the loan balance increased another \$21,000 (or \$1,750 per month); and so on, thus accelerating the rate of negative amortization and corresponding rate of diminution in of LTV ratios to warp speed.

91. Defendants could not honestly or in good faith claim to have maintained conservative lending practices, to have avoided the traps that plagued competitors or to be insulated from the payment shock rippling through the market in such circumstances.

## DEFENDANTS' MATERIALLY MISLEADING STATEMENTS REGARDING THEIR LOANS AND RESERVES

92. In light of the foregoing, as shown below, Defendants' statements before and during the Purchase Period were false and misleading.

93. Before and during the Purchase Period, Defendants touted Golden West's "conservative" underwriting standards, and how Golden West avoided subprime loans and took steps to ensure that the borrowers had the wherewithal to repay the loans in question. These representations were particularly important to the Investors as the overall housing market and residential lending business deteriorated.

### Wachovia's 2006 Form 10-K

94. On February 28, 2007, Wachovia filed its 2006 Form 10-K, which contained its annual report and financial

36

statement for the year ending December 31, 2006. Defendants
Thompson and Wurtz signed the 10-K. Wachovia reported total
revenues of $29.95 billion, compared with $26.11 billion for
2005. Diluted earnings per share for the year were $4.63, an 11%
increase over diluted earnings per share for the previous year.
The 2006 10-K was the first annual or quarterly report by
Wachovia following the October 2006 acquisition of Golden West.

95. In discussing Wachovia's standards and methodologies
for determining when to charge off delinquent loans, the 2006 10-
K stated the following:

> The accrual of interest is generally
> discontinued on commercial loans and leases
> that become 90 days past due as to principal
> or interest, or where reasonable doubt exists
> as to collection, unless well secured and in
> the process of collection. Certain consumer
> loans that become 120 days past due are
> placed on nonaccrual status. Consumer real
> estate secured loans that become 180 days
> past due are placed on nonaccrual status,
> with the exception of certain non-traditional
> loans which are placed on non accrual status
> at 90 days past due. Generally, consumer
> loans that become 180 days past due are
> charged off. When borrowers demonstrate over
> an extended period the ability to repay a
> loan in accordance with the contractual terms
> of a loan classified as nonaccrual, the loan
> is returned to accrual status.

96. That statement was materially false and misleading, and
misstated Wachovia's actual practice for charging off delinquent
loans. In fact, Wachovia had not been charging off delinquent
Golden West Pick-A-Pay loans after 180 days of non-payment.

37

Instead, as Defendants would first admit on January 22, 2008, Wachovia had, at all times before the fourth quarter of 2007, not "recogniz[ed] the losses [until] the time of an actual property sale." Thus, the loan charge-offs recorded in the 2006 10-K were materially understated because Wachovia had not, in fact, been charging off loans at 180 days past due, but only at the time of an actual property sale.

97. In addition, Wachovia's financial statements in its 2006 10-K materially misstated and did not fairly present Wachovia's financial performance and condition, as required by GAAP and applicable SEC rules and regulations.

98. The 2006 10-K report was also false and misleading because Defendants failed to disclose the following facts:

a. Wachovia did not follow strict underwriting and loan-origination practices, including in its Pick-A-Pay mortgage portfolio;

b. A material portion of Wachovia's loans were not "highly collateralized." Declining property values and increasing obligations by Pick-A-Pay customers who were making minimal monthly payments resulted in material and dangerous increases to the collateral's LTV ratio. Furthermore, because most of the loans were made on a stated income basis and Defendants therefore had no way of confirming the credit-worthiness of many loan applicants, Wachovia's reassurances about its conservative loan-origination and underwriting practices

lacked a reasonable basis; and

      c.   Wachovia's loan loss provisions were understated and did not properly reflect the risk facing the Company, thereby inflating Wachovia's reported income.

99.  The certifications signed by Defendants Thompson and Wurtz, which attested to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were themselves misleading for the same reasons.

### April 16, 2007 Conference Call

100. In a conference call relating to the release of earnings figures for the first quarter of 2007, on April 16, 2007, CEO Thompson said:

> [L]ooking forward with the integration of
> Golden West on track, we feel confident about
> the superior credit quality of our mortgage
> portfolio, the prospects for cross-selling
> our product set in Golden West markets, and
> originating pick-a-pay mortgages through
> traditional Wachovia channels.

101. CFO Wurtz said, "One thing I can tell you is we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices."

102. CRO Truslow stated:

> As we've talked about before, the Golden West
> loans are very conservatively underwritten at
> low loan to values with particular attention
> paid to the quality of the appraisals.  Most
> appraisals are completed by in-house
> appraisers, and the appraisal process, I can

tell you it's very robust.  Over the last
several months as our teams have worked more
closely with one another through integration,
our view regarding the quality of the Golden
West underwriting practices has just
continued to grow stronger.

103.  In response to a question about the legislative
atmosphere around "exotic instruments" in the mortgage industry
and if Wachovia expected to get "caught up" in it, Thompson
stated:

[W]e don't fear it because the guidance that
we've seen would impact most people in the --
in the option ARM and -- and fixed pick-a-pay
kind of business.  But it does not affect us.
And I think that goes to the very
conservative underwriting standards and
servicing standards that the Sandlers
implemented at Golden West.  And we are
changing none of that.  So, if anything, we
think that any changes might, in fact,
benefit us relative to our competition.

104.  Contrasting Wachovia to its competitors, Thompson
stated:

I also think that many competitors were
underwriting to the introductory or teaser
rate.  And Golden West has never done that.
We've always underwritten to a fully indexed
rate, which we will continue.  I think if you
look at the credit history and right up to
the current moment, it would be hard for me
to imagine how anybody could look at our
underwriting of these loans and draw any
conclusion under -- other than we are very
responsible underwriters and servicers of
these -- of these clients.

105.  The April 16, 2007 statements were false and misleading

because Wachovia's credit quality was not superior and it did not rely on "conservative underwriting standards."

106. The Class Action Complaint alleges that confidential witnesses will testify as to Defendants' knowledge of the true facts:

> Several CWs (CW 9, CW 1 and CW 3) support the fact that Pick-A-Pay loans were sold to subprime borrowers with FICO scores well below 660 and that the loans themselves had subprime characteristics, such as being stated income or no documentation. Subprime lending is inherently risky, and to make such loans almost entirely without employment or income verification exacerbates those risks. Wachovia was in fact stretching for earnings and weakening the portfolio's credit quality. As explained by CW 3, in order to maximize the number of Pick-A-Pay loans that it was underwriting, Wachovia embarked upon a scheme to falsify prospective borrower's income in order to qualify the borrower. According to CW 4, the priority at Wachovia was to sell as many Pick-A-Pay loans as possible, despite the availability of more traditional mortgages.

**False Statements Concerning Appraisals**

107. During the April 16, 2007 conference call, Truslow also addressed Golden West's purportedly rigorous appraisal process by stating "[a]s we've talked about before, the Golden West loans are very conservatively underwritten at low loan-to-values with particular attention paid to appraisals." Linking Golden West's past practices to those employed by Wachovia, Truslow added "[m]ost appraisals are conducted by in-house-appraisers and the appraisal process, I can tell you it's very robust." At the same

time, Wurtz assured investors "We're sticking to the Golden West
model and are not going to struggle for higher originations at
the expense of damaging the business model we purchased . . . ."

108. Wachovia made similar misrepresentations about the
purported quality of its appraisals throughout the Purchase
Period.  In a September 10, 2007 presentation at a Lehman
Brothers Financial Services Conference, defendant Thompson
contrasted Wachovia's in-house appraisal process for its Pick-A-
Pay loans with the "outsourced to market appraiser" approach of
Wachovia's competitors, and stated that: "We have 1100 appraisers
who are charged with giving the right value for houses and they
are held accountable for that.  We are not buying appraisals to
meet the needs of the borrower."  Defendant Truslow repeated this
boast at a November 9, 2007 presentation to the Bank Analysts
Association of Boston Conference.  And again, during Wachovia's
January 22, 2008 Q4 2007 earnings conference call, Truslow
stressed that "Golden West's underwriting practices focused on
rigorous appraisal process," and that Wachovia use of its "own
appraisers embedded in the market" was a competitive "advantage."

109. Similarly, Deutsche Bank noted in its January 22, 2008
4Q07 Wachovia earnings review: "Per the company, mitigants to a
potential spike in loss rates to a multiple above historical
levels are Golden West's (now Wachovia's) in-house appraisal
process (not outsourced to third-parties who don't get paid if
the loan is not closed) . . . ."

42

110. These statements were false and misleading. The Class
Action Complaint alleges that confidential witnesses will testify
to Defendants' knowledge that such statements were false:

> As recounted by CW 4, after the acquisition,
> Wachovia did not follow Golden West's
> tradition of utilizing in-house appraisers to
> value properties for Pick-A-Pay loans, but
> instead used outside, third-party appraisers.
> In fact, according to CW 4, after the
> acquisition, Wachovia's in house appraisers
> were relegated to merely reviewing the work
> done by the outside appraisers. CW 4 added
> that the outsourcing of appraisals made them
> less reliable because the outside appraisers
> had a reputation for assigning higher value
> to homes as compared to Golden West's
> appraisers.

111. Wachovia's misstatements regarding its use of in-house
appraisers were particularly material to investors because, as
stated above, Wachovia repeatedly touted Golden West's rigorous
in-house appraisal process as one of the cornerstones of the
Pick-A-Pay loan's historical success.

**Wachovia's First Quarter 2007 Form 10-Q**

112. Commenting on its management of credit risk, Wachovia
stated in the First Quarter 2007 10-Q, which was filed with the
SEC on May 4, 2007 (emphasis added):

> The low level of net charge-offs reflects a
> continuing solid credit environment, the
> highly collateralized nature of our loan
> portfolio and our <u>careful management of the
> inherent credit risk in our loan portfolio.</u>
> The Golden West portfolio has a long record
> of extremely low net charge-offs, including,
> virtually none for the past eight years,
> reflecting <u>strong underwriting and credit</u>

43

risk management.

113. For the reasons previously stated, this representation was materially false and misleading.

**July 20, 2007 Conference Call**

114. On Wachovia's July 20, 2007 earnings conference call, defendant Truslow stated that the turbulence in the Capital Markets did not pose significant risk to Wachovia (emphasis added):

> I thought I would just make a couple of comments switching gears about the turbulence in the capital markets and the impact on Wachovia. Overall, I feel like we are in very good shape. . . . . Probably not appropriate to get too specific around the numbers at Wachovia, but acknowledging there would be a high level of interest in that but for competitive reasons I want to be a little careful of how specific we get but we view the risk to Wachovia [sic] what's currently happening is very modest. . . .

115. Discussing Wachovia's exposure to subprime mortgages, Truslow said (emphasis added):

> . . . [G]iven that we don't have a sub-prime focus in our business and that our home equity loan exposure is . . . modest . . . we are very comfortable with our allowance coverages at the end of the quarter.
>
> \* \* \* \* \*
>
> As for subprime in our Capital Markets businesses, and in our origination businesses, we shied away from diving into this business over the last few years as the

market took off really for two reasons. One is given the firm's prior experience in the subprime market in the late '90s and also, importantly, the view of our Capital Markets group that the risk in this area has been underpriced for quite some time, so we just haven't felt that it has been a business that's made good sense for us and, therefore, <u>we've actively managed our business to minimize our exposure to the subprime market. So as a result there's been little impact to our businesses with the turbulence in the subprime markets and we don't anticipate any meaningful potential impact to earnings from subprime going forward.</u>

116. Further commenting on the Company's subprime exposure, Steve Cummings, Wachovia's head of corporate and investment banking, said (emphasis added):

But very quickly on a couple key markets, the subprime and CDO businesses, which Don touched on. As he said, we have avoided the origination side of subprime for some time. <u>We don't have that origination platform plus when we have brought platforms in that did have subprime activities over the last 18 to 24 months we have purposely exited that portion of the business</u>.

117. Truslow discussed Wachovia's Pick-A-Pay product (emphasis added):

I do want to remind everybody that our pick a pay product, which is our option payment. ARM is structured with caps that limit the amount customer's payment may increase in any given year to no more than 7.5% of the payment. So on a $1,000 mortgage payment that would be a $75 increase from one year to the next and therefore, I just want to point out that payment shock in our option ARMs is just not an issue here at all. It's really not an

45

issue with the product. Given the
environment, again, we're not surprised to
see the residential non-performs trend up as
we noted last quarter, it's what we've been
expecting and I would anticipate that we'll
continue to see some trend up over the next
few quarters as well.  <u>But because the way
these loans are underwritten, we're not
seeing any meaningful increases in losses in
the portfolio and we don't expect to see any
rises and losses we look forward over the
next few quarters and so the underwriting
process and how these things are booked and
what we're ultimately relying upon holding up
very well as expected.</u>

118. The First Quarter 10-Q and the July 20, 2007 conference

call statements were false and misleading.  Wachovia had engaged

heavily in subprime lending in contravention of Truslow's claim

that the Company "actively managed [its] business to minimize its

exposure to the subprime market."  Wachovia's disregard of the

measure of borrowers' assets or verification of their income, not

to mention its active encouragement of borrower fraud, belied the

10-Q's claims of "careful management of risk" and "strong

underwriting and credit risk management."  As the Class Action

Complaint alleges:

> According to CW 5, Wachovia originated Pick-
> A-Pay loans for borrowers with FICO scores
> even lower than 600 -- far lower than the
> Federal Reserve's Guideline setting the FICO
> score cut-off for a subprime borrower at 660
> or below -- if they provided certain minimal
> documentation.
>
> Moreover, according to CW 1 Wachovia had
> embraced subprime originations for borrowers
> with FICO scores in the mid-600's on a
> stated-income basis.  CW 1 added that for

46

> many stated-income loans, FICO scores were
> not required at all if the loan fell below a
> certain LTV threshold.  According to CW 9 and
> CW 3, lending to subprime borrowers almost
> exclusively without documentation and
> verification of income or assets created the
> perfect storm of increased risk. As stated by
> CW 4, when coupled with its "sell Pick-A-Pay
> at any cost" philosophy, the already high
> risk of credit loss was made much worse.

119. Because these risky subprime lending practices were integral to Wachovia's post-merger business model and represented its core operations, and because Truslow was responsible to monitor such practices, Truslow knew of or was reckless to these practices when he falsely represented Wachovia's superior underwriting and lack of exposure to subprime lending.

120. Wachovia's underwriting practices were not tightened until mid-2008 when Wachovia began requiring underwriters to "verify assets and employment before making a mortgage loan that it intends to keep in its portfolio."  Wachovia Adjusts Mortgage Underwriting Guidelines, Sacramento Business Journal, Apr. 11, 2008.  Under these conditions, Truslow could not have actually believed and had no basis for stating that Wachovia's portfolio would hold up well in a turbulent market.

**Wachovia's Second Quarter 2007 Form 10-Q**

121. In the Second Quarter 2007 10-Q, filed with the SEC on July 30, 2007, Wachovia again falsely described its management of credit risk (emphasis added):

47

> Consumer net charge-offs were $249 million,
> up from $112 million in the first six months
> of 2006 . . . . The low level of net charge-
> offs reflects the highly collateralized
> nature of our loan portfolio and our <u>careful
> management of inherent credit risk.</u> Our
> consumer real estate portfolio has a long
> record of relatively low net charge-offs,
> <u>reflecting strong underwriting and credit
> risk management.</u>

122. These representations, which were identical to statements made in the prior quarters' 10-Q filings, were materially false and misleading for the same reasons.

**October 19, 2007 Conference Call**

123. On an October 19, 2007 earnings conference call, CEO Thompson made a partial, but materially false and misleading, disclosure about Wachovia's subprime exposure:

> I would say that as we looked at results, I
> think the biggest disappointment for me is
> that of those $1.3 billion in marks, we had
> about $300 million, roughly $300 million in
> losses on AAA subprime paper that was, in
> trading desks or in inventory. And the thing
> that disappoints me about that is we have an
> institutional bias here against subprime.  We
> avoided it in our origination efforts and we
> avoided it in, for the most part, in our
> securitization efforts. So, frankly, I think
> we had a little bit of a break down in having
> AAA subprime in some of our portfolios that
> we took losses on. I do think it is really
> quite amazing that we could take $300 million
> of losses on AAA paper.  We didn't expect
> that that paper could degenerate that fast,
> with that kind of swiftness.

124. The October 19, 2007 conference call statement is false

because Wachovia was not, as a matter of Company policy, against subprime lending whether in origination or securitization. Wachovia purchased Golden West knowing that it specialized in non-traditional, subprime lending.  After the acquisition, Wachovia continued to aggressively originate Pick-A-Pay loans to subprime borrowers.  Despite having more traditional loans available, its priority was to sell Pick-A-Pay at any cost, including to those borrowers that had no realistic ability to repay the loan.

### Wachovia's Third Quarter 2007 Form 10-Q

125. In the Third Quarter 2007 10-Q, filed with the SEC on November 9, 2007, Wachovia reported that the Company was setting aside $600 million and that the value of securities it owned linked to subprime mortgages dropped by $1.1 billion in October 2007.  Despite this partial disclosure about its losses on subprime mortgage-backed securities, Wachovia continued to make positive representations about its management of credit risk in the Third Quarter 2007 10-Q:

> While our outlook indicates a rise in the
> overall level of charge-offs at this point in
> the credit cycle, we believe the well
> collateralized nature of our real estate-
> secured portfolio, our careful management of
> inherent credit risk and strong underwriting
> will position us relatively well in a more
> uncertain credit environment.

126. This statement, which repeated Wachovia's statements

49

throughout the Purchase Period, was materially false and misleading for the reasons previously stated.

### November 9, 2007 Conference Call

127. On November 9, 2007, Defendant Truslow gave a presentation on Wachovia at a BancAnalysts Association of Boston Conference.  Acknowledging that the market was in a down cycle, Truslow falsely claimed that the impact on Wachovia would be diminished because "we also start from a position where underwriting has been disciplined and very thoughtful over the last several years, even in an environment that got very, very frothy and where we saw credit standards and pricing weakened very substantially."

128. By that time, the risks of and losses from Option ARMs (of which Wachovia's Pick-A-Pay was one variant) were a prominent focus of market concern.  Noting that Wachovia's "Pick a Pay product gets a lot of attention" and that Wachovia's Pick-A-Pay mortgages "are often compared with other option ARMs available in the marketplace," Defendant Truslow sought to defuse market concerns by insisting, falsely, that "there really are very significant differences in the product" that made Wachovia's Pick-A-Pay mortgage immune from the risks and losses then apparent in other subprime and Option ARM mortgages.

129. First, Defendant Truslow represented that Wachovia originated its Pick-A-Pay mortgages for its own portfolio, rather than to be securitized and sold off, so Wachovia was motivated to

produce safer, less risky mortgages:

> First of all, this is a portfolio product for
> us. We are a portfolio lender and that is
> important because everybody in the chain of
> these loans basically treats this with --
> these loans with a cradle to grave mentality.
> So the appraisers, the underwriters, the
> relationship managers to their management
> team, this is not an originate and dump into
> the capital market and be done with it sort
> of product. This is a product where people
> are measured and their performance rewarded
> or penalized, based upon the long-term
> quality and value of these loans that are
> being created.

130. This statement was materially false and misleading.
Wachovia underwrote its Pick-A-Pay mortgages on the basis of
"stated" income, the same standard prevalent in the mortgage
securitization markets.  Wachovia's Pick-A-Pay mortgages were
thus not distinguished from mortgages originated for
securitization, but in truth shared exactly the same low
origination standards and heightened default risks.  Further,
Wachovia's compensation structure and origination practices were
not based on "the long-term quality and value of these loans that
are being created", but rather on rewarding increased Pick-A-Pay
origination volume and short term profits at the expense of the
loans' long-term quality and value.

131. Defendants made exactly the same misrepresentations,
which were false and misleading for exactly the same reasons, in
later earnings conference calls and in later investor conference
presentations of November 14, 2007 and February 13, 2008.

132. Second, Defendant Truslow emphasized the quality and rigor of Wachovia's "in house appraisers."  These representations were materially false and misleading for the reasons specified herein.  Defendants continued to make similar misrepresentations throughout 2007 and much of 2008.

133. Third, Defendant Truslow represented that the Pick-A-Pay product design, and particularly the 7.5% annual rate reset cap, distinguished Wachovia's Pick-A-Pay mortgages from other subprime adjustable rate loans then experiencing high rates of default due to rate resets that produced "payment shock" and spiking defaults.  Defendant Truslow asserted that, for Pick-A-Pay mortgages, "resets here just really aren't an issue":

> It is also a consumer friendly product from a resets standpoint. Obviously resets from the 2/28 and the 3/27 that are on the market are of significant concern, particularly in the subprime sector. Our product basically has a 7.5% payment cap on the minimum payment which protects consumers. So payment resets here just really aren't an issue . . . .

134. The "2/28" and "3/27" subprime mortgages referred to by Defendant Truslow were hybrid adjustable rate mortgages ("hybrid ARMs") that: (1) offered a low, fixed "teaser" rate for either 2 or 3 years, after which (2) they reset to sharply higher adjustable rates, generally exceeding 11%, for the remaining life of the mortgage (either 28 years or 27 years).  Such mortgages accounted for in excess of 80% of all subprime mortgages originated during 2005 and 2006.

52

135. Defendant Truslow's representations were materially false and misleading. The 7.5% payment cap on Pick-A-Pay mortgages did not obviate or eliminate the risk of adjustable payment rates resetting (or recasting) to levels that would induce "payment shock" and default, but merely deferred that risk into the future. Since Wachovia had not in fact adhered to conservative underwriting standards, and had a portfolio full of risky subprime mortgages, Wachovia's Pick-A-Pay mortgages were certain to adjust to exactly the same increased rates, produce exactly the same payment shock, and result in exactly the same spike in defaults as the subprime market generally. The only difference was that, due to the 7.5% annual rate reset cap, this would occur in slow motion for Wachovia. Wachovia did not avoid the spike in defaults and losses then evident in the subprime market, but merely deferred its recognition.

136. Defendants were aware of this reality but denied it in their public statements. Defendants repeated the same false and misleading misrepresentations in earnings conference calls and presentations on November 14, 2007, January 22, 2008, January 30, 2008, February 13, 2008, March 12, 2008, and April 14, 2008. Defendants falsely assured investors that Wachovia was immune to default and loss risks that in fact were imminent.

137. Fourth, Defendant Truslow falsely distinguished Wachovia's Pick-A-Pay mortgages by representing that their low LTV ratios functioned to protect Wachovia from loss even upon

53

mortgage default:

> So very different than some other products
> and then, of course, conservative loan to
> value is on top of the more conservative
> appraisal process that we have. Very few
> loans made above 80% and where we have lent
> above 80% we have required mortgage
> insurance. So on most properties at the
> outset we've acquired 20 to 30% real cash
> equity on the front end.

138. Defendant Truslow's representations concerning the safety provided by the purportedly low and conservative LTV ratios of Pick-A-Pay mortgages were materially false and misleading. Though the initial LTV ratio at origination may have been relatively low, the current LTV ratios were already substantially higher and continuing to climb. The majority of Pick-A-Pay borrowers picked the "minimum amount" payment option: therefore, with each monthly payment, their loan balance was in fact increasing. As the loan balance increased, so did the LTV (the "L" being the loan balance). Simultaneously, as property prices were declining, especially in California and Florida, where 68% of Wachovia's Pick-A-Pay loans were made, the property values were experiencing double-digit declines. As property values declined, LTV increased (the "V" being the property value). In short, Wachovia's mortgage LTV were being squeezed upwards on both the "L" end and the "V" end.

139. Defendants publicly misrepresented, concealed and denied the reality of these high and ever-higher LTV ratios until

mid-2008.  Defendants repeated the same false and misleading

misrepresentations during earnings conference calls and

presentations on November 14, 2007, January 22, 2008, January 30,

2008, February 13, 2008, March 12, 2008, and April 14, 2008.

Defendants thus falsely assured investors that Wachovia was

protected from losses when, in truth, Wachovia was exposed to

substantial and severe losses.

140. Finally, notwithstanding his previous assurances to

investors, on November 7, 2007, Truslow made a partial, but still

false and misleading disclosure, at a BancAnalysts Association of

Boston Conference, similar to Thompson's false statements on

October 19, 2007:

> Clearly we could have done a better job
> around subprime on -- for the company that
> has had such a negative bias towards
> subprime.  We didn't leap into the
> origination side. We stayed away from a lot
> of the businesses that evolved and grew
> beginning just a couple of years ago yet we
> found ourselves in this downdraft with
> pockets of subprime exposure that
> essentially, there were investments or
> positions taken in various places across the
> platform.  Mostly in the form of what we
> believe to the very high-quality assets,
> AA[A], Super Senior AAA, and adjunct to that
> is that where those decisions were made, they
> probably didn't involve the expertise and
> talent of the part of the platform that
> really had the most experience around
> residential mortgages and subprime, probably
> too reliant on the ratings and taking too
> much comfort in historical performance around
> securities with those ratings.

141. These statements about Wachovia's "negative bias toward

subprime" and that Wachovia "didn't leap into the origination" of subprime loans were false and misleading. Wachovia was not against subprime lending whether in origination or securitization, and in fact originated such loans. Wachovia purchased Golden West knowing that it specialized in non-traditional, subprime lending. After the acquisition, Wachovia continued to aggressively originate Pick-A-Pay loans to subprime borrowers, and its core business became the sale of Pick-A-Pay mortgages at any cost, including to borrowers who had no realistic ability to repay the loan.

### November 14, 2007 Conference Call

142. On November 14, 2007, the President of Wachovia's General Bank division, Ben Jenkins, provided a presentation on Wachovia at Merrill Lynch's Banking and Financial Services Investor conference.

143. Mr. Jenkins repeated Defendant Truslow's above-detailed misrepresentations of November 9, 2007 as to purported distinguishing features of Wachovia's Pick-A-Pay loans that purportedly rendered them safer than other subprime and option ARM mortgages and/or immune to the risks of default and loss then evident with respect to those other mortgages:

> First of all, it operates as a portfolio
> product. . . .  So, the performance of all of
> these Wachovia personnel is tied to the
> performance of the loan. What I'm trying to
> say is we own that loan to a far greater
> degree than if it was just originated and

56

quickly shipped into the capital markets.

\* \* \*

The appraisal process is, again, done by somebody on staff, a Wachovia appraisal, who knows the market, knows the submarket, and the only pressure that appraiser feels is the pressure to get it exactly right from a value standpoint . . . .  And we have protections built in for the borrower in terms of how much movement that can be in the payment rate. The payment rate can only move up 7.5% year to year. So if rates move up dramatically, the borrower's payment rate only goes up 7.5% . . . .

\* \* \*

Now, the fourth fundamental for good performance is superb risk management, and that has, I think, long been the hallmark of our company . . . .  And with the addition of Golden West, our real estate portfolio has a loan to value at origination of 71% . . . .

144. These representations -- as to the "portfolio" quality of Wachovia's originations and loans, Wachovia's "in house" appraisals, Wachovia's insulation from rate-reset-induced payment shock, and Wachovia's low LTV ratios -- were false and misleading for the reasons already alleged above.

145. Mr. Jenkins further sought to distinguish Wachovia's mortgages from other mortgages bearing high risks of default by asserting that: "The underwriting we do on this product is to the fully-indexed rate, not to a teaser rate."

146. This representation was materially misleading.  A mortgage underwritten on the basis of the borrower's ability to pay the low, initial "teaser" rate has a high risk of default,

because the borrower's ability to bear the "payment shock" upon rate reset is in doubt. Jenkins represented that Wachovia was immune to this risk, because Wachovia purportedly underwrote mortgages on the basis of borrowers' ability to pay the high rate (the fully-indexed rate) to which the mortgage would reset. This was false. In truth, Wachovia was underwriting its Pick-A-Pay mortgages on the basis of borrower income merely "stated" by the borrower rather than verified by the lender. Underwriting mortgages on a "stated income" basis rendered underwriting at the "fully indexed rate" a fiction. The borrower's ability to pay that fully indexed rate had not in fact been determined or verified. Thus, Wachovia was exposed to the very default risks that it represented it had avoided.

**January 22, 2008 Conference Call**

147. On January 22, 2008, Wachovia held a conference call to discuss its full-year 2007 results. Defendant Thompson began the call with a set of misrepresentations which capture the essence of plaintiffs' claims here (emphasis added):

> Nevertheless, based on recent action in our stock price, I'm certain that investors are anxious about several questions on Wachovia which I want to address now. The first question is: "What is the level of losses in your Pick-A-Pay mortgage portfolio?". . . . [O]ur Pick-A-Pay portfolio will generate very meaningful bottom-line profits in 2008, and I do not believe that investors grasp that fact today.
>
> The second question: "Does Wachovia have

enough capital?" After our December preferred offering, <u>Wachovia's capital levels were higher at year end than at the end of the third quarter</u>, in spite of the marks, and in spite of the reserve build that we did in the fourth quarter. <u>And we're confident that those capital levels will increase as we go through 2008.</u>

And the third question: "Will Wachovia cut its dividend?" And the answer to that question is <u>we have no plans to cut the dividend, because we do not need to cut the dividend. We're confident in our ability to meet our 2008 business plan</u>, and that plan as we have said before, will generate cash earnings that will cover our dividend payments, continue to build necessary credit reserves, improve our capital ratios and support growth in our business lines.

148. Defendant Thompson's statements were correct in the limited sense that: (a) these were the most prominent questions facing Wachovia; (b) the answers to these questions were inter-related; and (c) investor concerns as to these matters, as Defendant Thompson conceded, had already depressed Wachovia's share price.

149. However, Defendant Thompson's "answers" to these three inter-related questions were materially false and misleading, had no basis in fact, and sustained Wachovia's share prices at artificially-inflated levels.

150. In truth, the level of losses in Wachovia's $120 billion Pick-A-Pay portfolio was far greater than Defendants had publicly acknowledged.

151. These concealed, publicly-misrepresented and publicly-

denied realities pertaining to Wachovia's Pick-A-Pay portfolio
meant: (a) that enormous loan losses were then inherent in the
Pick-A-Pay portfolio, known to Defendants though concealed by
Defendants to the public; (b) that such losses would cut deeply
into Wachovia's capital levels, which would diminish rather than
increase; and (c) that such Pick-A-Pay losses and such capital
erosion would require Wachovia to eliminate dividend payouts, so
as to conserve capital and funds with which to provision loan
loss reserves.

152. During the January 22, 2008 earnings conference call,
Defendants presented a highly misleading impression of the health
of Wachovia's Pick-A-Pay portfolio, and thus of Wachovia's
fundamental financial condition.  Defendant Wurtz assured
investors that dividend payments were safe and made positive
remarks as to Wachovia's liquidity.  Defendants Wurtz and
Truslow, supporting Defendant Thompson's misrepresentations
concerning Wachovia' Pick-A-Pay portfolio, Wachovia's
capitalization, and Wachovia's ability to continue to pay
dividends, made reference to a series of charts they had prepared
which purportedly demonstrated that Wachovia's Pick-A-Pay
mortgages were performing like prime mortgages, rather than like
troubled Alt-A and subprime loans, and were thus at little risk
of default and loss (emphasis added):

> WURTZ: First, as [Ken Thompson] mentioned our
> intention is to execute on our 2008 plan that
> keeps the dividend very safe, provides ample

capacity to build reserves, support balance
sheet growth and permits us to meaningfully
grow our capital base.

WURTZ: Turning to page three, details on
strong liquidity positions both as the bank
and the holding company level. We are
confident that we are very well positioned to
deal with challenging markets and it
continued our very disciplined approach to
modeling our liquidity needs in this
environment. We believe, we're one of the
most liquid players among the major peers. We
also believe that given the highly secured
nature of our loan portfolio, our capital
levels are appropriate, given our risk
portfolio compared to peers. However, we
understand the power of the uptake of ratios,
and as I mentioned earlier, we will take due-
diligent and balanced approach to rebuilding
capital levels, while we invest in the
future.

WURTZ: [T]here is clear evidence that our
Pick-A-Pay portfolio is, to date, performing
very similar to that of the average prime
portfolio in the industry, in terms of 60 day
delinquency, as an example. . . .

                    * * *

TRUSLOW: Given the stressed mortgage markets,
and the fact that the underwriting for
Wachovia's Pick-A-Pay product is different
from what is a typical option payment ARM,
and therefore admittedly a little difficult
to categorize against other more common
products, we've included the next two slides
to provide some help in better understanding
how this portfolio is performing in this
market, against traditional prime, Alt-A, and
subprime loans.

So if you'll slip over to slide 18, this
charts the Wachovia Pick-A-Pay 90 day past
due ratios, in the green diamond line, and
the Wachovia overall mortgage portfolio loans
inclusive of Pick-A-Pay is in the darker blue
small square line, against prime, Alt-A, and
subprime industry results, and you can see
that the Wachovia results are performing well

> measured against Alt-A, and just modestly
> worse than prime. And of course subprime
> performance has been rather dismal . . . . We
> provided this to the extent that it would be
> helpful . . . . But we think that slide 18,
> in aggregate tells a story that is maybe not
> well understood in the market.

153. These statements were materially false and misleading. Subprime and Alt-A default rates were spiking because those mortgages were experiencing "payment shock" following uncapped rate resets, which often increased borrower payment burdens by 30% or more immediately. Wachovia's Pick-A-Pay mortgages did not become delinquent or default at the same rate because the rate resets on Wachovia's mortgages were capped at 7.5% per year. As a result, Wachovia's mortgages had not yet adjusted to "payment shock" levels. But that did not mean they would not so adjust, only that the adjustment was temporarily deferred. Because the same problems existed, Wachovia's Pick-A-Pay mortgages were certain to reset to exactly the same high payment levels and produce exactly the same high rates of default. Wachovia's loans thus were not out-performing the market in any meaningful sense.

154. Defendants repeated the same false and misleading misrepresentations during earnings conference calls and presentations on January 30, 2008, February 13, 2008, and April 14, 2008. By these representations, Defendants falsely assured investors that Wachovia was protected from losses when, in truth, Wachovia was exposed to substantial and severe losses.

155. In addition, Defendants continued on January 22, 2008

to misrepresent and conceal the reality of the high and ever

higher Pick-A-Pay LTV ratios.  For example, Defendant Truslow

represented that the initial LTV of the Pick-A-Pay mortgages was

71%, and that the current LTV ratio essentially unchanged at 72%:

> For the pick-a-pay product, the portfolio has
> an original loan-to-value of about 71%, and
> an original FICO score of about 673, and as a
> reminder, the Golden West underwriting
> practices focused on a rigorous appraisal
> process, and the borrower's ability to fund
> 20% to 30% of the purchase price up front.
> Using estimated current valuation updates
> that we ran in November, the average current
> loan-to-value across the portfolio, is
> basically unchanged from origination, coming
> in around 72%.

156. This representation was materially false and

misleading, and was reiterated by Defendants on January 30, 2008,

February 13, 2008, and March 12, 2008.  In truth, LTV values

across Wachovia's Pick-A-Pay portfolio were already far higher,

as Defendants would later admit in various disclosures between

April 2008 and October 2008, and thus the risks of default of

loss were far higher than Defendants admitted.

157. Although Defendants conceded the general proposition

that declining property prices in California and elsewhere were

exerting upward pressure on LTV ratios, Defendants further

represented -- falsely -- that such pressure was the exception

with respect to Wachovia's Pick-A-Pay portfolio, rather than the

rule.  For example, Defendant Truslow represented that Wachovia

had identified and reserved for a $8 billion subset of the $120

billion Pick-A-Pay mortgage portfolio -- i.e., a mere 6.67% of
the Pick-A-Pay portfolio -- where Pick-A-Pay LTV ratios were
expected to rise above 95%:

> We've begun experiencing higher loss rates
> where we have loans in markets, that
> experienced rapid price depreciation since
> 1999, and are now seeing rapidly declining
> trends in housing values. Most of the build
> in the allowance for the Pick-A-Pay product
> is for the loans in those markets where the
> current loan-to-values have risen, or are
> expected to rise above 95%, were originated
> over the last three years, and are exhibiting
> a higher likelihood of default. So when you
> carve out this pool of loans, it constitutes
> about $8 billion of the $120 billion Pick-A-
> Pay portfolio.

158. Defendants repeated this misrepresentation on February
13, 2008 and March 12, 2008.

159. Similarly, on January 22, 2008, Defendant Truslow
represented that less than $1 billion of Wachovia's entire
mortgage portfolio (including both Pick-A-Pays and traditional
mortgages) had LTV ratios of 90% or more.

160. This representation was materially false and misleading
and turned reality on its head.  Many of Wachovia's portfolio of
Pick-A-Pay loans were now approaching a 90%+ LTV ratio due to (a)
sharp property price declines in California and Florida, where
68% of Wachovia's Pick-A-Pay loan portfolio was concentrated, and
(b) the fact that most Pick-A-Pay borrowers' were making minimum
payments, causing their loan balances to grow.

161. Truslow also misled investors by downplaying loss

severities nearing 25% on defaulting mortgages. Truslow falsely represented that such loss severities were the exception, rather than the norm, that they were the worst-case scenarios, and that the apparent loss severity merely reflected Wachovia's purported discipline in "moving" foreclosed properties quickly (emphasis added):

> In December severities, I believe, got to just under 25%, so again <u>you have to take that in light of where most of these sales have been, so the most severely impacted properties. And we have been helped by the fact that we had 20%, 30% real equity on the front-end . . . .</u>
>
> * * *
>
> That would be the loss against the value of the loan. So if you think about some markets in California that have given up 25%, 30% from their peak, that could entirely take away the equity that the borrower put in on the front end, and maybe a little more, and then you take into account the foreclosure costs, cost of fixing up the property, going through foreclosure, the commissions that we're willing to pay to get the house moved, <u>we've been willing to take some possibly higher severities in some markets, to get the properties moved . . . .</u>

162. Truslow's "spin" on the facts was materially false and misleading. Truslow falsely represented that such cases (where the LTV ratio was one hundred percent) were the exception, and that Wachovia's mortgages' LTVs were essentially unchanged from their original values (71% at origination, 72% now). In fact such cases were not exceptional and Wachovia's mortgages' LTV

ratios were materially higher than their original values.

163. Furthermore, a primary metric used to assess the adequacy of a company's loan loss reserves is the ratio between comparing the amount of the loan loss reserve to the amount of non-performing loans. During Wachovia's January 22, 2008 conference call, Sandler O'Neill analyst Kevin Fitzsimmons pointed out that this ratio at Wachovia was substantially lower than at peer lending institutions, and asked why -- in light of that fact -- investors should not conclude that Wachovia was substantially under-reserved.

164. Defendants' answer -- that Wachovia's loan portfolio was of higher quality than the portfolios of its peers, and that Wachovia's loan portfolio was well-secured by the underlying collateral -- was false and misleading. This answer was repeated by Defendants on February 13, 2008 and March 12, 2008. In truth, Wachovia's loan portfolio suffered from the same risky underwriting, such as "stated income" origination, as its peers' subprime and Alt-A mortgages, and exposed Wachovia to the same risks of default; those default risks were simply hidden in the short-term because of the 7.5% annual cap on rate resets. Similarly, due to declining property prices and increasing loan balances, coupled with inflated appraisals at origination that understated the LTV at origination, Wachovia's loan portfolio was now de facto a portfolio of high LTV loans. Therefore, it was no different than peer portfolios of "no money down" loans and other

66

loans originated with high LTVs, and was exposed to exactly the
same increased risks of default and sharpened loss severity
inherent in high LTV loans.

165. Finally, Defendant Thompson closed the January 22, 2008
conference call with the following materially false and
misleading wrap-up (emphasis added):

> And I think, in addition to that, if you look
> at the provision expense in the fourth
> quarter, and if you look at what we're
> planning going forward, I think <u>we're being
> very conservative from a point moving
> forward. So I think we are being very
> conservative, and I think we are optimistic
> about the future given the conservatism that
> we've already taken, and that's why we feel
> comfortable giving the kind of guidance that
> we've given you, as far as covering the
> dividend, growing capital ratios,</u> growing our
> business, and we're optimistic about
> Wachovia. Frankly, <u>it's just hard for me to
> understand the impact that our stock price
> has taken over the last three months,</u> because
> I look at how we compare to others, and I
> feel very good about where Wachovia is.

166. This statement was materially false and misleading, for
all the reasons alleged immediately above. Wachovia was sitting
on the world's largest portfolio of option ARMs, $120 billion of
Pick-A-Pay loans. Those mortgages had been originated on a stated
income basis, which increased the risk of their default.
Although Wachovia purported to originate the loans at low LTVs
that would insulate Wachovia from loss upon default, it did so
based on inflated appraisals; those mortgages now had high LTVs
and -- much higher LTVs than if the values reflected in the

original appraisals were honest and accurate -- thus exposing Wachovia to increased risks of default and sharp loss severity upon default.

167. And the worst was yet to come, because the 7.5% annual rate reset caps on Wachovia's mortgages would only temporarily insulate Wachovia from the higher rates of default prevalent in the market. At the same time, Wachovia was grossly under-reserved for its loan losses. Given all this, Wachovia: (1) had not been conservative in its lending practice; (2) was not being conservative in its current accounts; and (3) faced imminent and risking mortgage defaults and loss severities that would erode Wachovia's capital and extinguish its ability to pay dividends.

168. Also during the January 22, 2008 conference call, Wachovia admitted that, with respect to Golden West's delinquent loans, it had to play "catch-up" and increase loss reserves by $63 million due to a "methodology change" in recognizing loan losses. Specifically, contrary to its stated policy to charge off loans that were more than 180 days past due, Wachovia, at all times prior to the Fourth Quarter 2007, had not charged off Golden West's non-performing loans until the properties had been sold after foreclosure proceedings. As a result of Wachovia's deviation from its stated policy, it had materially understated reserves while concomitantly overstating earnings.

**January 30, 2008 Conference Call**

169. On January 30, 2008, Defendants Thompson and Truslow

provided a presentation on Wachovia at Citigroup's Financial Services investor conference.

170. Thompson reiterated, in highly false and misleading fashion, that Wachovia's Pick-A-Pay mortgages were less likely to default than other subprime and Alt-A mortgages, as well as the false claim that Wachovia's Pick-A-Pay mortgages were low-LTV mortgages of 71%-72%:

> So I know that potential credit losses are of concern for investors, and I want to talk directly with you about that. Wachovia, as we see on this slide, has historically been a conservative underwriter, and I can assure you that that's not changed . . . . Here, we underwrote, as did Golden West before us, with a substantial cash up front. We were at 70%, 71% loan-to-value on our mortgage portfolio, and we are confident--in fact, we are very confident--that the loss content on these NPAs will not approach levels of loss content in other asset classes that you look at. This slide further illustrates that. It shows why we've got confidence in the statement I just made.

> Now, mortgage portfolio loss rate will be manageable because, as this slide shows [] the dark green line shows 90-day past-due performance for Wachovia's Pick-a-Pay mortgage portfolio. You can see on this slide that it tracks most closely to the blue line, which is the entire mortgage industry prime performance. It's way below the red line, which is subprime, and it's tracking well below Alt-A, which is the gray line. So that gives us confidence that our loss rate in the Pick-a-Pay portfolio is going to be good.

> I think you should take further comfort by focusing on this slide. This slide shows delinquency rates for Wachovia portfolios, versus industry averages for the same portfolios. In every category--mortgage--

whether it be Pick-a-Pay or traditional
mortgages, home equity, and in auto finance--
Wachovia is demonstrably superior to the
industry.

171. These statements were false and misleading, for the
reasons alleged in detail above with respect to Wachovia's
January 22, 2008 conference call.

172. During the January 30, 2008 question-and-answer
session, one attendee pointed out that another large originator
of Option ARMs had recently reported: (a) that 20% of their
Option ARM portfolio had recently hit their negative amortization
limit of 110% of original loan value, and were recasting to
fully-amortizing rates; and (b) that 30% of such recasting loans
were becoming delinquent. The attendee asked: "Does that concern
you, considering you guys have such a large option ARM book?"

173. Defendant Thompson gave a false and misleading reply
(emphasis added):

> KEN THOMPSON: Well, our option ARMs were
> totally different than other option ARMs in
> the market, and we've gone over this time and
> time again. We've got a cap on payment rates
> going up by more than 7.5%. We underwrote to
> the fully indexed rate, not to the teaser
> rates. Our average going on LTV was somewhere
> in the 70% to 72% range. So we've got a
> cushion, and we're being hurt in California,
> where we've seen great price depreciation,
> and in some other places. But overall, I
> stand by what I've said about the NPAs are
> rising, but our loss content in our NPA
> portfolio will not be anything close to other
> asset classes.

70

174. Defendant Thompson's representation was materially false and misleading because: (a) Wachovia's option ARMs (the Pick-A-Pays) were not fundamentally different from other option ARMs, but exposed Wachovia to exactly the same risks on a delayed basis due to the 7.5% annual rate reset cap; (b) the risks purportedly avoided by underwriting to the fully-indexed rate had not in fact been avoided, because Wachovia had not verified the "stated" income that served as the purported "basis" of borrowers' ability to pay those fully-indexed rates; (c) the average LTV of Wachovia's mortgage portfolio was far, far higher than 70%-72%; and (d) Wachovia had in no way immunized itself from the losses then experienced by other mortgage lenders, but had merely deferred those losses and publicly concealed that fact.

**February 13, 2008 Conference Call**

175. On February 13, 2008, Wachovia held its annual Fixed Income Update conference, at which Defendants Wurtz and Truslow provided presentations on Wachovia.  Defendant Truslow reiterated certain material misrepresentations made on January 22, 2008, including: (a) that only a minor portion of the $120 billion Pick-A-Pay portfolio (specifically, $8 billion or 6.67% of the total) was at heightened risk of default and loss severity due to rising LTV values; (b) that the current LTV ratios of Wachovia's mortgages were essentially unchanged from those ratios at origination (i.e., 71%); (c) that Wachovia's seemingly-low ratio

of loan reserves to nonperforming loans only "seemed" low but in fact was not; and (d) that the comparison of delinquency rates between Wachovia's Pick-A-Pay mortgages and other subprime and Alt-A mortgages was invidious.

176. Defendant Truslow also recycled misrepresentations from October 19, 2007, including: (a) that Wachovia originated its Pick-A-Pay mortgages for its own portfolio, rather than to be securitized and sold off, so Wachovia was motivated to produce safer, less risky mortgages; (b) that Wachovia's "in house" appraisals made Pick-A-Pay mortgages safer still; and (c) that the Pick-A-Pay mortgages were distinguished from other Option ARMs, and safer, due to their 7.5% annual rate reset cap.

177. One attendee directly questioned Defendant Truslow on this very reality, noting that where other Option ARMs were already recasting now after hitting their 110% negative amortization limit (and causing spikes in delinquencies), Wachovia's would do so as well, only later, due to Wachovia's 125% negative amortization limit (which delayed recast):

> UNIDENTIFIED PARTICIPANT: Then secondly, the
> characteristics of your product versus a lot
> of the other industry players, the 125% cap
> on negative amortization has -- it seems to
> me that that's helped your portfolio
> delinquencies in that we're hearing from some
> of the other players that recast event is
> actually causing the delinquency. So I'm just
> wondering if you could just discuss, sort of
> merits of that or the quality of those loans,
> I guess, one comment could potentially be
> that you're just delaying the inevitable by
> delaying the recast event to a later time

period but maybe you could just discuss the
pros and cons of that.

178. Defendant Truslow flatly -- and falsely -- denied this
reality in his answer. Defendant Truslow stated that no Wachovia
loans would hit that 125% negative amortization limit and thus
trigger recast, and that those Wachovia loans experiencing
negative amortization had extremely low LTVs of 68.5%. Defendant
Truslow concluded (emphasis added):

> So it really hasn't -- it's a--it gets a lot
> of attention and <u>we get a lot of questions
> about it but it just hasn't been a factor
> from an asset quality standpoint or a
> delinquency standpoint</u> and again, we believe
> that <u>it's actually very favorable from the
> consumer's vantage point in that it avoids
> some of the traps that are now popping up in
> some other products</u>.

179. Defendant Truslow's assertions were materially false
and misleading. The structural features of the Pick-A-Pays did
not "avoid" the "traps that are now popping up in some other
products", but just deferred them temporarily.

**Wachovia's 2007 Form 10-K**

180. Discussing its credit risk management in the 2007 10-K
report, filed with the SEC on February 28, 2008, Wachovia stated:
"While our outlook indicates a rise in the level of charge offs
at this point in the credit cycle, we believe the well-
collateralized nature of our real estate-secured portfolio, our
careful management of credit risk and strong underwriting

73

position us relatively well in this credit environment."

181. On that same day, Thompson admitted to "poor" timing in Wachovia's $24 billion purchase of Golden West back in October 2006:

> With the benefit of hindsight, it is clear that the timing was poor for this expansion in the mortgage business, Thompson said in a letter to shareholders. Yet we have reconfirmed our opinion of the quality of the Golden West franchise, its underwriting and service model, and the quality of its people.
>
> We expect to recognize further credit losses and to earn less than we'd anticipated in our mortgage business over the next year or two . . .

Wachovia CEO says timing of Golden West deal "poor", Reuters, Feb. 28, 2008.

182. The February 28, 2008 statement served as a partial corrective disclosure but was still materially false and misleading. Although Thompson admitted that the timing of the acquisition of Golden West was wrong, he still misrepresented that Golden West's underwriting standards were high quality. The Class Action Complaint alleges further testimony from confidential witnesses (emphasis added):

> According to CW 9, an underwriter and a loan processor specialist for World Savings in California until October 2007, 100% of the Pick-A-Pay loans that he and his co-workers reviewed were considered subprime. Additionally, CW 3 stated that he was repeatedly instructed by managing directors to sell prospective borrowers on Pick-A-Pay

74

> loans by getting borrowers to overstate his
> or her actual income.  CW 3 estimates that
> 90% or more of approved Pick-A-Pay loans were
> done as stated income or no documentation
> loans.  And, if the Company had required
> documentation or other verification of
> income, "there was no way they would have
> been approved."

**March 12, 2008 Conference Call**

183. In a March 12, 2008 investor conference call hosted by Deutsche Bank, Defendant Truslow reiterated his prior misrepresentations about Pick-A-Pay mortgages: "We get a lot of questions about the Pick-A-Pay product and its features and how the product works, and it doesn't appear that the features themselves are creating any significant issue for us."

184. This representation was false.  The structural features of the Pick-A-Pays were creating an enormous issue for Wachovia, which Defendants, as detailed above, publicly misrepresented, concealed and falsely denied.

185. Defendant Truslow reiterated further prior misrepresentations, including: (a) that current Pick-A-Pay LTV ratios had not materially changed since origination, and stood at 72%; and (b) that only a very small portion of Pick-A-Pay mortgages (6.67% of the portfolio) was at heightened risk of default and loss due to high LTV ratios.

**April 14, 2008 Conference Call**

186. On April 14, 2008, in announcing Wachovia's results for the first quarter of 2008, Defendants returned to three questions

with which they had begun their prior quarterly earnings conference call on January 22, 2008: (a) what was level of losses in Wachovia's Pick-A-Pay portfolio? (b) did Wachovia need to raise capital? and (c) could Wachovia continue to fund its dividend payout. Defendants' answers to these questions partly contradicted the answers that they had provided on January 22, 2008. Defendants began to say on April 14, 2008 that due to Pick-A-Pay mortgage losses, Wachovia's fundamental financial condition had materially weakened, Wachovia would need to raise billions in new capital, and that Wachovia could not afford to continue its dividend payout.

187. Defendants represented that they were not contradicting prior representations, but simply reporting a "new model" determining mortgage losses:

> THOMPSON: Over the past year, we have witnessed a consistent pattern of deterioration in credit statistics in our mortgage portfolio in stressed areas of the country and particularly in California and Florida. . . . The basis for our revised projections is a new model which permits us to model home prices at the MSA level in conjunction with a behavioral model that captures changes in borrower's repayment behavior when their equity dissipates . . . .
>
> * * *
>
> WURTZ: As Ken mentioned, we have changed considerably the modeling of our Pick A Pay portfolio with far greater emphasis on forecasting future changes in housing markets and customer behaviors. Particularly in the stressed markets and Don will describe that in great detail going forward. But the

results of that is we expect further robust
provisioning in both 2008 and 2009.

* * *

TRUSLOW: Ken and Tom mentioned for the Pick A
Pay in its portfolio we have implemented a
new modeling tool which will help us better
estimate the outlook for credit costs for
this portfolio. And we have chosen to use the
OFHEO Index at the MSA level weighted for our
loan balances in order to calibrate the
correlations of what we were observing in
borrower propensity to default to housing
price declines, therefore using this as a
backdrop for forecasting credit costs . . . .

[A]s housing prices decline and borrowers
lose their equity in their homes relative to
their first mortgage balances, we are seeing
borrowers default at a faster rate than
historical trends and other quality measures
such as FICO would suggest and we believe
that this new approach, this new model better
captures these linkages and home price trends
and this new analysis and what we've been
experiencing in the housing market in the
first quarter led us to build the allowance
by about $1.1 billion for the Pick A Pay
mortgage portfolio . . . .  [W]e've used the
models output to help dimension for investors
credit costs we are currently estimating for
the Pick A Pay loan through the end of 2009.
We're currently expecting charge-offs
including first quarter results for all of
2008 at about $1.3 billion to $1.7 billion
rising to somewhere in the $2.5 billion range
in 2009. In terms of reserves, we expect to
continue adding another $800 million to $1
billion in addition to the $1.1 billion, that
was added in the first quarter across 2008
and this is in anticipation of the estimated
charge-offs in 2009 so the reserve has a
forward look to it. As you can see, these
actions substantially build the loan loss
reserves for this product.

188. Defendants also disclosed for the first time that 14%

of the entire $120 billion Pick-A-Pay portfolio -- i.e., $17 billion of mortgages -- had LTV ratios above 100%. Of the 100%+ LTV mortgages, 75% were from California and 10% from Florida.

> BETSY GRASECK, ANALYST, MORGAN STANLEY: On page 21, you've got the percentage of the Pick A Pay portfolio that has got an LTV above 100%, 14%. Is this the first time you're giving that data?

> DON TRUSLOW: It is. We wanted to provide that just to, number one, that's the most stressed stratification in the portfolio. And also just exhibit that we recognize there's been severe deterioration in several of our markets where we have the Pick A Pay loans.

189. Although Defendants' April 14, 2008 statements above were at best, only partial disclosures, defendants still continued to represent that: (a) the current average LTV ratio of Wachovia's Pick-A-Pay mortgages had risen only slightly from the LTV ratio at origination -- to 78% from 71%; (b) cumulative losses on the entire $120 billion portfolio, even under Defendants' new loss model, would not exceed 7.5%; and (c) Wachovia still had sufficient capital levels to fund a reduced dividend payout of approximately 60% of the amount of Wachovia's prior dividend.

190. These April 14, 2008 representations were materially false and misleading – as Wachovia began to admit three months later, on July 22, 2008.

**July 22, 2008 and September 9, 2008 Conference Calls**

191. On July 22, 2008, Wachovia (under its new CEO Robert Steel, who replaced Defendant Thompson on July 10, 2008), admitted that Pick-A-Pay LTVs were substantially higher than previously admitted; that Pick-A-Pay losses were running at 12% of the $120 billion portfolio, rather than 7.5%; and that Wachovia could barely afford any dividend.

192. These statements, though partial corrective disclosures, continued to be false and misleading, continued to understate current LTV ratios, and continued to understate the true level of Pick-A-Pay losses.

193. During a September 9, 2008 presentation at the Lehman Brothers Global Financial Services Conference, Steel was confronted directly with the falsity of those representations as to Pick-A-Pay losses:

> JEFFREY TALBERT, ANALYST: I believe that the last time you offered projections with respect to the Pick-A-Pay portfolio, the bank was looking at about a 12% estimated cumulative loss rate. When I apply the same estimated projections that come out of both Lehman and other firms fixed income research groups by vintage, I come up with a number much closer to something close to 20%. You've now been at the bank longer than the initial call, has your view on estimated cum losses on a Pick-A-Pay changed, or are you still looking at around 12% or perhaps something higher than that?

194. Steel and other (unidentified) Wachovia executives replied that their lower loss calculations (12% as opposed to 20%) were correct, that nothing had changed since their

announcement on July 22, 2008, and that the 20% loss figure cited by Mr. Talbert did not apply to Wachovia's mortgages because it was an "apples to oranges" comparison.

195. These representations were false and misleading.  One month later, on October 22, 2008, with nothing having changed in the underlying mortgage fundamentals, Wachovia's new management nearly doubled their Pick-A-Pay loss calculations from 12% of the $120 billion portfolio to a stunning 22%, revealing an additional $10 billion of losses that had been previously concealed.

**WACHOVIA'S ADDITIONAL MISREPRESENTATIONS ABOUT CDOs**

**Wachovia Holds A Large Undisclosed CDO Exposure**

196. During 2006 and 2007, Wachovia created, structured and underwrote approximately $10.11 billion of CDOs backed by pools of subprime mortgages.

197. Before October 19, 2007, Wachovia concealed that it held, at its own risk, an interest in these CDOs totaling several billion dollars.  Wachovia furthered its concealment, at all times before October 19, 2007, by carrying these (undisclosed) CDO holdings at par value, despite the impairment in their value by no later than February 2007.

198. Wachovia first revealed the existence of these CDOs on October 19, 2007 but Wachovia did not disclose what that amount actually was.  At all times until November 9, 2007, Wachovia concealed that it had retained in excess of $2.1 billion of those

very subprime CDO securities: i.e., in excess of 20% of the subprime CDOs it had underwritten.

199. Wachovia's CDO-related disclosures were misleading on October 19, 2007 and continued to be so through July 21, 2008, because, throughout, Wachovia continued to overstate the value of its CDOs.  Although indicators of those CDOs' value had long indicated that they were essentially valueless, Wachovia failed to acknowledge that until July 2008.

### Wachovia's False and Misleading Statements Concerning CDO Exposures

200. CDOs are a class of asset-backed securities.  A CDO invests in a group of assets and then issues securities "collateralized" by those assets.  The assets here were yet another class of asset-backed securities: subprime residential mortgage backed securities ("RMBS").

201. An asset-backed security is typically structured into a number of "tranches" representing a prioritized series of rights to payment, each of which has a separate credit rating (e.g., AAA, AA, A, BBB, and BB) based on its expected loss.  The higher the rating, the higher the priority of payment and the lower the risk of loss.

202. The cash flow generated by a subprime RMBS goes first to paying off interest on the AAA tranche -- known as the "super senior tranche", then on the AA tranche, etc.  Conversely, any losses (e.g., from defaulting subprime loans) are felt first in

the lowest tranche (called the "equity" tranche), then in the most "junior" rated tranche (BB), and then, as losses mount, in each successively higher-rated tranche.

203. Each tranche has an assigned level of "credit support", which denotes the loss level at which losses are first felt in that tranche.  According to the Class Action Complaint, a typical BBB tranche in an RMBS had credit support of 4.5% (meaning that once losses hit 4.5% of the total securitization, additional losses would be allocated to the BBB tranche); the A tranches (A-, A, A+) had credit support of 8.8%; the AA tranche (AA-, AA, AA+) had credit support of 14.2%; and the AAA tranche had credit support of 20.8% -- meaning that once losses hit 21% of the securitization, even the "super senior tranche" would experience loss.

204. CDOs can be characterized by the quality of the asset-backed securities (such as RMBS) in which they invest.  A "mezzanine CDO" invests in mezzanine-level assets, i.e., BBB rated tranches of other asset-backed securities such as RMBS.  A "high-grade" CDO invests in assets that are above mezzanine level, e.g., A or AA-rated assets.

205. The risks of subprime CDOs were well known by February 2007 and the market value of CDOs was already materially impaired.  The Class Action Complaint alleges that by October 2007, the impairment was near-total, and later declines in value were minor as most of the value had already evaporated.  What

investors did not know was that Wachovia had any exposure to CDO devaluation.

206. During July 2007, credit rating agencies downgraded hundreds of triple-B rated subprime RMBS tranches, and a variety of other investment vehicles reported severe losses from investments in RMBS and CDOs. In the industry, residential mortgage backed-securities are tracked by two specialized indices known as the ABX.HE (the "ABX") and TABX.HE ("TABX"), which are issued by a consortium of fifteen banks. The Class Action Complaint alleges that according to those indices, the super senior tranches of Mezzanine CDOs declined to below 60%; indices for high-grade CDOs declined to between 50% and 70%, effectively wiping out the value of any tranche below the super senior tranche.

207. Wachovia continued to conceal its exposure, such that no sign of Wachovia's exposures and losses publicly emerged.

208. On Wachovia's July 20, 2007 conference call, Steve Cummings, head of corporate and investment banking, stated that Wachovia is "one of the larger players in the CDO business and in that market we've managed that exposure also extremely well, some indicators of that would include that the recent rating agency actions that have been taken."

209. The Class Action Complaint alleges that Wachovia issued the following subprime CDOs in 2006 and 2007:

|  | | | | Tranching / Rating Structure ($ millions) | | | | | |
| CDO | Date Issued | Size | Type | Super Senior | AAA | AA | A | BBB | Equity |
|---|---|---|---|---|---|---|---|---|---|
| Longshore CDO Funding 2006-1 | 1/1/06 | $750 million | HG | 619 | 64 | 30 | 22 | 7 | 9 |
| Duke Funding High Grade IV | 2/1/06 | $1.5 billion | HG | 1312 | 62 | 42 | 54 | 12 | 18 |
| Longshore CDO Funding 2006-2 | 6/14/06 | $1 billion | HG | 870 | 60 | 42 | 13 | 8 | 8 |
| Duke Funding High Grade V | 7/2/06 | $1.5 billion | HG | 1260 | 108 | 78 | 21 | 15 | 18 |
| Stillwater ABS CDO 2006-1 | 7/30/06 | $650 million | HG | 520 | 98 | 11 | 8 | 5 | 8 |
| Octans II CDO | 12/20/06 | $1.575 billion | MZ | 945 | 195 | 108 | 110 | 126 | 91 |
| Sagittarius CDO | 3/29/07 | $985 million | MZ | 630 | 148 | 82 | 45 | 80 | |
| Longshore CDO Funding 2007-3 | 5/1/07 | $1.3 billion | HG | 1131 | 94 | 38 | 18 | 10 | 10 |
| Grand Avenue III CDO | 8/2/07 | $850 million | HG | 670 | 121 | 29 | 16 | 5 | 9 |
| Total | | $10.11 billion | | 7957 | 950 | 460 | 307 | 268 | 171 |

210. The first disclosure that Wachovia had retained any exposure to these subprime CDOs was on October 19, 2007, when Wachovia disclosed in its third quarter earnings report that "CDO/CLO and other structured credit products losses of $438 million largely relating to warehouse positions," including "$347 million loss directly related to subprime mortgage investments." Wachovia, however, did not disclose its holdings. Wachovia merely stated that "CDO/CLO warehouse exposures [were] down significantly from 2Q 07 levels," without disclosing what those second quarter levels had been and what the third quarter levels now were.

211. Even Wachovia's October 19, 2007 partial disclosures

84

were false and misleading.  The Class Action Complaint alleges
that the writedowns did not value Wachovia's CDOs at current
market prices, which were then -- and had long been -- far lower
than Wachovia's post-writedown valuations.  For example, by
September 30, 2007, the ABX Triple B indices had fallen to 30%,
and TABX indices for all junior mezzanine CDO tranches showed
them to be effectively worthless.  The TABX index for mezzanine
super seniors had fallen by 33%, and ABX indices for higher RMBS
tranches also showed substantial declines: single-A ABX indices
were at 50% and double-A ABX indices were at 80%.  It was not
publicly evident that Wachovia's writedowns still reported
inflated CDO valuations, however, because Wachovia had not
disclosed its subprime CDO holdings per se -- which would have
revealed the inaccuracy and insufficiency of the October 19, 2007
writedowns.

212. Wachovia first disclosed the extent and nature of its
CDO exposures on November 9, 2007.  On that date, Wachovia
disclosed that, as of the end of the third quarter of 2007
(September 30, 2007), Wachovia held $1.39 billion of subprime
Mezzanine CDO super senior tranches and $730 million of junior
subprime CDO tranches.

213. The Class Action Complaint alleges that Wachovia's
$1.39 billion of Mezzanine CDO super senior exposure included:
(a) the $945 million super senior tranche of the Octans II CDO,
and (b) $160 million of the super senior tranche of the

85

Sagittarius CDO. Wachovia also may have included in this total approximately $217 million of the $1.13 billion super senior tranche of Longshore CDO Funding 2007-3 (the risk of the remaining $896 million had been hedged with the Monoline insurer MBIA) and/or some fragment of the Grand Avenue III CDO super senior tranche.

214. Wachovia's November 9, 2007 disclosures also clarified Wachovia's October 19, 2007 writedowns: (a) Wachovia wrote down its $1.39 billion of Mezzanine super seniors by $160 million (or 11.5%, despite the fact that Mezzanine CDO super seniors had by then lost 70% of their value); and (b) Wachovia wrote down its $730 million of junior CDO tranches by $170 million (a 23.3% writedown, despite the fact that junior CDO tranches were then worthless). Wachovia acknowledged on November 9, 2007 that further writedowns were required.

215. On January 22, 2008, Wachovia disclosed a further round of $970 million of CDO writedowns: (a) a further $617 million writedown of its Mezzanine super seniors (to $613 million); and (b) a further $352 million writedown of its junior CDO tranches (to $208 million). Wachovia's January 22, 2008 writedowns and valuations were still materially false and misleading as it: (a) valued its super seniors at 44.1% of par, when in fact and no later than October 2007 such instruments were worth only 30% of par; and (b) valued its junior CDO tranches at 28.5% of par, when in fact and no later than October 2007 such instruments were

worthless.

216. On January 22, 2008 Wachovia also revealed that it had retained a further $4.18 billion of super senior tranches whose risks had purportedly been "hedged" by transferring those risks to various counterparties, including $2.2 billion to certain Monoline insurers ("Monolines") that in fact were unable to pay their guarantees of the debt. Monoline insurers guarantee the timely repayment of bond principal and interest when an issuer defaults. They are so named because they provide services to only one industry.

217. Wachovia's representations concerning its "hedged" exposures on and after January 22, 2008 were false. First, Wachovia's purported hedges were worthless. In dribs and drabs throughout 2008, Wachovia admitted that the guarantees provided by the Monolines were not, in reality, guarantees of anything, and recognized $411 million of losses from its purported $2.2 billion of Monoline exposure. This amounts to a 26% writedown, which, upon information and belief, overstated the value of such guarantees.

218. Second, Wachovia materially understated its exposure to the Monolines. Whereas Wachovia claimed only $2.2 billion of exposure to the Monolines, the two largest Monolines, Ambac and MBIA, Inc., claim in excess of $7 billion of exposure to Wachovia's CDOs.

      a.   AMBAC, for example, has disclosed its liability

for $5.7 billion of Wachovia-issued subprime CDO super senior tranches. See Ambac, CDO of ABS Data Supplement, Aug. 25, 2008.

      b.    According to the Class Action Complaint, MBIA has acknowledged liability for at least $1.37 billion of Wachovia subprime CDO super senior tranches.

219. On April 14, 2008, Wachovia disclosed a further round of $315 million of CDO writedowns: (a) a $174 million writedown of its Mezzanine super seniors (to $439 million); and (b) a $141 million writedown of its junior CDO tranches (to $67 million).

220. Wachovia's April 14, 2008 writedowns and valuations were still materially false and misleading. The Class Action Complaint alleges that Wachovia: (a) valued its super seniors at 31.6% of par, when in fact and no later than October 2007 such instruments were worth only 30% of par (and had subsequently declined further); and (b) valued its junior CDO tranches at 9.2% of par, when in fact and no later than October 2007 such instruments were worthless.

221. Finally, on July 22, 2008, a further round of writedowns brought Wachovia's valuations in line with market realities that had been evident nine months earlier in October 2007. Wachovia: (a) wrote down its Mezzanine super seniors to $419 million, or 30.1% of par; and (b) wrote down its junior CDO tranches to $12 million, or 1.6% of par.

### WACHOVIA'S ADDITIONAL MISREPRESENTATIONS
### ABOUT AUCTION RATE SECURITIES

222. Wachovia also misled investors regarding its exposure relating to its underwriting, marketing, and sales of auction rate securities ("ARS"), which ultimately caused Wachovia to buy back as much as $9 billion in ARS from its customers after the ARS market collapsed.

223. As detailed in a complaint file by the SEC, SEC v. Wachovia Securities, LLC, 09 CV 743 (N.D. Ill.), Wachovia and A.G. Edwards & Sons, Inc. ("A.G. Edwards"), who merged with Wachovia on October 1, 2007, and whose broker-dealer operations were consolidated into Wachovia on January 1, 2008, misrepresented to their customers that ARS were safe, highly liquid investments comparable to cash or money market instruments. (As used herein, "Wachovia" refers to the combined operations of Wachovia and A.G. Edwards, and the terms "Wachovia Legacy" and "A.G. Edwards" refer to their separate operations. Wachovia assumed A.G. Edwards' liabilities at merger.)

224. However, the ARS retained their liquidity only so long as the auctions to reset their interest rates or dividend yields, generally held every seven, 14, 28, or 35 days, were successful.

225. In an ARS auction, customers, through broker-dealers, bid the lowest interest rate or dividend they are willing to accept for the instruments. The auction clears at the lowest bid rate sufficient to cover all of the securities for sale, and this rate applies to all of the securities at the auction until the

next auction.  If there are not enough bids to cover the securities for sale, the auction fails, and the issuer pays a penalty.

226. Before February 2008, the sole or lead broker-dealer would customarily place "support" bids in each auction sufficient to purchase the ARS for sale in case customers did not place enough bids.

227. Wachovia was one of these broker dealers.  As of February 2008, Wachovia customers held over $14 billion in ARS.

228. Wachovia also offered a par daily liquidity service, a secondary ARS market between auctions for customers who purchased ARS through A.G. Edwards.  This service allowed customers to convert their ARS to cash by selling them directly to A.G. Edwards' inventory, rather than waiting for the next auction date.

229. Wachovia repeatedly represented to its customers that ARS were safe, highly liquid investments.  Wachovia knew, but did not inform its customers, that:  (a) ARS did not have the guaranteed liquidity of cash or money market funds; (b) ARS were complex securities; (c) an auction's success may depend on support from broker-dealers like Wachovia; (d) without broker-dealer support, auctions may fail and ARS might not be sold; (e) the penalty rate set for a failed auction may not be high enough to compensate the customer for loss of liquidity or to encourage the issuer to redeem the ARS; and (f) Wachovia could withdraw its

90

secondary liquidity service without notice, at any time.

230. Beginning in August 2007, A.G. Edwards' ARS trading desk was often carrying a higher ARS inventory than recommended in company guidelines, indicating that more customers were choosing investments such as treasury bills over ARS.  At the end of November, 2007, A.G. Edwards' trading desk sold $100 million in ARS inventory to Wachovia Legacy, which at that time still maintained a separate book from A.G. Edwards.

231. Wachovia, nevertheless, made no attempt to determine whether this increased inventory was indicative of increased risk in the ARS business.

232. Wachovia Legacy and A.G. Edwards also knew, as early as August 2007, that the monoline insurers guaranteeing the timely payment of principal and interest payments in the event of a bond issuers' default were experiencing credit problems as a result of the subprime mortgage crisis because they had insured mortgage-backed bonds.

233. Wachovia Legacy and A.G. Edwards falsely downplayed these risks.  In August 2007, Wachovia Legacy's Advisory Services Group issued a report stating that despite the "current turmoil in the global credit markets," auction failures were a "low probability event."  Wachovia Legacy repeated similar assurances in a report issued on February 5, 2008.

234. Wachovia Legacy did so even though, in August 2007, A.G. Edwards' fixed income department was aware that ARS issued

by structured investment vehicles were failing due to concerns about the subprime securities underlying the vehicles.

235. In early November 2007, A.G. Edwards' ARS trader learned that an ARS not sold by A.G. Edwards failed two auctions in October and November.

236. In the last two weeks of January 2008, Wachovia learned that Lehman Brothers, Bank of America, and Piper Jaffray had allowed ARS auctions to fail.

237. By the end of January, 2008, Wachovia employees, including senior management, were aware that Lehman may have permitted its auction to fail rather than back-stop the auction price due to balance sheet problems. They were also aware that if other broker-dealers had similar balance sheet problems, it could impact the ARS market.

238. By late January or early February of 2008, Wachovia senior managers realized that, because of the credit crisis, other sole or lead broker-dealers might stop supporting auctions rather than continue to ensure ARS liquidity, which would lead to widespread auction failures. Wachovia did not disclose this information to its ARS customers or the investing public.

239. In response to other broker-dealers allowing auctions to fail in early February 2008, Wachovia's senior management decided to stop Wachovia's par daily liquidity service on February 13, 2008.

240. On February 14, 2008, after more auctions failed and

Wachovia's ARS inventory had grown significantly, Wachovia's management decided to stop placing support bids in auctions for those ARS for which Wachovia acted as lead manager or sole broker-dealer.

241. Shortly thereafter, the ARS market completely froze, and Wachovia's customers were unable to liquidate about $14 billion in ARS holdings.

242. Throughout this period, Wachovia's public filings were silent about its ruinous ARS exposure.

243. On March 19, 2008, Wachovia investors filed a class action suit in the Southern District of New York (Waldman v. Wachovia Corp., 08 CV 02913), accusing Wachovia of misleading the proposed class into investing in ARS while artificially propping up the market.

244. Wachovia did not disclose its massive exposure to ARS-based liability until its June 30, 2008 Form 10-Q, filed on August 11, 2008, which recorded a $500 million charge for expenses and valuation losses.

245. In August 2008, Wachovia also announced that it was being investigated by the SEC and could face charges based on its ARS practices. See Maurna Desmond, Long Arm of the Law Slaps Wachovia, Forbes.com, Aug. 11, 2008 (time-stamped after close of market).

246. The day after Forbes.com reported the announcement, which came on the same day that Wachovia filed the 10-Q recording

a $500 million charge, Wachovia's stock dropped from $17.64 to $15.87.

247. The full, multi-billion dollar scale of Wachovia's exposure was not revealed until August 15, 2008, when details of a settlement between Wachovia and the SEC were announced. Under the settlement Wachovia agreed to repurchase as much as $9 billion worth of ARS and pay a $50 million fee. See Karen Freifeld and David Mildenberg, Wachovia to Buy Back Auction-Rate Debt, Pay Fine (Update2), Bloomberg.com, Aug. 15, 2008. In response to this news, Wachovia's stock price dropped that day from $15.81 to $15.57.

248. Wachovia recorded a further $497 million charge in its September 30, 2008 Form 10-Q for expenses and valuation losses related to its role in manipulating the ARS market.

249. In its December 31, 2008 financial statements, Wells Fargo disclosed that, as a result of Wachovia's settlement, it purchased $3.7 billion of ARS that were held in its balance sheet. In the fourth quarter of 2008, Wells Fargo recorded an additional $91 million of losses for anticipated future losses on ARS yet to be purchased under the settlement. Wells Fargo went on to say that if it purchased all remaining ARS subject to the settlement, then the estimated maximum exposure to loss would be $620 million.

250. In total, as a result of Wachovia manipulating the ARS market, Wells Fargo recorded over $1 billion of losses through

94

December 31, 2008, and will eventually purchase more than $8 billion of ARS and expects to record an additional $620 million of losses.

251. On February 5, 2009, the SEC announced a settlement with Wachovia that provided for payments to customers to compensate them for the difference between the inflated prices they paid for ARS and the par value of the securities, in addition to the buybacks and fine previously announced.

## DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

252. Defendants also caused Wachovia to falsely report its financial position and results of operations during the Purchase Period by, among other things, omitting required disclosures, overstating net income and misrepresenting the Company's true financial position. Wachovia's financial statements and related Forms 10-K, for the years ended December 31, 2006 and December 31, 2007, and the interim quarterly reports issued by Wachovia in 2007 and 2008, did not present fairly the Company's financial position and results of operations, and were not presented in conformity with Generally Accepted Accounting Principles ("GAAP") promulgated by the Financial Accounting Standards Board ("FASB").

253. GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of FASB Statements of Financial Accounting Standards ("FAS"), followed by FASB Interpretations ("FIN"), FASB Statements of Position ("FSP"),

Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP").

254. Under SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. The responsibility for preparing the financial statements in conformity with GAAP rests with Wachovia's management.

255. Wachovia's relevant financial statements, in violation of GAAP and SEC rules, omitted required disclosures regarding significant concentrations of credit risk and vulnerabilities in the market place.

**Required Disclosures Regarding
the Loan Portfolio Were Omitted**

256. Wachovia's 2006 annual financial statements were the first financial statements to include the financial position and results of the operations of Golden West (beginning October 1, 2006). Those financial statements failed to disclose significant concentration of credit risk and current liabilities, in violation of Financial Accounting Standards Board Standard No. 107 ("FAS 107") and FASB Staff Position ("FSP") Statement of Position ("SOP") No. 94-6-1.

257. FAS 107, Disclosures about Fair Value of Financial Instruments ("FAS 107"), requires disclosure of significant

concentrations of credit risk arising from all financial instruments. Credit risk can arise from group concentrations in which "a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions." For each such significant concentration, FAS 107 requires disclosure of (a) the characteristic that identifies the concentration, (b) the related maximum amount of loss due to credit risk, (c) Wachovia's related policies regarding collateral, and (d) Wachovia's related policies regarding master netting arrangements to mitigated credit risk.

258. FSP SOP 94-6-1, Terms of Loan Products That May Give Rise to a Concentration of Credit Risk, indicates loan products with certain features may increase the exposure of the originator, holder, investor, guarantor, or servicer to risk of nonpayment of realization, and thereby, create a concentration of credit risk which requires the FAS 107 disclosures described above by the reporting entity. Regarding such features, SOP 94-6-1 provides the following, in relevant part:

> Examples of features that may increase credit risk include, but are not limited to:
>
> (a) Terms that permit principal payment deferral or payments smaller than interest accruals(negative amortization);
>
> (b) A high loan-to-value ratio;
> (c) Multiple loans on the same collateral than when combined result in a high loan-to-value ratio;

(d) Option adjustable-rate mortgages (option ARMs) or similar products that may expose the borrower to future increases in repayments in excess of increases that result solely from increases in the market interest rate (for example, once negative amortization results in the loan reaching a maximum principal accrual limit);

(e) An initial interest rate that is below the market interest rate for the initial period of the loan term and that may increase significantly when that period ends; and

(f) Interest-only loans.

259. Under FAS 107 and FSP SOP 94-6-1, further examples that create group concentrations of credit risk include loans to nonprime (i.e., subprime and Alt-A) borrowers, second mortgages/home equity loans (i.e, multiple loans on the same collateral), loans in second lien positions are not secured by collateral, loans heavily concentrated in certain geographic areas and loans subject to ineffective, and potentially fraudulent, underwriting practices, as well as certain investments dependent upon cash flows from significant group concentrations.

260. FSP SOP 94-6-1 also requires disclosure of concentrations when such a concentration (a) exists as of the date the financial statements and (b) makes the enterprise vulnerable to the risk of a near-term severe impact, and there is at least a reasonable possibility that the events that could cause the sever impact will occur in the near term. Disclosure of concentrations meeting such criteria should include

"information that is adequate to inform users of the general nature of the risk associated with the concentration."

261. Wachovia's loan portfolio exposed it to significant concentrations of credit risk and current vulnerabilities because it held a significant loan portfolio which, in substantial parts, was comprised of loans with negative amortization features, option ARMs, variable interest rates, interest-only payment options, high LTV ratios, and loans based on a low documentation and/or stated income basis; loans to subprime; loans based on inappropriate appraisals; and loans subject to ineffective, and potentially fraudulent underwriting practices.

262. Wachovia, however, failed to disclose that at all times then and thereafter, its loan portfolio had a staggering number of "interest only" and -- worse -- "minimum payment" loans with high LTV ratios, and low documentation/stated income; loans to nonprime (i.e., subprime and Alt-A) borrowers; second mortgages/home equity loans (i.e., multiple loans on the same collateral); loans in second lien positions or not secured by collateral; loans based on inappropriate collateral appraisals; and loans subject to ineffective, and potentially fraudulent underwriting practices.

263. Wachovia's 2007 financial statements likewise failed to disclose the above credit risks and vulnerabilities.

**Required Disclosures Regarding
Certain Investments Were Omitted**

264.  During the Purchase Period, Wachovia accumulated a substantial investment portfolio that, in significant parts, was comprised of CDOs and mortgage debt that exposed the Company to significant concentrations of credit risk.

265.  In violation of FAS 107 and FSP SOP No. 94-6-1, at all times before November 9, 2007, Wachovia failed to disclose significant concentrations of credit risk created by its CDO investment portfolio.  The limited disclosures in Wachovia's financial statements during the Purchase Period after November 9, 2007 failed to reveal the maximum amount of loss due to credit risk, as required by GAAP and SEC Rules.

**Overstatement of the Loan Portfolio,
and Related Understatement of the
Provision and Allowance for Credit Losses**

266.  In violation of GAAP and SEC rules, Wachovia's financial statements overstated the value of the Company's loan portfolio, and understated the related allowance for loan/credit losses and the provision for credit losses.

267.  FAS 5 states that an estimated loss from a loss contingency, such as the collectability of receivables, should be accrued (i.e., increase the allowance for loan losses) by a charge to income.  Such accrual should be made when, based on information available before issuance of the financial statements, it is probable (defined as likely to occur) that the

loss has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated. Specifically with respect to loss contingencies relating to the collectability of receivables, FAS 5 states that accrual shall be made in relation to individual receivables or groups of similar types of receivables even though particular receivables that are uncollectible may not be identifiable.

268. Additionally, FAS 5, as amended by FAS 114, <u>Accounting by Creditors for Impairment of a Loan</u>, provides that an individual loan is impaired when, based on current information and events, it is probable that a creditor will not be able to collect all amounts due according to the contractual terms of the loan agreement.  All amounts due includes both the contractual interest payments and contractual principal payments.

269. The AICPA Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (the "AAG") provides that the quality of the related underwriting and review procedures should be considered in determining when credit losses should be recognized under the FAS 5 criteria.  The AAG ¶ 9.37 states, in relevant part, "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss generally should be recognized at the date of loan origination."

270. In addition to those requirements provided in GAAP, the

SEC provides additional guidance for registrants, such as the Company, regarding the management's methodology for the estimating credit losses in SAB 102, <u>Selected Loan Loss Allowance Methodology and Documentation Issues</u> ("SAB 102"). Specifically, SAB 102 states that "[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process" and consider the following factors:

      a.   Levels of and trends in delinquencies and impaired loans;
      b.   Levels of and trends in charge-offs and recoveries;
      c.   Trends in volume and terms of loans;
      d.   Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
      e.   Experience, ability, and depth of lending management and other relevant staff;
      f.   National and local economic trends and conditions;
      g.   Industry conditions; and
      h.   Effects of changes in credit concentrations.

271. Before and during the Purchase Period, Wachovia accumulated a significant loan portfolio that, in significant parts, was comprised of loans with negative amortization features, option ARMs, variable interest rates, interest-only payment options, high LTV ratios, low documentation/stated income; loans to nonprime (i.e., subprime and Alt-A) borrowers; second mortgages/home equity loans (i.e., multiple loans on the same collateral); loans in second lien positions or not secured by collateral; loans based on inappropriate collateral

appraisals; loans heavily concentrated in certain geographic areas; and loans subject to ineffective, and potentially fraudulent, underwriting practices.

272. At the same time, the credit quality of the loan portfolio, as indicated by the relative amount of nonperforming assets, began to deteriorate. Nonperforming assets were comprised of nonaccrual loans -- i.e., loans not accruing interest income, typically due to a past due status or other concerns regarding collectability -- and foreclosed properties.

273. Wachovia's false assertion that its loan portfolio, and related allowance for loan losses, were reported in conformity with GAAP rested on knowingly or recklessly ignoring the prevailing economic conditions and the risks inherent in its loan portfolio. Wachovia did not adequately consider such conditions and risks in determining the collectability of the loan portfolio and setting allowance for loan losses. Even as the risks inherent in the loan portfolio increased, the Company's allowance for loan losses, and net charge-offs, remained minimal.

274. During the first quarter of 2008, Wachovia claimed to have refined its model with respect to its mortgage portfolio. Wachovia's "new" model was also materially deficient because it, too, relied heavily on inflated collateral values and on the unrealistic assumption that current delinquency and default rates would not rise, even as monthly payments did, and did not sufficiently consider geographic concentrations. Thus,

Wachovia's financial statements, in violation of GAAP and SEC rules, materially understated the allowance for loan losses, and thereby, materially overstated the value of its loan portfolio, net of the allowance for loan losses.

275. Direct write-offs (i.e., charge-offs) from the loan portfolio and increases to the allowance for loan losses, which are included in the allowance for credit losses, are reported in the provision for credit losses (i.e., an expense), a component of net income. By overstating its loan portfolio (i.e., avoiding direct write-offs) and understating the allowance for credit losses, the relevant financial statements, in violation of GAAP and SEC rules, materially understated the amounts reported as the provision for credit losses, and thereby materially overstated net income.

276. For example, Wachovia reported the following income before taxes in its publicly-filed documents:

    2006 10K          $3,295 million

    2007 1Q 10-Q      $11,470 million

    2007 2Q 10-Q      $3,300 million

    2007 3Q 10-Q      $3,481 million

    2007 4Q 10-Q       ($234 million)

277. Had Wachovia, as it represented it was doing in its public filings, properly charged off nonperforming loans at 180 days throughout this period, each of these reported earnings figures would have been substantially lower.

278. Had Wachovia made appropriate loss provisions for other nonperforming loans, and for the large percentage of negatively amortizing loans that -- contrary to Wachovia's public statements -- in fact were subprime loans, issued on the basis of inflated appraisals, undocumented income, and/or poor credit history, Wachovia's publicly-reported income throughout the Purchase Period would have been lower still.

279. Wachovia's public filings demonstrate its massive understatement of charge-offs and loss provisions during 2007 and the beginning of 2008 despite the known downturn in the real estate industry -- an accounting practice that went hand in hand with Wachovia's claim before and during the Purchase Period to be insulated from that downturn's effect on competitors because of its purportedly superior, conservative lending practices and claimed refusal to "stretch for earnings":

|  | 1Q 2007 | 2Q 2007 | 3Q 2007 | 4Q 2007 | 1Q 2008 | 2Q 2008 | 3Q 2008 |
|---|---|---|---|---|---|---|---|
| Allowance for loan losses ('000s) (includes commercial) | 3,378 | 3,390 | 3,505 | 4,507 | 6,567 | 10,956 | 15,605 |
| Net charge-offs, consumer real estate ('000s) | 27 | 29 | 47 | 147 | 341 | 682 | 1,060 |

280. The magnitude of Wachovia's overstatement of its earnings, based on its systematic violation of accounting standards, is evidenced by the fact that in October 2008, when Wachovia dropped its pretenses, Wachovia admitted that over $25 billion of its $120 billion Pick-A-Pay portfolio had to be written off.

281. Indeed, in a December 10, 2008 conference, Wells Fargo, after reviewing Wachovia's operations, stated that it expected to write down $36 billion of Wachovia's option ARMs.  Reuters, <u>Wells Fargo Completes Wachovia Purchase</u>, Jan. 1, 2009.

282. Thus, Wachovia materially misstated its results of operations, including the provision for credit losses, net income and earnings per share or EPS, and its financial position, including the loan portfolio and related allowance for loan and credit losses, because the numbers disclosed were not derived in conformity with GAAP.

**Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting**

283. Wachovia falsely represented that it had effective disclosure controls and procedures, and internal control over financial reporting.  The SEC defines "disclosure controls and procedures" as:

> controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the [Securities] Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commission's rules and forms . . . .

SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02.

284. Securities Exchange Act Rules 13a-15 and 15d-15 required Wachovia's principal executive officer and principal

106

financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of the end of each fiscal quarter-end and fiscal year-end. Further, Wachovia was required to annually report on the effectiveness of its internal control over financial reporting.

285. Wachovia's disclosure controls and procedures, and internal control over financial reporting were not effective as the Defendants caused the Company to issue the relevant financial statements, and related Forms 10-K and 10-Q that, for the violations noted above herein, were not in conformity with GAAP and SEC rules. Further, Wachovia had ineffective underwriting practices and inadequate risk management. Defendants, however, falsely represented that Wachovia's disclosure controls and procedures were effective as of the date of each individual Securities Exchange Act report filed during the Purchase Period.

286. Further, Wachovia falsely represented that it maintained effective internal control over financial reporting as of the date of each of the relevant annual financial statements. As such, during the Purchase Period, the Defendants caused Wachovia to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting.

**Failure to Disclose Liabilities Stemming**
**From Sales of Auction Rate Securities**

287. Under GAAP, Wachovia was required to write down the value of the illiquid ARS held in its balance sheet to fair value when it was apparent that these assets were overvalued and illiquid.

288. Statement of Financial Accounting Standards ("SFAS") 115, Accounting for Investments in Certain Debt and Equity Securities, requires that securities which are purchased and held with the intention of being sold in the near term are to be classified as "trading securities," requires companies to record trading securities on their balance sheets at fair value, and further requires that all mark-to-market (unrealized) gains and losses on trading securities be recognized in the current period's income statement.

289. In violation of SFAS 115, Wachovia failed to write down the value of its ARS, electing instead to carry those assets on its balance sheet at artificially inflated amounts despite its knowledge of significant ARS liquidity concerns during 2007, when Wachovia manipulated auctions.

290. Under GAAP SFAS 5, Contingent Liabilities, a company is required to record contingent liabilities when the occurrence of a possible claim is probable and can be reasonably estimated. Here, an integral part of manipulating ARS auctions was the selling of ARS to customers at prices Wachovia knew were inflated. As a result, Wachovia was contingently liable for

potential claims made by customers who got stuck paying above market prices for their ARS.  Wachovia violated SFAS 5 by not recording an estimate of such contingent liabilities during 2007-08.

291. Under Statement of Financial Accounting Concepts ("SFAC") 5, Recognition and Measurement in Financial Statements of Business Enterprises, revenues are not recognized until earned, and a company's revenues are considered to have been earned when the company has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.  In violation of SFAC 5, Wachovia recorded fees and commissions for underwriting and selling ARS despite its knowledge that the alleged "auctions" were really an elaborate scam.  Wachovia then violated SFAC 5 by recording revenue in connection with ARS auctions that it had not earned, in violation of GAAP.

292. The reason Wachovia gave for the ARS write-offs was that they resulted from failed ARS auctions driven by the credit markets' deterioration.  In fact, Wachovia's manipulation of the market kept the ARS auctions artificially alive from 2007 through early 2008.  Therefore, Wachovia should have recorded its write-offs in 2007, at the time of the first failed ARS auction, not in the second and third quarters of 2008. Had Wachovia done so in conformity with GAAP, Wachovia's 2007 third quarter pre-tax earnings of $2.2 billion would have been materially reduced by

$500 million, or 29%, the 2007 fourth quarter pre-tax loss of $234 million would have increased to $730 million, and for the 2007 fiscal year, pre-tax earnings of $8.8 billion would have been materially reduced by nearly $1 billion. A similar result would have obtained had Wachovia, at a minimum, recorded a contingent liability based on its massive ARS exposure and its knowledge of the failed auction problem. Earnings would have been reduced even further had Wachovia not recorded unearned ARS underwriting fees.

### ADDITIONAL ALLEGATIONS REGARDING
### THE INDIVIDUAL DEFENDANTS' SCIENTER

293. Defendants knew or recklessly disregarded that public documents and statements issued or disseminated in the name of Wachovia were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

294. The Individual Defendants -- the CEO, CFO and CRO of Wachovia -- had such knowledge because they knew that subsequent to Wachovia's acquisition of Golden West, Wachovia's mortgage business had changed in a fundamental way.

295. Because of their position with Wachovia, Defendants at all times had the opportunity to, and did, commit the wrongdoing

alleged herein.

**Defendants Received Reports Detailing Significant
And Widespread Problems with Wachovia's Lending**

296. The Individual Defendants received various reports concerning Wachovia's lending practice and loan performance. The Class Action Complaint quotes confidential witnesses to this effect:

> According to CW 2, quarterly reports were complied for management's review, detailing information related to the Company's loan origination, including standards implemented and underwriting guidelines, was automated and readily available to the Individual Defendants as senior executives of the Company.
>
> CW 2, a workout specialist in the loss mitigation department from 2000 through 2004 and a loan servicing specialist from November 2004 through October 2007 for HomeEq Servicing Corporation in California, stated that HomeEq provided quarterly reports to Wachovia on losses and costs associated with the Company's collection efforts on their loans. The portfolio loans serviced by HomeEq "were not the best" and those serviced by CW 2 were all subprime loans, which Wachovia aggressively sold to customers.
>
> Moreover, CW 2, while attempting to help borrowers avoid foreclosure, said it was not uncommon for a borrower to tell CW 2 that while the loan application showed the borrower's income as a certain amount, he or she really only made a third or half of that amount. The borrower would explain to CW 2 that he or she was told to write the higher number on the application in order to get the loan approved. This was a situation CW 2 ran into "a lot of the time."
>
> CW 2 had direct knowledge of the information

provided in the quarterly reports Wachovia
received from attending quarterly all-
employee meetings, which took place in the
auditorium at the North Highlands, California
location.

### Defendants Knew of, or Recklessly Disregarded Facts Concerning, Wachovia's Lax Underwriting Guidelines

297. Because Wachovia's underwriting guidelines directly
affected the value and credit quality of Wachovia's loans, and
therefore were fundamental to Wachovia's overall financial
condition, Wachovia's senior management monitored and managed
Wachovia's prime and subprime home lending underwriting
guidelines and operations.

298. In June 2006, Wachovia reported that the factors
contributed to the decision to approve the merger in their SEC
Form S4 were that Golden West's financial condition and asset
quality were very sound. In July 2006, Individual Defendant
Thompson and Wachovia's management reviewed and discussed
strategic factors related to the proposed transaction, including
Golden West's consumer banking and mortgage-lending businesses,
the timing of integration activities, and the credit quality and
risk management assessment of Golden West.

299. Shortly after the acquisition, Thompson stated that
Wachovia had captured "a crown jewel" in the mortgage business.
The Class Action Complaint once again identifies confidential
witnesses to show that Defendants did not believe that Golden
West's practices, adopted by Wachovia, were sound:

All the while, according to CW 2, Wachovia
was receiving quarterly reports on losses and
costs with the Company's collection efforts
on their portfolio which consisted of
subprime loans after the acquisition of
Golden West.

CW 3 explained that after the merger, the
underwriting process at Wachovia was nothing
short of fraud.  As previously discussed, the
vast majority of Pick-A-Pay loans were stated
income/no document, or "Quick Qualifier"
loans. To get the loans approved, CW 3 and
other loan officers and sales managers were
instructed to falsify the amount of stated
income on the loan application.  CW 3
recalled witnessing an incident where another
loan officer was instructed to "bump up" an
applicant's social security income to qualify
for the stated loan/no documentation loan.

Moreover, CW 4 stated that at Wachovia "it
was all about the numbers."  The priority was
to sell Pick-A-Pay, even though Wachovia had
other more conservative mortgage programs
available.  Additionally, after Wachovia took
over the Pick-A-Pay loan program, Wachovia
stopped using World in-house appraisers and
instead used outside appraisers to assess the
home values for loan applications.  CW 4
stated that this practice made the home
valuation appraisals on Pick-A-Pay loans less
reliable because outside appraisers had a
reputation for assigning higher values to
homes than World's in-house appraisers did.

300. Wachovia, at the direction of the Individual

Defendants, furthered these bad practices by implementing a

system of financial rewards for originating higher risk loans,

and corresponding negative consequences for those who did not.

Wachovia loan production personnel were compensated based on loan

volume without any regard to loan quality, and were paid even

more for originating riskier Pick-A-Pay loans. The Class Action Complaint alleges that: "CW 3 stated that commissions earned by Wachovia's employees who sold Pick-A-Pay loans were substantially higher than those resulting from the sale of more traditional products."

301. The Individual Defendants caused Wachovia's underwriting standards to significantly deteriorate during the Purchase Period, while creating a false and misleading appearance of conservative, quality-focused underwriting at Wachovia through their public statements. The Class Action Complaint alleges that: "According to CW 3, loan officers were instructed not to fully educate borrowers about the Pick-A-Pay loans and the negative amortization they could face if they chose the Pick-A-Pay mortgage."

302. As high-level officers of Wachovia, the Individual Defendants exercised control over, and had a duty to familiarize themselves with, the Company's core operations.

303. According to Wachovia's 2007 10-K annual report, the Company's strategic business risk and general business affairs were overseen through an Operating Committee that "meets monthly and is composed of the senior management of the Company, including all executives who report directly to the chief executive officer [i.e., defendant Thompson]." Further, the chief executive officer (defendant Thompson) was "responsible for the overall risk governance structure." The chief risk officer

114

(defendant Truslow) reported directly Thompson and was
"responsible for independent evaluation and oversight of
[Wachovia's] credit, market and operational risk-taking
activities."

304. According to the 2007 10-K report, Wachovia's risk
management strategy was "aligned around four components of risk
governance:  our business units; our independent risk management
functions joined by other corporate staff functions including
legal, finance, human resources and technology; internal audit;
and risk committees."  Wachovia's risk managers "proactively
work[ed] with the business units . . . to establish appropriate
standards and also monitor[ed] business practices in relation to
those standards."   Wachovia's risk management committees
reported "to the senior risk committee, which is chaired by the
chief executive officer and composed of certain members of the
Operating Committee."

305. The risk managers who reported to Truslow and Thompson
were responsible to "approv[e] credit risk exposures."   One of
the processes for approving credit risk exposure "involves
standard approval structures (such as rapid decision scorecards)
for use in retail . . . lending." Wachovia also had a "credit
risk review" unit that "performs risk process reviews and
evaluates a representative sample of credit extensions," and that
"has the responsibility to assess the adequacy of credit
underwriting." That unit, too, reported "directly to the chief

risk officer [defendant Truslow], and to the Risk Committee of the board of directors" that defendant Thompson chaired.

306. Even though Wachovia's core lending operation had devolved into writing subprime loans virtually on demand to persons whose claimed assets and employment were, as a matter of corporate policy, wholly unverified -- and often falsified -- each of the Individual Defendants personally attested, in numerous public statements, to the alleged conservatism, rigor and superiority of Wachovia's underwriting practices and its purported alleged lack of exposure to sub-prime lending.

307. In making such statements, the Individual Defendants knew, or recklessly ignored, data that was reasonably available to them as high-level officers of Wachovia that directly contradicted such public statements, including data about the Company's debased lending standards; the riskiness of its loans; the deteriorating credit ratings of borrowers; the volume and rate of loans issued as "exceptions" to the Company's supposed underwriting requirements; and the existence of corporate policies effectively eliminating these supposed requirements. As such, the Individual Defendants either knew the true facts contradicting their public statements or recklessly misrepresented those facts.

**Insider Stock Sales By Thompson and Other Officer Defendants During the Purchase Period Were Highly Unusual and Suspicious**

308. The sales of Wachovia stock by Defendants Thompson,

Wurtz, and Truslow after the Golden West acquisition were highly unusual, and therefore suspicious, as measured by (a) the amount and percentage of shares sold, (b) comparison with the Individual Defendants' own prior trading history and that of other insiders, and (c) the timing of the sales. Such sales therefore provide strong evidence of scienter.

309. According to publicly available data reported to the SEC, Wachovia's insiders owned and sold the following Wachovia shares:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Thompson | 02/06/07 | 29,712 | $57.32 | 1,703,118.58 |
| Thompson | 3/30/2007 | 9,521 | $55.05 | 524,131.05 |
| Thompson | 4/18/2007 | 9,604 | $55.87 | 536,575.48 |
| Thompson | 4/19/2007 | 9,606 | $55.52 | 533,325.12 |
| Thompson | 4/20/2007 | 7,129 | $55.85 | 398,154.65 |
| Thompson | 2/20/2008 | 15,074 | $34.08 | 513,721.92 |
| Thompson | 3/31/2008 | 9,521 | $27.00 | 257,067.00 |
| Thompson | 4/18/2008 | 19,210 | $27.24 | 523,280.40 |
| Thompson | 4/22/2008 | 7,129 | $26.20 | 186,779.80 |
| **Total** | | **116,506** | | **5,176,154.00** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Truslow | 10/18/06 | 16,980 | $55.14 | 936,277.20 |
| Truslow | 3/30/2007 | 1,429 | $55.05 | 78,666.45 |
| Truslow | 4/18/2007 | 1,552 | $55.87 | 86,710.24 |
| Truslow | 4/18/2007 | 37,334 | $55.52 | 2,072,783.68 |
| Truslow | 4/18/2007 | 1,789 | %55.87 | 99,951.43 |
| Truslow | 4/19/2007 | 1,682 | $55.52 | 93,384.64 |
| Truslow | 4/20/2007 | 1,498 | $55.85 | 83,663.30 |
| Truslow | 2/20/2008 | 1,816 | $34.08 | 61,889.28 |
| Truslow | 3/31/2008 | 1,092 | $27.00 | 29,484.00 |
| Truslow | 4/18/2008 | 2,473 | $27.24 | 67,364.52 |
| Truslow | 4/22/2008 | 1,145 | $26.20 | 29,999.00 |
| **Total** | | **68,790** | | **3,640,173.74** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Wurtz | 10/23/06 | 23,358 | $55.95 | 1,306,880.10 |
| Wurtz | 12/16/06 | 6,368 | $57.04 | 363,230.72 |
| Wurtz | 2/5/2007 | 422 | $56.46 | 23,824.56 |
| Wurtz | 2/5/2007 | 1,984 | $56.50 | 112,090.84 |
| Wurtz | 2/5/2007 | 28,014 | $57.30 | 1,605,143.37 |
| Wurtz | 3/30/2007 | 1,684 | $55.05 | 92,704.20 |
| Wurtz | 4/18/2007 | 582 | $55.87 | 32,516.34 |

117

| Wurtz | 4/19/2007 | 431 | $55.52 | 23,929.12 |
| Wurtz | 4/20/2007 | 409 | $55.85 | 22,842.65 |
| Wurtz | 2/20/2008 | 2,133 | $34.08 | 72,692.64 |
| Wurtz | 3/31/2008 | 1,287 | $27.009 | 34,749.00 |
| Wurtz | 4/18/2008 | 775 | $27.24 | 21,111.00 |
| Wurtz | 4/22/2008 | 313 | $26.20 | 8,200.60 |
| **Total** | | **67,760** | | **3,719,915.14** |

310. Defendants' insider trading was unusual and suspicious. Defendant Thompson sold just over 85,000 shares of Wachovia common stock in the 18 months before the Golden West acquisition, but sold over 116,500 shares in the 14 months between February 2007 and April 2008. Defendant Wurtz sold just over 8,700 shares of Wachovia common stock in the 18 months preceding the Golden West acquisition, but sold over 67,700 shares in the 18 months between October 2006 and April 2008. Defendant Truslow sold just over 29,000 shares of Wachovia common stock in the 18 months preceding the Golden West acquisition, but sold almost 68,000 shares in the 18 months between October 2006 and April 2008.

**Defendants Used Wachovia's Inflated Stock as Currency for Acquisitions During The Purchase Period**

311. Defendants were also motivated to keep Wachovia's stock price artificially inflated because they used it for acquisitions.

312. Before the Purchase Period, Defendants were able to acquire Golden West by payment of 326 million shares of artificially inflated Wachovia common stock as currency.

313. Later in the Purchase Period, on or about October 1,

118

2007, Defendants once again used Wachovia's artificially inflated shares as currency using 72 million shares of Wachovia's common stock to acquire AG Edwards.

314. Defendants reaped additional benefits from Wachovia stock's artificially inflated stock price in the form of an April 14, 2008 public offering of 145.83 million shares, priced at $24 a share. Although that price was significantly below Wachovia's Purchase Period highs, subsequent corrective disclosures reveal that even this offering price was artificially inflated.

## LOSS CAUSATION

315. Throughout the Purchase Period, Wachovia's stock price was artificially inflated because of its false and misleading disclosures. At various intervals during the Purchase Period, Wachovia made partial corrective disclosures. When Wachovia did so, its stock price dropped in response. Even so, its stock price remained artificially inflated because its disclosures were only partial, and because Wachovia continued to conceal its problems. Wachovia did not fully disclose its problems until after the Purchase Period ended.

316. On July 20, 2007, Wachovia announced its second quarter results, which included a dramatic increase to its loss reserves. CEO Thompson stated that Wachovia was "going through a little pain" as a result of the Golden West deal. In response, Wachovia's stock price dropped from $56.61 to $48.40 in the three trading days after that announcement.

317. On October 19, 2007, Wachovia announced its third quarter results, which included $1.3 billion of writedowns for bad loans on its mortgage backed securities, including subprime CDOs. Wachovia also announced that it had more than doubled its loss reserve levels from the prior quarter on Pick-A-Pay loans. Wachovia's stock price dropped from $48.14 to $45.40 in the three days following that announcement.

318. On February 28, 2008, Wachovia announced that it had increased its reserves for expected loan losses, primarily from Pick-A-Pay mortgages, by more than three times the amount Wachovia had set aside for reserves in the previous year. Many of those loans had been originated by Golden West.

319. As reported in media accounts of Wachovia's February 28, 2008 announcement:

> Wachovia's report also provided updates on highly watched aspects of its business, including loan quality and exposure to distressed assets such as mortgage-based securities . . . .
>
> Wachovia also increased the nonperforming assets in its consumer first-lien mortgage portfolio by 9.7% from a report filed last month, to $3.23 billion at yearend, to reflect "a final review of certain modified loans."
>
> At yearend it had about $3.3 billion of nonperforming assets in its entire consumer portfolio.
>
> Many of Wachovia's issues stem from its October 2006 purchase of Golden West Financial Corp., and Oakland, Calif., thrift company that specialized in option

120

adjustable-rate mortgages. Golden West's $120
billion mortgage portfolio accounted for
15.3% of Wachovia's assets at yearend. Paul
Davis, *Wachovia say 2 workers targeted in a
Federal Investigation*, American Banker, Feb
29, 2008.

320. During the last three days in February, Wachovia's
stock price dropped from $34.10 to $30.62 per share.

321. On March 12, 2008, CRO Truslow, announced that the
housing market "appears to be worsening," and that Wachovia saw
particular weakness in the housing markets of California and
Florida, where approximately 70% of Golden West's loans were
made. Deutsche Bank analyst Mike Mayo, who hosted the conference
call with Truslow, commented that "[h]e now expects Wachovia to
charge off 1.1 percent of its Golden West loans as of March 31,
up from his previous estimate 0.65 percent, which reflects the
worst quarterly loss rate for residential mortgages in general
over the last 20 years.'" David Mildenberg, <u>Wachovia Sees
Outlook for U.S. Housing Deteriorating</u>, Bloomberg, March 12,
2008. Wachovia's stock price dropped from $29.78 to $28.05 that
day, and fell to $25.60 by March 17, 2008.

322. On April 14, 2008, Wachovia announced that it would
sell $7 billion worth of stock to raise capital, and had reduced
its dividend, despite prior assurances that it would not need to
do so. Both developments resulted from substantially increased
loss reserve provisioning for Pick-A-Pay mortgages. There had
been no change in those mortgages' performance in recent months
that made these developments suddenly necessary. Rather, the

121

increased reserves reflected a "new" mortgage loss model that belatedly took into account mortgage risks long known to Wachovia (i.e., that borrowers with little, or no equity in their homes presented a higher risk of default). Wachovia revealed, for the first time, that as of February 2008, 14% of its Pick-A-Pay loans matched or exceeded the value of the underlying collateral (i.e., that 14% of its $120 billion Pick-A-Pay loan portfolio had LTV ratios of 100% or more). As a result, Wachovia reported that it had set aside $2.8 billion in reserves to cover problem loans, up from $1.5 billion in fourth quarter 2007, and that it was considering halting the origination of Pick-A-Pay loans in California.

323. Market analysts concluded that Wachovia "obviously didn't take a close enough look at Golden West . . . . The lender's adjustable-rate mortgages, which let borrowers skip payments and add the unpaid interest on the principal, were a formula for disaster by anyone's standard." David Mildenberg, Wachovia Posts Loss, Plans $7 Billion Capital Raising, Bloomberg, Apr. 14, 2008. Wachovia also disclosed that it would take a further $315 million of subprime CDO writedowns. In response, Wachovia shares fell from $27.81 to $25.55.

324. On June 2, 2008, Wachovia announced that its board of directors forced Thompson to retire from the Company. He was replaced as CEO by director Lanty L. Smith. Over June 2 and June 3, 2008 Wachovia's shares declined from $23.80 to $21.92 per

share.

325. The next day, a June 4, 2008 Business Week article ascribed Thompson's ouster to the Golden West fiasco. <u>See</u> Dean Foust, <u>Wachovia: Golden West Wasn't Golden</u>, Business Week, June 4, 2008. The article described not only the devastation wrought by that deal, but also Wachovia's shady (and previously undisclosed) business practices (emphasis added):

> Who[m]ever Wachovia directors pick to succeed Thompson may spend a great deal of time mopping up the mess at Golden West. <u>The thrift's vaunted underwriting proved inadequate</u> when housing prices began to plummet in California and Florida . . . . Analysts figure Wachovia could end up incurring losses of as much as $11 billion on Golden West and $122 billion mortgage portfolio. "You would be hard pressed to find anything good out of this acquisition." says Terry Maltese, president of Sandler O'Neil Asset Management . . . .

> In most mergers, it's the acquirers that exert their will. But right after Wachovia bought Golden West, executives from the S&L took control of all mortgage lending. <u>And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-A-Payment" loans</u> . . . .

> <u>Former brokers say they were given sales targets for the Pick-A-Payment loans and were told to downplay the fact that making the minimum payment would cause the loan balance to rise -- a phenomenon known as "negative amortization." In one training video reviewed by</u> Business Week<u>, brokers were instructed to avoid using terms like "negative amortization" in favor of euphemisms like "deferred interest."</u> (Wachovia has said it does not set quotas by mortgage type) . . . .

123

> Analysts note that Golden West focused too
> much on appraisals an too little on verifying
> the income and assets of applicants . . . .

326. The next day, on June 5, 2008, Goldman Sachs announced that Wachovia might be required to cut its dividends again in light of economic conditions. Wachovia's stock price dropped from $21.59 to $20.13 on June 6, 2008, and to $18.89 on June 9, 2008.

327. On July 9, 2008, Wachovia "pre-announced" financial results for the recently-ended second quarter of 2008. Wachovia warned of an expected $2.6 - $2.8 billion loss for the quarter "driven by higher provision expense, including $4.2 billion pre-tax to build loan loss reserves, $3.3 billion of which related to Wachovia's former Pick-a-Pay loan product." Wachovia also admitted that it would need to write down the value of impaired goodwill, and that such impairment charge would add to Wachovia's above-mentioned losses. On July 10, 2008, during a call with investors, Wachovia's new chairman and CEO, Lanty Smith, admitted that Wachovia had made a serious mistake when it acquired Golden West: "[t]here has been a complete recognition at the board level that Golden West was a mistake and that we have to deal with the consequences of it . . . . It should be recognized that we have come to grips with this issue." In the four trading days after this announcement, Wachovia's stock dropped from $ 14.29 to $9.08.

124

328. On July 22, 2008, Wachovia posted losses of $8.86 billion and again slashed its dividends.  It was only on September 29, 2008 that the true value of Wachovia was finally revealed.  On September 29, 2008, Citigroup Inc. agreed to acquire Wachovia Corp.'s banking operations for $2.1 billion in stock and the assumption of $53 billion in Wachovia debt.  The proposed Citigroup acquisition valued Wachovia's banking operations at a mere $1 per share.

329. Following this revelation of Wachovia's real value, Wachovia stock immediately lost nearly all its remaining value, falling from its previous closing price, $10.00 per share on Friday September 26, 2008, to close on Monday September 29, 2008 at $1.84 per share.  During September 29, 2008 intra-day trading, Wachovia shares fell below $1.00 per share.

330. Later events and disclosures during October and November 2008 confirmed in greater factual detail what had been revealed on September 29, 2008: that Wachovia, under the weight of the losses inherent in its $120 billion Pick-A-Pay portfolio, was nearly worthless.

331. For example, the proposed Citigroup transaction was itself subsidized by government guarantees to backstop Wachovia's mortgage losses should they exceed a certain amount.  Absent such guarantees to limit acquirer losses, Wachovia's executives stated, no buyer could be found.  On October 5, 2008, Robert K. Steel, in an affidavit submitted in Wachovia Corporation v.

<u>Citigroup, Inc.</u>, No. 08 Civ. 8503 (LAK) (S.D.N.Y.), stated the following:

> Shortly after I spoke with Mr. Kovacevich, Sheila Bair, Chairman of the Federal Deposit Insurance Corporation ("FDIC") contacted me by telephone. She advised me that the FDIC believed that no transaction with Citigroup or Wells Fargo could be effected without substantial government assistance. Chairman Bair confirmed that in the FDIC's view this situation posed by a systemic risk to the banking system, and that the FDIC was prepared to exercise its powers under Chapter 13 of the Federal Deposit Insurance Act to effect an open bank assisted transaction. Subsequently, Chairman Bair directed Wachovia to commence negotiations with Citi.

Robert K. Steel Affidavit ¶ 8.

332. On October 22, 2008, Wachovia's new management: (a) posted net losses of $23.9 billion; (b) revealed Wachovia's largest-ever quarterly loss reserve expense, $4.8 billion, 66% of which was dedicated to the Pick-A-Pay portfolio; (c) admitted that cumulative Pick-A-Pay losses would amount to 22% of the entire $120 billion portfolio (or $26.4 billion) -- nearly twice the 12% cumulative loss figure that Defendants had represented months earlier; (d) revealed that, as a result of sharp property price declines in California and Florida (which declines were already sharp two years earlier, in late 2006), and as a result of most Pick-A-Pay borrowers picking to pay minimum payments (which they had been doing all along), the average LTV ratio across Wachovia's $120 billion Pick-A-Pay portfolio had risen

from 71% to a stunning 95%; and (e) acknowledged with a further $18.8 billion writedown what Defendants had long explicitly denied: the substantial devaluation of Wachovia's Pick-A-Pay franchise. After reviewing Wachovia's $498 billion of loan portfolios, Wells Fargo a potential acquirer, disclosed that Wachovia's portfolios was projected to generate losses of $74 billion.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

333. At all relevant times, the market for Wachovia's common stock was an efficient market for the following reasons, among others:

a. Wachovia's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

b. As a regulated issuer, Wachovia filed periodic public reports with the SEC and the NYSE;

c. Wachovia traded an average of 19.6 million shares per day during the Purchase Period;

d. Wachovia regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e.   Wachovia was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

334. As a result of the foregoing, the market for Wachovia's common stock promptly digested current information regarding Wachovia from all publicly available sources and reflected such information in Wachovia's stock price.  Under these circumstances, all purchasers of Wachovia's common stock during the Purchase Period, including Investors, suffered similar injury through their purchase of Wachovia's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

335. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  Many of such statements relied on current or past data, referred to risk factors that were not hypothetical but were in fact happening or were made with actual knowledge of their falsity and, therefore, do not fall in the safe harbor.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual

results to differ materially from those in the purportedly
forward-looking statements.  Alternatively, to the extent that
the statutory safe harbor does apply to any forward-looking
statements pleaded herein, Defendants are liable for those false
forward-looking statements because at the time each of those
forward-looking statements were made, the particular speaker knew
that the particular forward-looking statement was false, and/or
the forward-looking statement was authorized and/or approved by
an executive officer of Wachovia who knew that those statements
were false when made.

## FIRST CLAIM

### Violation of § 10(b) of the Exchange
### Act and Rule 10b-5 Against All Defendants

336. Plaintiffs repeat and reallege each and every
allegation contained above as if fully set forth herein.

337. During the Purchase Period, Defendants carried out a
plan, scheme and course of conduct which was intended to and,
throughout the Purchase Period, did: (a) deceive the investing
public regarding Wachovia's business, operations, management and
the intrinsic value of Wachovia common stock; and (b) caused the
Investors to purchase Wachovia's common stock at artificially
inflated prices.  In furtherance of this unlawful scheme, plan
and course of conduct, each of the Defendants, took the actions
set forth herein.

338. Each of the Individual Defendants' primary liability,

and controlling person liability, arises from the following
facts: (a) the Individual Defendants were high-level executives
and/or directors at Wachovia during the Purchase Period and
members of the Company's management team or had control thereof;
(b) each of these Defendants, by virtue of his responsibilities
and activities as a senior officer and/or director of Wachovia
was privy to and participated in the creation, development and
reporting of the Company's internal budgets, plans, projections
and/or reports; (c) each of these Defendants enjoyed significant
personal contact and familiarity with the internal reports and
other data and information about Wachovia's finances, operations,
and sales at all relevant times; (d) each of these Defendants was
aware of Wachovia's finances, operations and sales at all
relevant times; and (e) each of these Defendants was aware of
Wachovia's dissemination of information to the investing public
which they knew or recklessly disregarded was materially false
and misleading.

339. The Defendants had actual knowledge of the
misrepresentations and omissions of material facts set forth
herein, or acted with reckless disregard for the truth in that
they failed to ascertain and to disclose such facts, even though
such facts were available to them.  Such Defendants' material
misrepresentations and/or omissions were done knowingly or
recklessly and for the purpose and effect of concealing
Wachovia's operating condition from the investing public and

supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Purchase Period, Defendants either had actual knowledge or deliberately failed to take steps necessary to discover whether those statements were false or misleading.

340. As a result of the dissemination of the materially false and misleading information and the failure to disclose material facts, as set forth above, the market price of Wachovia's common stock was artificially inflated during the Purchase Period. In ignorance of the fact that market prices of Wachovia's publicly-traded common stock were artificially inflated, and relying on the integrity of the efficient market for Wachovia securities and/or directly on the false and misleading statements made by Defendants but not disclosed in public statements by Defendants during the Purchase Period (which caused Wachovia's shares to trade at artificially inflated prices), the Investors acquired Wachovia common stock during the Purchase Period at artificially high prices and were damaged thereby.

341. All of the Investors purchased Wachovia stock at a time when its price was artificially inflated. But for the fraud alleged herein, Wachovia's stock would have traded for the price set by the market on September 29, 2008 when the truth was revealed.

## SECOND CLAIM

### Violation of § 20(a) of the Exchange Act Against the Individual Defendants

342. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

343. The Individual Defendants acted as controlling persons of Wachovia within the meaning of Section 20(a) of the Exchange Act. By reason of their positions as officers and/or directors of Wachovia, and their ownership of Wachovia stock, the Individual Defendants had the power and authority to cause Wachovia to engage in the wrongful conduct complained of herein. The Individual Defendants were provided with, or had unlimited access to, copies of Wachovia's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

344. Wachovia and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, the Investors suffered damages in connection with their purchases of Wachovia's common stock during the Purchase Period.

## THIRD CLAIM

### Violations of Section 20A of the Exchange Act
### Against Defendants Thompson, Truslow, and Wurtz

345. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

346. This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants Thompson, Truslow and Wurtz.

347. Each of these Defendants sold substantial numbers of shares of Wachovia common stock during the Purchase Period while in possession of material, adverse, nonpublic information.  This conduct violated Section 20A of the Exchange Act.

348. The Investors purchased shares of Wachovia common stock on the same day as or close in time to sales of Wachovia common stock made by the Defendants named in this Count, while these Defendants were in possession of material, adverse, nonpublic information.  The sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

349. Accordingly, under Section 20A of the Exchange Act, the Defendants named in the Count are liable to the plaintiffs for all profits gained and losses avoided by them as a result of their stock sales, and are required to account for all such sales and to disgorge their profits or ill-gotten gains.

WHEREFORE, plaintiffs demand compensatory damages on all claims against all Defendants, jointly and severally, in an amount to be determined at trial, together with interest and

costs and such other and further relief as the Court may deem just and proper.

Dated:     New York, N.Y.
            May 28, 2010

          KORNSTEIN VEISZ WEXLER &
            POLLARD, LLP.

          By: _____
          Daniel J. Kornstein (DK-3264)
          Daniel A. Cohen (DC-8719)
          757 Third Avenue
          New York, New York 10017
          Tel.:(212) 418-8600
          Fax: (212) 826-3640

              and

          BRAGAR WEXLER EAGEL & SQUIRE, PC

          By: _____
          Paul D. Wexler (PW-9340)
          Jeffrey H. Squire (JS-8910)
          885 Third Avenue, Suite 3040
          New York, New York 10022
          Tel.: (212) 308-5858
          Fax:  (212) 486-0462
          **Attorneys for plaintiffs**