# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————————

Nº 08 Civ. 6171 (RJS)

————————————————

IN RE WACHOVIA EQUITY SECURITIES LITIGATION,

————————————————

Nº 09 Civ. 4473 (RJS)

————————————————

STICHTING PENSIOENFONDS ABP,

Plaintiff,

VERSUS

WACHOVIA CORPORATION, *ET AL.*,

Defendants.

————————————————

Nº 09 Civ. 5466 (RJS)

————————————————

FC HOLDINGS AB, *ET AL.*,

Plaintiffs,

VERSUS

WELLS FARGO & COMPANY, *ET AL.*,

Defendants.

————————————————

Nº 09 Civ. 6351 (RJS)

————————————————

IN RE WACHOVIA PREFERRED SECURITIES & BOND/NOTES LITIGATION,

————————————————

OPINION AND ORDER
March 31, 2011

————————————————

RICHARD J. SULLIVAN, District Judge:

In these related actions, Plaintiffs bring a panoply of claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against Defendant Wachovia Corporation ("Wachovia") and a variety of related entities and individuals. All claims arise from the financial disintegration Wachovia experienced between its 2006 purchase of Golden West Financial Corporation and its 2008 merger with Wells Fargo & Company. Now before the Court are no fewer than seven motions to dismiss four complaints. For the reasons stated herein, those motions are granted in part and denied in part.

## I. BACKGROUND

### A. Facts[1]

The four complaints at issue span a grand total of 605 pages and 1,814 paragraphs.[2] Although the following recitation of facts provides only a bird's-eye view of the litigation, the Court will delve into the details of the pleadings as necessary to resolve particular legal challenges.

#### 1. Overview

The relevant narrative begins in 2006, when Wachovia was one of the country's largest financial services providers, with a market capitalization of $112 billion. (Eq. Compl. ¶ 4.) As a bank holding company, Wachovia engaged in capital management, general banking, and investment banking (id. ¶ 61), and maintained retail banking offices in 21 states (id. ¶ 33).

On October 1, 2006, Wachovia completed its acquisition of Golden West Financial Corporation ("Golden West"), an Oakland-based mortgage lender, for more than $24 billion.[3] (Id. ¶¶ 5, 62.) Prior to the Golden West acquisition, a majority of the loans funded by Wachovia were traditional fixed-rate mortgages. (Id. ¶ 80.) Golden West's main product, however, was a payment option adjustable rate mortgage ("Option ARM") known as the Pick-A-Payment ("Pick-A-Pay") mortgage, which allowed borrowers to choose from multiple payment options each month. (Id. ¶ 5.) Among those options was a "minimum" payment that, because it did not cover the monthly interest, actually increased the principal of the loan – a phenomenon known as "negative amortization." (Id. ¶ 6.)

Plaintiffs allege that following the Golden West acquisition, Wachovia began to focus on selling Pick-A-Pay loans rather than the traditional loans that had previously comprised the bulk of its residential mortgage business. (Id. ¶ 85.) Plaintiffs further allege that Wachovia weakened the credit quality of the Pick-A-Pay portfolio by lowering minimum credit scores (id. ¶ 97), failing to verify borrower income levels (id. ¶ 113), implementing quotas and sales incentives for loan officers (id. ¶ 125), and relying on inflated third-party appraisals of home value (id. ¶ 142). According to Plaintiffs, Wachovia adopted debased underwriting standards and aggressive

---

[1] For the sake of simplicity, the following facts are derived from the *In re Wachovia Equity Securities Litigation* Complaint ("Eq. Compl."), unless otherwise noted. Abbreviations for the other three complaints appear in footnote 11 below.

[2] Including the Complaints, motion papers, and attached exhibits and declarations, the parties have filed no less than 3,130 pages in connection with the pending motions to dismiss.

[3] Golden West was the parent company of World Savings Bank, FSB ("World Savings"). (Eq. Compl. ¶ 5 n.1.)

marketing strategies in order to maximize Pick-A-Pay loan volume "at all costs." (*Id.* ¶ 137; *see id.* ¶ 85.)

### 2. Alleged Misrepresentations

Plaintiffs collectively identify allegedly false and misleading statements made by Wachovia on 24 separate occasions. In the interest of brevity, the Court will summarize a representative sampling of these statements.

On a May 8, 2006 conference call announcing the Golden West acquisition, Defendant G. Kennedy Thompson ("Thompson"), the President and CEO of Wachovia, indicated that Golden West was "obsessed with conservative underwriting," had "no subprime origination," and maintained a "very conservative portfolio." (*Id.* ¶ 169.) On an April 16, 2007 call, Thompson similarly touted the "superior credit quality" of Wachovia's mortgage portfolio. (*Id.* ¶ 190.) "It would be ha[r]d for me to imagine," Thompson said, "how anybody could look at our underwriting of these loans and draw any conclusion . . . other than [that] we are very responsible underwriters." (*Id.* ¶ 194.)

As the housing market continued to decline, Defendants allegedly misrepresented the comparative advantages of the Pick-A-Pay mortgage relative to the troubled subprime market. On a July 20, 2007 conference call, Defendant Donald K. Truslow ("Truslow"), Wachovia's Chief Risk Officer, stated that "we've actively managed our business to minimize our exposure to the subprime market. So as a result there's been little impact to our businesses with the turbulence in the subprime markets . . . ." (*Id.* ¶ 205.) On a January 22, 2008 earnings call, Defendant Thomas J. Wurtz ("Wurtz"), Wachovia's

Chief Financial Officer, referred to a series of charts comparing the Pick-A-Pay portfolio with prime, subprime, and Alt-A industry performance.[4] Wurtz concluded that "[t]here is clear evidence that our Pick-A-Pay portfolio is, to date, performing very similar to the average prime portfolio in the industry . . . ." (*Id.* ¶ 241.)

Plaintiffs separately allege that during 2006 and 2007, Wachovia created, structured, and underwrote approximately $10.11 billion of collateralized debt obligations ("CDOs") backed by pools of subprime mortgages.[5] (*Id.* ¶ 164.) Until November 9, 2007, however, Wachovia allegedly concealed that it had retained more than $2.1 billion of those CDOs. (*Id.*) Wachovia carried these CDOs at par value until October 19, 2007, despite the fact that their value was allegedly impaired no later than February 2007. (*Id.*)

### 3. The Crash

According to the pleadings, the true "risks and realities" of the Pick-A-Pay portfolio began to seep out in early 2008. (*Id.* ¶ 286; *see id.* ¶¶ 287-88.) In an April 14, 2008 conference call, Wachovia disclosed for the first time that 14% of the $120 billion Pick-A-Pay portfolio had loan-to-value (LTV) ratios above 100%.[6] (*Id.*

---

[4] "Alt-A is a classification of mortgages where the risk profile falls between prime and subprime." (Eq. Compl. ¶ 100 n.12.)

[5] "CDOs are a class of asset-backed securities. Essentially, a CDO invests in a group of assets and then issues securities 'collateralized' by those assets." (Eq. Compl. ¶ 302.)

[6] "The LTV ratio compares the amount lent to purchase the property (*e.g.*, $70,000) to the value of the property (*e.g.*, $100,000 – which would yield an LTV of 70%). LTV ratios are one of the primary factors in mortgages' risks of default and in loss

¶ 287.) Defendants simultaneously admitted that due to Pick-A-Pay losses, Wachovia would need to raise billions in new capital and could not afford to continue its dividend payout. (*Id.* ¶ 282.) Thompson was forced to resign as CEO on June 2, 2008. (*Id.* ¶ 24.) The new CEO, Lanty Smith, later admitted to investors that "there has been a complete recognition at the Board level that Golden West was a mistake and that we have to deal with the consequences of it." (*Id.* ¶ 25.)

By late September 2008, Wachovia's share price fell below $1 per share for a market capitalization loss of approximately $109.8 billion from early 2007. (*Id.*) Following a proposed acquisition by Citigroup, Wachovia subsequently merged with Wells Fargo in a $12.7 billion transaction – less than Wachovia had originally paid for Golden West. (Stichting Compl. ¶¶ 22-23.)

### B.  Procedural History

This opinion resolves pending motions to dismiss four distinct complaints: *In re Wachovia Equity Securities Litigation*, No. 08 Civ. 6171; *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09 Civ. 6351; *Stichting Pensioenfonds ABP v. Wachovia Corporation*, No. 09 Civ. 4473; and *FC Holdings AB v. Wells Fargo & Co.*, No. 09 Civ. 5466. The *Bond/Notes* case includes a total of four consolidated cases, and the *Stichting* case includes a total of three consolidated cases.

#### 1.  *In re Wachovia Equity Securities Litigation*

The first relevant case is a putative class action originally captioned *Lipetz v.*

*Wachovia Corporation*, No. 08 Civ. 6171, and filed on July 7, 2008. By Order dated October 14, 2008, the Court appointed New York City Pension Funds as Lead Plaintiff and the law firm of Kirby McInerney LLP as lead counsel. Lead Plaintiff filed an Amended Complaint on December 15, 2008 and a Second Amended Complaint (the "*Equity* Complaint") on May 28, 2010.

The *Equity* Complaint asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder; Section 20(b) of the Exchange Act; Section 11 of the Securities Act; Section 15 of the Securities Act; and Section 20A of the Exchange Act. Named as Defendants are Wachovia, several Wachovia executives, and several investment banks that served as underwriters in connection with various offerings of Wachovia securities.[7] On February 26, 2009, the Court re-captioned the action *In re Wachovia Equity Securities Litigation.*

#### 2.  *Stichting Pensioenfonds ABP v. Wachovia Corporation*

*Stichting Pensioenfonds ABP v. Wachovia Corporation*, No. 09 Civ. 4473, is a companion to the *Equity* action filed on May 8, 2009. Two nearly identical complaints were also filed in this District: *Deka Investment GmbH v. Wachovia Corporation*, No. 09 Civ. 7920, on September 15, 2009; and *Första AP-Fonden v. Wachovia Corporation*, No. 09 Civ. 8205, on September 25, 2009. By Order dated October 30, 2009, these actions were

---

severity to lenders upon default." (Eq. Compl. ¶ 19.)

[7]    The *Equity* Defendants are (1) Wachovia; (2) Individual Defendants Thompson, Wurtz, and Truslow; and (3) Underwriter Defendants Wachovia Securities, Citigroup Global Markets, Inc., UBS Securities LLC, Utendahl Capital Group LLC, Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, and Samuel A. Ramirez & Co.

consolidated with the *Stichting* action for all purposes. The *Stichting* Plaintiffs filed an Amended Complaint (the "*Stichting* Complaint") on May 28, 2010.

The *Stichting* Complaint asserts claims under Section 10(b) of the Exchange Act, and Rule 10b-5, promulgated thereunder; Section 20A of the Exchange Act; and the common law. Named as Defendants are Wachovia, Wells Fargo, and various Wachovia officers and directors.[8]

### 3. *FC Holdings v. Wells Fargo & Company*

*FC Holdings v. Wells Fargo & Company*, No. 09 Civ. 5466, is another follow-on to the *Equity* litigation filed on June 12, 2009. The *FC Holdings* Plaintiffs filed an Amended Complaint (the "*FC Holdings* Complaint") on May 28, 2010.

The *FC Holdings* Complaint asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder; as well as Sections 20(a) and 20A of the Exchange Act. Named as Defendants are Wachovia, Wells Fargo, and various Wachovia officers and directors.[9]

### 4. *In re Wachovia Preferred Securities & Bond/Notes Litigation*

In July 2009, three cases were transferred to this Court from the United States District Court for the Central District of California: *Miller v. Wachovia*

*Corporation*, No. 09 Civ. 6351; *Orange County Employees' Retirement System v. Carlson*, No. 09 Civ. 6374; and *Swiskay v. Wachovia Corporation*, No. 09 Civ. 6457. By Order dated August 20, 2009, the Court consolidated the three actions to become *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09 Civ. 6351. The Court's consolidation Order appointed Orange County Employees' Retirement System, Louisiana Sheriffs' Pension and Relief Fund, and Southeastern Pennsylvania Transportation Authority as co-Lead Plaintiffs, and the law firms of Bernstein Litowitz Berger & Grossmann LLP, Barroway Topaz Kessler Meltzer & Check, LLP, and Robbins Geller Rudman & Dowd LLP as co-lead counsel. Lead Plaintiffs filed a Consolidated Class Action Complaint on September 4, 2009 and an Amended Consolidated Class Action Complaint (the "*Bond/Notes* Complaint") on May 28, 2010.

The *Bond/Notes* Complaint asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act. Named as Defendants are Wachovia, numerous Wachovia executives and directors, Wells Fargo, numerous investment banks that served as underwriters in connection with offerings of Wachovia securities, and the accounting firm KPMG, which audited Wachovia's financial statements in connection with various offerings.[10]

---

[8] The *Stichting* Defendants are (1) Wachovia; (2) Wells Fargo as successor-in-interest to Wachovia; and (3) Individual Defendants Thompson, Wurtz, Truslow, as well as Individual Defendants Lanty L. Smith and Robert K. Steel.

[9] The *FC Holdings* Defendants are (1) Wachovia; (2) Wells Fargo as successor-in-interest to Wachovia; and (3) Individual Defendants Thompson, Wurtz, and Truslow.

[10] The *Bond/Notes* Defendants are (1) Wachovia; (2) Wells Fargo as successor-in-interest to Wachovia; (3) Individual Defendants Thompson, Wurtz, and Truslow, as well as Individual Defendants Peter M. Carlson, Ross E. Jeffries, David M. Julian, Mark C. Treanor, John D. Baker II, Robert J. Brown, Peter C. Browning, John T. Casteen III, Jerome A Gitt, William H. Goodwin, Jr., Mary Ellen C. Herringer, Robert A. Ingram, Donald M. James, Mackey J. McDonald, Joseph Neubauer, Timothy D. Proctor, Ernest S. Rady, Van L. Richey, Ruth G. Shaw, Lanty L. Smith, John C. Whitaker, Jr., and Dona Davis

A substantially identical complaint was filed on September 29, 2009 in *City of Livonia Employees' Retirement System v. Wachovia Corporation*, No. 09 Civ. 8268. By Order dated November 16, 2009, the Court consolidated the *Livonia* action with the *Bond/Notes* action for pre-trial purposes. On December 11, 2009, the Court modified its consolidation Order to provide that, in the event the motions against the *Bond/Notes* action were unsuccessful, Defendants could then move separately against flaws unique to the *Livonia* Complaint. The amended *Bond/Notes* Complaint later incorporated the claims by the City of Livonia Employees' Retirement System ("Livonia").

### 5. The Instant Motions

Following an initial round of briefing on motions to dismiss these related actions, the Court issued an Order dated April 15, 2010, informing the parties that the Court intended to rule no more than once on the sufficiency of the pleadings and advising Plaintiffs that they should leave to amend no later than April 26, 2010. Upon receipt of letters from Plaintiffs in each action seeking leave to amend their complaints, the Court granted leave to amend by Order dated May 3, 2010.

---

Young; (4) Underwriter Defendants Wachovia Capital Market LLC, Banc of America Securities LLC, Barclays Capital Inc., BB&T Capital Markets, Citigroup Global Markets, Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., Guzman & Co., Jackson Securities LLC, Loop Capital Markets LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co., M.R. Beal & Co., Muriel Siebert & Co., Samuel A. Ramirez & Co., Sandler O'Neill & Partners, L.P., UBS Securities LLC, Wells Fargo Securities LLC, and The Williams Capital Group; (5) Issuer Defendants Wachovia, Wachovia Capital Trust IV, Wachovia Capital Trust IX, and Wachovia Capital Trust X; and (6) Defendant KPMG LLP.

After Court approval of a joint briefing schedule, the following motions were filed:

In the *Equity* Action, Defendants filed two motions to dismiss on July 14, 2010, one on behalf of Wachovia and the Individual Defendants (the "Wachovia Defendants"), and one on behalf of the Underwriter Defendants. In the *Stichting* and *FC Holdings* Actions, Defendants moved to dismiss each complaint on July 14, 2010. In the *Bond/Notes* Action, Defendants filed three motions to dismiss: one on behalf of the Wachovia Defendants, one on behalf of the Underwriter Defendants, and one on behalf of KPMG. The motions in all cases were fully submitted as of September 15, 2010.[11]

---

[11] In ruling on the instant motions, the Court has considered the following documents: the *Equity* Complaint ("Eq. Compl."); the *Stichting* Complaint ("Stichting Compl."); the *FC Holdings* Complaint ("FC Holdings Compl."); the *Bond/Notes* Complaint ("B/N Compl."); Wachovia Defendants' Consolidated Memorandum of Law in Support of the Motions to Dismiss the *Equity* and *Bond/Notes* Complaints ("Wachovia Consol. Mem."); the Underwriter Defendants' Memorandum of Law in Support of the Motion to Dismiss the *Equity* Complaint ("UD Eq. Mem."); Plaintiffs' Consolidated Memorandum of Law in Opposition to the Wachovia Defendants' and Underwriter Defendants' Motions to Dismiss the *Equity* Complaint ("Pls.' Eq. Opp'n"); the Wachovia Defendants' Consolidated Reply Memorandum of Law in Support of the Motions to Dismiss the *Equity*, *Stichting*, *FC Holdings*, and *Bond/Notes* Complaints ("Wachovia Consol. Reply"); the Underwriter Defendants' Reply Memorandum of Law in Support of the Motion to Dismiss the *Equity* Complaint ("UD Eq. Reply"); the Wachovia Defendants' Memorandum of Law in Support of the Motion to Dismiss the *Stichting* Complaint ("Wachovia Stichting Mem."); the *Stichting* Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss the *Stichting* Complaint ("Pls.' Stichting Opp'n"); the Wachovia Defendants' Memorandum of Law in Support of the Motion to Dismiss the *FC Holdings* Complaint ("Wachovia FC Holdings

## II. Legal Standards

### A. Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). If the plaintiff "ha[s] not nudged [his] claims

Mem."); the *FC Holdings* Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss the *FC Holdings* Complaint ("Pls.' FC Holdings Opp'n"); the Underwriter Defendants' Memorandum of Law in Support of the Motion to Dismiss the *Bond/Notes* Complaint ("UD B/N Mem."); Defendant KPMG's Memorandum of Law in Support of the Motion to Dismiss the *Bond/Notes* Complaint ("KPMG Mem."); the *Bond/Notes* Plaintiffs' Combined Memorandum of Law in Opposition to the Wachovia, Underwriter, and KPMG Motions to Dismiss the *Bond/Notes* Complaint ("Pls.' B/N Opp'n"); the Underwriter Defendants' Reply Memorandum of Law in Support of the Motion to Dismiss the *Bond/Notes* Complaint ("UD B/N Reply"); Defendant KPMG's Reply Memorandum of Law in Support of the Motion to Dismiss the *Bond/Notes* Complaint ("KPMG Reply"); as well as the various declarations and exhibits accompanying these documents.

across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Securities Fraud

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns*, 493 F.3d at 99. The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).

#### 1. Rule 9(b)

Although the rules of federal pleading usually require only "a short and plain statement" of the plaintiffs' claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "state[d] with particularity," Fed. R. Civ. P. 9(b). *See ATSI Commc'ns*, 493 F.3d at 99. In order to satisfy Rule 9(b), the plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

#### 2. PSLRA

The PSLRA expanded on Rule 9(b)'s requirements by mandating a uniform national pleading standard for securities fraud actions. "The statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is

misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1)). "Therefore, while we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quotation marks omitted).

### III. DISCUSSION

### A. Section 10(b) Claims

Plaintiffs' principal securities fraud claims are brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, the companion SEC provision, 17 C.F.R. § 240.10b-5(b). Rule 10b-5 provides, in relevant part, that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.* To state a claim for securities fraud under Section 10(b) and Rule 10b-5, the plaintiff must adequately plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

In this case, Section 10(b) and Rule 10b-5 claims appear in the *Equity* Complaint, the *FC Holdings* Complaint, and the *Stichting* Complaint. Defendants argue that all three complaints fail to plead materiality and scienter, and that the *FC Holdings* and *Stichting* Complaints also fail to plead reliance and causation.

### 1. Scienter

Under the PSLRA, a well-pled scienter allegation must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). Recklessness, defined as "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *South Cherry*, 573 F.3d at 109 (internal quotation marks and alterations omitted), is also a "sufficiently culpable mental state for securities fraud" in the Second Circuit, *ECA*, 553 F.3d at 198.

The requisite strong inference of scienter can be established by alleging facts (a) showing that the defendants had both motive and opportunity to commit the fraud, or (b) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI Commc'ns*, 493 F.3d at 99. In an alternate four-part formulation, the Second Circuit has held that a strong inference of scienter may arise from sufficient allegations that the defendants:

> "(1) benefited in a concrete and personal way from the purported

fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information they had a duty to monitor . . . ."

*South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 311). Although some degree of tension exists between the scienter framework of the two opinions, the Court does not read *South Cherry* to have silently overruled the two-pronged standard employed seven months earlier in *ECA*. Accordingly, the Court will apply the two-pronged scienter standard here, mindful that litigants need not rely on "magic words such as 'motive and opportunity' with respect to intent." *South Cherry*, 573 F.3d at 109. The resulting inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.[12]

a. Motive and Opportunity

It is undisputed that as senior officers and directors at Wachovia, the Individual Defendants had the "opportunity" to commit fraud. *See In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 529-30 (S.D.N.Y. 2009); *accord Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996). Thus, the relevant question is whether Plaintiffs have adequately pled "motive."

In order to raise a strong inference of scienter through motive and opportunity to defraud, Plaintiffs must allege that the Individual Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (internal citation omitted). However, "it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *South Cherry*, 573 F.3d at 109 (internal citation omitted). By contrast, insider trading is considered a classic example of a "concrete and personal" benefit that suffices to plead motive to commit securities fraud. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).

In this case, the *Equity* and *Stichting* Plaintiffs primarily allege motive to defraud based on "highly unusual and suspicious" insider stock sales. (Eq. Compl. ¶ 453; Stichting Compl. ¶ 325.) The *Equity* and (to a lesser extent) *Stichting* Plaintiffs also allege that the Individual Defendants inflated Wachovia's stock value as "currency" for corporate acquisitions and received increased compensation based on inflated financial performance, thereby bolstering the inference of motive. (*See, e.g.*, Eq. Compl. ¶ 457; Pls.' Eq. Opp'n 63; Pls.' Stichting Opp'n 44 n.31.) Each of these motive allegations fails.

For purposes of the insider trading inquiry, "[f]actors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number

---

[12]   In conducting the scienter analysis that follows, the Court has separately considered the merits of the *Equity*, *Stichting*, and *FC Holdings* Complaints and noted relevant distinctions in their respective Section 10(b) claims.   In the interest of brevity, however, illustrative citations are frequently drawn from the *Equity* Complaint.

of insiders selling." *In re Scholastic Corp.*, 252 F.3d at 74-75. Plaintiffs here describe the Class Period stock sales of Defendants Thompson, Wurtz and Truslow as "highly unusual, and therefore suspicious" based on the amount and percentage of shares sold, the timing of the sales, and the comparison with Defendants' prior trading histories. (Eq. Compl. ¶ 453; Stichting Compl. ¶ 325.) According to the transaction charts in the pleadings (Eq. Compl. ¶ 455; Stichting Compl. ¶ 327), Defendants appear to have dumped tens of thousands of Wachovia shares throughout the subprime mortgage crisis. But Defendants' SEC filings belie this account by confirming a substantial net increase in their vested Wachovia stock holdings over the course of the Class Period. (Wachovia Consol. Mem. 17; Eric A. Hirsch Decl., March 19, 2009, Exs. 33-35, No. 08 Civ. 6171, Doc. No. 46.) Although a net increase in company holdings does not conclusively negate scienter, courts in this Circuit have suggested that purchasing during the class period "signals only confidence in the future of th[e] company." *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009); *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).[13]

In an attempt to corroborate the existence of unusual trading activity, the

*Equity* Plaintiffs thinly allege that the insider sales were "suspiciously timed." (Pls.' Eq. Opp'n 60.) Although the *Equity* Complaint includes more than 50 pages of alleged misstatements over a period of 29 months, the *Equity* Plaintiffs identify only one transaction by a named Defendant that occurred close in time to an alleged misstatement. (*Id.*; *see* Eq. Compl. ¶ 455.) The other allegedly suspicious transaction appears only in the opposition papers and concerns Wachovia executive David Carroll, who is neither named as a Defendant nor mentioned in the *Equity* Complaint. (Pls.' Eq. Opp'n 60.) Because the *Equity* Plaintiffs have failed to plead Carroll's identity or trading history, the Court declines to consider the Carroll transaction. In the absence of further evidence of unusual insider sales, the Court concludes that Defendants' trading history cannot support a strong inference of scienter.

Plaintiffs' second motive allegation, that Defendants inflated Wachovia stock value as currency for the acquisitions of Golden West and A.G. Edwards,[14] is similarly unavailing. Although "the artificial inflation of stock prices in order to acquire another company may, in some circumstances, be sufficient for scienter . . . the inquiry is an extremely contextual one." *ECA*, 553 F.3d at 201 n.6 (internal citation and quotation marks omitted). In this case, the first alleged misrepresentation in the *Equity* Complaint is the May 8, 2006 conference call announcing the Golden West acquisition. (Eq. Compl. ¶ 169.) Only three of the 21 statements identified as materially misleading occurred before Wachovia closed the Golden West deal on October 1,

---

[13] *But see In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068 (C.D. Cal. 2008) (finding that insider stock sales "could properly be viewed as an attempt to keep the ball rolling . . . for a period of time before the weight of the loan origination practices began taking its toll on the Company's operations and the value of the stock"). The Court notes that the scienter allegations in *In re Countrywide*, which included testimony from a former vice president who reported his concerns about "low documentation" loans and inflated appraisals up the corporate ladder, *id.* at 1060, are easily distinguished from the allegations at issue here.

---

[14] "In June 2007, Wachovia acquired A.G. Edwards in exchange for approximately 72 million shares of Wachovia common stock." (Eq. Compl. ¶ 31 n.3.)

2006.[15]   (*Id.* ¶¶ 167-77.)   The Court is unpersuaded that a transaction announced and completed within the first five months of the Class Period creates an inference of motive to inflate Wachovia's share price in the two years that followed.  Neither do the scant mentions of A.G. Edwards in the *Equity* Complaint form a plausible connection between the A.G. Edwards acquisition and the alleged misstatements.  At most, Plaintiffs have alleged only "a generalized desire to achieve a lucrative acquisition proposal," which fails to establish the requisite scienter. *ECA*, 553 F.3d at 201.

Finally, the motive allegation based on Defendants' incentive compensation is also unpersuasive.  It is well established that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  Here, the *Equity* Plaintiffs note that Defendants "received cash incentive awards based on earnings-per-share and profit goals directly related to corporate . . . performance."  (Pls.' Eq. Opp'n 63 (quotation marks omitted)).  But if scienter could be pled on the sole basis of executive compensation, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito*, 47 F.3d at 54.  Because executive compensation can support but not independently sustain an inference of motive, the failure of the first two motive allegations is fatal to the third.

---

[15]   The *Stichting* Complaint pegs the first alleged misrepresentation to the May 7, 2006 press release announcing Wachovia's plans to acquire Golden West (Stichting Compl. ¶ 184), and only five of the 24 enumerated statements occurred before the completion of the Golden West acquisition.  (*Id.* ¶¶ 184-200.)

Accordingly, the Court finds that Plaintiffs have failed to plead a strong inference of scienter by showing that Defendants had motive and opportunity to commit fraud.

b.  Conscious Misbehavior or Recklessness

Where motive is not apparent, a plaintiff may also raise a strong inference of scienter by showing circumstantial evidence of conscious misbehavior or recklessness, although "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308 (internal citations omitted).  Because Plaintiffs allege no facts to support an inference that Defendants engaged in such behavior, the relevant question is whether Plaintiffs have adequately pled recklessness.

In the context of securities fraud, a "reckless disregard for the truth" means "conscious recklessness," defined as "a state of mind approximating actual intent, and not merely a heightened form of negligence." *South Cherry*, 573 F.3d at 109. Recklessness is sufficiently pled where the plaintiff specifically alleges that defendants either (1) knew facts or had access to information contradicting their public statements, or (2) failed to review or check information they had a duty to monitor. *Novak*, 216 F.3d at 308.  "'[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)

(*Dynex I*) (quoting *Novak*, 216 F.3d at 309); *see also In re PXRE*, 600 F. Supp. 2d at 536 (holding that plaintiffs seeking to establish recklessness must allege "that specific contradictory information was available to the defendants at the time they made their misleading statements").

### i.   General Pleading Defects

In the context of the recklessness inquiry, the primary defect in Plaintiffs' Section 10(b) pleadings is the absence of any serious effort to specify the contradictory information available to Defendants at the time of the alleged misstatements.   Although Plaintiffs generally allege that Defendants "received reports detailing significant and widespread problems with Wachovia's lending," they fail to adequately identify the particular reports at issue. (Eq. Compl. ¶ 437; FC Holdings Compl. ¶ 296; *see* Stichting Compl. ¶ 315.)   For example, the *Equity* Complaint and *FC Holdings* Complaint allege that automated "quarterly reports were complied [sic] for management's review, detailing information related to the Company's loan origination, including standards implemented and underwriting guidelines."[16]   (Eq. Compl. ¶ 437; FC Holdings Compl. ¶ 296.)   Such allegations fail to specify which reports revealed the widespread lending problems, what information those reports contained, and whether the reports contradicted the public declarations of Defendants.   Thus, no inference of access to contrary facts arises. *See Dynex I*, 531 F.3d at 196.

The Confidential Witness ("CW") allegations scattered throughout the pleadings are no more successful than the unspecified quarterly reports in establishing an inference of recklessness.   Plaintiffs identify CWs ranging from loan processors to regional managers who variously characterize the Wachovia underwriting process as "deteriorating" (Eq. Compl. ¶ 96), riddled with risky lending practices (*see id.* ¶ 154), and "nothing short of fraud" (*id.* ¶ 110).   Despite these colorful accusations, however, there is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period.   The absence of such communication undermines the inference that Defendants recklessly disregarded the truth about Wachovia's mortgage portfolio while publicly trumpeting the virtues of the Pick-A-Pay product.   *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010); *In re PXRE*, 600 F. Supp. 2d at 537.

In addition to the missing link problem, the majority of the CW allegations are either undated or pegged to an indefinite time period (*i.e.*, "after the acquisition"). (*See, e.g.*, Eq. Compl. ¶¶ 199, 448; FC Holdings Compl. ¶¶ 110, 229.)   This omission renders the task of matching CW allegations to contrary public statements all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged

---

[16]   The *Stichting* Complaint alleges only that "Defendants received reports and/or had access to reports detailing the Company's loan origination statistics, including information concerning compensation of loan personnel who sold Pick-A-Pay loans." (Stichting Compl. ¶ 315.)

misstatement.[17]  In lieu of pleading contrary facts, the *Equity* Plaintiffs pen a sprawling novella on the subprime mortgage crisis, apparently relying on the metanarrative of the Wachovia collapse to infuse the alleged misstatements with an aura of fraud.  Such a pleading strategy effectively requires the Court to reconstruct the chronology of Class Period allegations in order to decipher what Defendants knew or should have known on the date of a particular statement.  Because Rule 9(b) and the PSLRA contemplate heightened rather than debased pleading standards, the Court declines to find an inference of recklessness on the basis of the CW allegations.

### ii. "Core Operations" Theory

In the absence of allegations regarding Defendants' access to contrary facts or contact with confidential sources, Plaintiffs appeal to the "core operations" doctrine, arguing that "scienter may be imputed to key officers who should have known facts relating to the '"core operations"' of their company."  (Pls.' Eq. Opp'n 47; *see* Pls.' Stichting Opp'n 29-30; Pls.' FC Holdings Opp'n 9-10.)  The *FC Holdings* and *Stichting* Plaintiffs cite *In re Atlas Air Worldwide Holdings, Inc. Securities*

*Litigation*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004), for the proposition that knowledge of false financial statements can be imputed to key officers of the company.  (Pls.' Stichting Opp'n 29-30; Pls.' FC Holdings Opp'n 9-10.)  The *Equity* Plaintiffs string cite cases from this District and other jurisdictions for the same proposition.  (Pls.' Eq. Opp'n 47-48.)

What Plaintiffs neglect to consider is that the Second Circuit has yet to pass on the current viability and scope of the "core operations" theory following the passage of the PSLRA in 1995.  *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010).  The seminal "core operations" case in the Second Circuit, *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989),  preceded the PSLRA by six years, and post-PSLRA decisions in other circuits have cast doubt on the strength of the "core operations" inference.  *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-85 (9th Cir. 2008); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003).  This tension is mirrored in recent cases within this District, where courts have adopted a range of positions on the issue.  Courts in one camp continue to apply the "core operations" doctrine and cite *Atlas* with approval.  *See In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010); *In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009) (*Dynex II*).  Others have either distinguished *Atlas*, *see 380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 225 (S.D.N.Y. 2008), or questioned the continued viability of the "core operations" doctrine after the PSLRA, *see Glaser v. The9, Ltd.*, No. 09 Civ. 08904 (RJH), 2011 WL 1106713, at *19 n.17 (S.D.N.Y. March 28, 2011); *Arbitron*, 741 F. Supp. 2d at 490;

---

[17]  In at least one instance, the *Equity* Complaint alleges the falsity of a Class Period statement based on the allegations of a CW who was not employed by Wachovia at the time of the alleged misstatement.  (*Compare* Eq. Compl. ¶ 177 ("The May 16, 2006 statements are false because there was nothing conservative about the Pick-A-Pay loans.  According to CW1, at least 90% and probably more of the Pick-A-Pay loans were stated income/no documentation loans with FICO scores in the low 600s."), *with id.* ¶ 52 ("CW1 was a sales strategist and Mortgage Banking Executive for Wachovia Mortgage from 2007 to October 2008.").)  Although such errors are certainly not dispositive of the scienter inquiry, they do not help the *Equity* Plaintiffs' case for Section 10(b) liability.

*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 (S.D.N.Y. 2006).

Based on the trajectory of "core operations" law in this and other circuits, the Court ventures to suggest that the future of the doctrine may be tenuous. Indeed, the plain language of the PSLRA, which requires facts supporting the scienter inference to be "state[d] with particularity," would seem to limit the force of general allegations about core company operations. 15 U.S.C. § 78u-4(b)(1). In the absence of Circuit guidance, the Court considers "core operations" allegations to constitute supplementary but not independently sufficient means to plead scienter.

iii. Plaintiffs' Individual Allegations

Having identified the general defects of the pleadings and the state of "core operations" law, the Court now proceeds to examine Plaintiffs' factual allegations of recklessness. In doing so, the Court must ultimately determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. Nonetheless, for the sake of clarity and ease of analysis, the Court will first examine Plaintiffs' allegations by category before undertaking the required holistic assessment. *See In re PXRE*, 600 F. Supp. 2d at 536-37.

(1) "Conservative" Underwriting Standards

The first and largest category of alleged misstatements concerns Defendants' repeated public declarations of their "conservative" underwriting standards and credit risk management. For example, on the May 8, 2006 conference call announcing the Golden West acquisition, Thompson characterized Golden West as "obsessed with conservative underwriting." (Eq. Compl. ¶ 169; Stichting Compl. ¶ 188.) In another instance, Wachovia's 2Q 2007 Form 10-Q, filed with the SEC on July 30, 2007, stated that "[t]he low level of net charge-offs reflects the highly collateralized nature of our loan portfolio and our careful management of inherent credit risk." (Eq. Compl. ¶ 211; Stichting Compl. ¶ 234; FC Holdings Compl. ¶ 121.) Similar statements were repeated in conference calls and SEC filings throughout the Class Period.

The parties brief this category of alleged misstatements primarily to contest the question of falsity rather than scienter. Citing a litany of nonbinding authority, Plaintiffs argue that "[c]ourts have routinely held that misrepresentations concerning the quality of a company's underwriting are actionable under the securities laws." (Pls.' Eq. Opp'n 27; *see* Pls.' Stichting Opp'n 13-16; Pls.' FC Holdings Opp'n 7-9.) *See, e.g.*, *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.'"); *In re New Century*, 588 F. Supp. 2d 1206, 1215, 1226 (C.D. Cal. 2008) (holding public statements regarding the company's "strong" credit quality and "strict" underwriting guidelines actionable).

Defendants counter with the Second Circuit's opinion in *ECA*, which held that statements asserting a "highly disciplined" risk management process, a reputation for "integrity," and a "focus on financial discipline" were "no more than 'puffery' which does not give rise to securities violations." 553 F.3d at 205-06. The relevant rule from *ECA* is that statements "too general to cause a reasonable investor to rely upon them" are not actionable. *Id.* at

206. Applied to these facts, the *ECA* rule dictates a similar result, sweeping the contested Wachovia descriptors into the category of commonplace statements too general to cause reliance by a reasonable investor.[18] Since *ECA* and not *Shapiro* controls in the Second Circuit, the Court finds that Defendants' statements about their "conservative" underwriting and risk management constitute corporate puffery rather than actionable misrepresentations.

Because this class of statements forms the crux of Plaintiffs' theory of securities fraud, however, the Court will also consider the relevant scienter analysis. Assuming *arguendo* that these statements are actionable, Plaintiffs still fail to raise an inference that Defendants knew or should have known the contrary facts at the time of the challenged statements. In other recent securities fraud cases, corporate statements about underwriting standards have triggered Section 10(b) liability where the defendants internally approved the debasement of underwriting standards while publicly touting the company's cautious and conservative underwriting approach. *See In re CIT Group Inc. Sec. Litig.*, No. 08 Civ. 6613 (BSJ), 2010 WL 2365846, at *2-3 (S.D.N.Y. June 10, 2010); *In re Ambac Fin. Group., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 266-68 (S.D.N.Y. 2010). By contrast, Plaintiffs here supply no particularized allegations that Defendants knew or should have known that their underwriting standards were *not* conservative while publicly maintaining the opposite.

The *Stichting* Plaintiffs do argue in their opposition papers that at the time of the conservative underwriting statements, "Defendants had access to information and knew . . . that Pick-A-Pay loans were being originated without regard to borrowers' credit scores and with minimal or no documentation, and that employees and outside brokers were trained and incentivized to utilize aggressive sales tactics to close loans." (Pls.' Stichting Opp'n 8-9.) However, the supporting citations to the *Stichting* Complaint make no attempt to supply factual allegations regarding what Defendants knew and when they knew it. (*See* Stichting Compl. ¶¶ 116-20, 123-34, 136-38.) Coupling field office anecdotes with incriminating adverbs (*see id.* ¶ 133 ("Defendants knowingly increased the concentration of risky loans in Wachovia's portfolio")) is not enough to raise an inference of scienter. In the absence of specific factual allegations, the Court does not find this category of statements to constitute evidence of recklessness.

### (2) Pick-A-Pay Loan Features

Plaintiffs also allege that Defendants' statements about the distinguishing structural features of Pick-A-Pay loans misrepresented the risks inherent in the product. (*See* Eq. Compl. ¶ 100; Stichting Compl. ¶¶ 100-01; FC Holdings Compl. ¶¶ 85-87.) In particular, Plaintiffs target public statements regarding (1) the 7.5% annual payment increase cap built into the Pick-A-Pay structure; and (2) the 10-year delay before Pick-A-Pay mortgages "recast" to fully amortizing rates. There is no dispute that Defendants repeatedly represented these features as distinguishing characteristics and advantages of the Pick-A-Pay loan relative to other Option ARMs.

---

[18]   The Court is not persuaded by Plaintiffs' suggestion that the terms "rigorous" and "conservative" become actionable when used to describe the underwriting process. (Pls.' Eq. Opp'n 30.) The law of the Second Circuit does not support the proposition that adjectives which otherwise constitute puffery become actionable when attached to a particular noun.

For example, in a November 9, 2007 conference call, Truslow stated that "there really are very significant differences in the [Pick-A-Pay] product" (Eq. Compl. ¶ 217), including the "7.5% payment cap on the minimum payment which protects consumers" (*id.* ¶ 222). In a January 22, 2008 conference call regarding 4Q 2007 earnings, Wurtz claimed that "[t]here is clear evidence that our Pick-A-Pay portfolio is, to date, performing very similar to that of the average prime portfolio in the industry . . . ." (*Id.* ¶ 241.) When questioned about the relative quality of the Option ARM portfolio in a January 30, 2008 conference call, Thompson replied that "our option ARMs were totally different than the other option ARMs in the market . . . . We've got a cap on payment rates going up by more than 7.5%. We underwrote to the fully-indexed rate, not to the teaser rates. Our average going on LTV was somewhere in the 70% to 72% range. So we've got a cushion . . . ." (*Id.* ¶¶ 267-68.)

Plaintiffs do not dispute that the enumerated features of the Pick-A-Pay loan existed (*see* Pls.' Stichting Opp'n 20), or that they operated to slow the rate of default during the early stages of the financial crisis (*see* Eq. Compl. ¶ 106). Rather, Plaintiffs argue that Wachovia misrepresented these features as protective measures against borrower "payment shock" due to adjustable rate resets in the volatile real estate market. (*See id.* ("Defendants knew that the 7.5% annual payment increase cap did not obviate or eliminate the 'payment shock' risk of these mortgages, but merely delayed it.").) According to Plaintiffs, Wachovia willfully ignored the fact that Pick-A-Pay loans would produce "exactly the same levels of payment shock" as other mortgages, but would do so in "slow motion." (*Id.*)

Although the product design did not ultimately rescue the Pick-A-Pay loans from the fate of other Option ARMs, that fact is not enough to plead scienter. By alleging that Defendants recklessly disregarded the "slow motion" demise of the Pick-A-Pay portfolio, Plaintiffs rely on a flawed assumption about the determinate outcome of the financial crisis. Pick-A-Pay loans eventually produced levels of payment shock equivalent to other mortgages – but only because the crisis outlasted the cushion of structural delay embedded in the product. To find scienter on these facts would be to assume that the duration of the financial crisis was both inevitable and foreseeable to Defendants. Because "lack of clairvoyance simply does not constitute securities fraud," the Court does not find this category of alleged misstatements to support an inference of recklessness. *Acito*, 47 F.3d at 53.

(3) Fully-Indexed Underwriting

Plaintiffs further allege that Defendants misrepresented the risk profile of the Pick-A-Pay loans by stating that the portfolio was underwritten to the fully-indexed rate rather than the initial teaser rate. For example, in an April 16, 2007 conference call, Thompson contrasted Wachovia with peer lenders, noting that "I also think that many competitors were underwriting to the introductory or teaser rate. And Golden West has never done that. We've always underwritten to a fully indexed rate, which we will continue." (Eq. Compl. ¶ 194; Stichting Compl. ¶ 216; FC Holdings Compl. ¶ 104.) The implied benefit of fully-indexed underwriting was that Wachovia would evaluate the income of their borrowers "to ensure that they would satisfy their loan payments after the end of the introductory period." (Pls.' Eq. Opp'n 26.)

16

Once again, Plaintiffs primarily dispute the stated advantage of underwriting Pick-A-Pay loans to the fully-indexed rate. In particular, the *Equity* Plaintiffs argue that any risk protection afforded by fully-indexed underwriting was nullified "by Wachovia's general practice not to verify borrowers' assets or income," a procedure known as "stated income" lending. (*Id.*) However, Wachovia executives disclosed the Company's use of stated income lending as early as January 2007 during public testimony before the California Senate Committee on Banking, Finance and Insurance.[19] (*See* Eric A. Hirsch Decl., Sept. 9, 2010, Ex. 8; Wachovia Consol. Reply 32.) The mere fact of that disclosure undermines any credible theory of scienter. In any event, that Wachovia's practices were distinguishable from those of their competitors in some ways and not in others is not fraud, especially when Defendants made no attempt to represent otherwise. Accordingly, the Court cannot impute an inference of recklessness to Defendants based on the purported tension between two lending practices.

(4) LTV Ratios

Plaintiffs also allege that Wachovia touted low initial loan-to-value (LTV) ratios as a competitive advantage of the Pick-A-Pay portfolio while concealing the rise of current LTV ratios throughout the Class Period.[20] For example, Truslow represented in a January 22, 2008 conference call that "the average current loan-to-value across the [Pick-A-Pay] portfolio . . . is basically unchanged since origination, coming in around 72%." (Eq. Compl. ¶ 249; Stichting Compl. ¶ 261; FC Holdings Compl. ¶ 162.) The *Equity* Plaintiffs assert that these and similar statements were materially misleading because "the LTV ratios of Wachovia's Pick-A-Pay loans were rising dramatically from both the 'L' end (the loan amount) and the 'V' end (the property value), so that they bore little resemblance to the initial LTV ratios touted by Defendants." (Eq. Compl. ¶ 103(a).)

The scienter allegations for the LTV ratio statements primarily rely on Defendants' purported knowledge of market dynamics. According to the *Equity* Plaintiffs, "Defendants were aware *ab initio* that LTV ratios were . . . being squeezed upward from both ends," but nonetheless persisted in providing outdated LTV ratios to investors. (*Id.*) What emerges from the pleadings is a plausible market narrative in which loan amounts rise due to negative amortization, property values fall due to the housing market crash, and Defendants incur Section 10(b) liability by doggedly denying both. But pleading an inference of recklessness requires more than mere narrative, and Plaintiffs fail to support their story with contrary facts that were available to Defendants at the time of the alleged misstatements. Although Plaintiffs allege a divergence between current and initial LTV ratios, they offer no contemporaneous information to specify what the current LTV disclosure should have been throughout the Class Period. (*See* Wachovia Consol. Mem. 63.) In the absence of such factual

---

[19] "The court can . . . consider public records without converting the motion [to dismiss] to one for summary judgment." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 504 (S.D.N.Y. 2009)

[20] The *Equity* Plaintiffs explain the significance of LTV ratios as follows: "Mortgages with low LTVs experience both lower risk of default and lower (or no) loss to lenders upon default. This is because a borrower with substantial equity invested in a home is less likely to default; conversely, a borrower with little or no equity in the property has less to lose upon default and thus is more likely to default." (Eq. Compl. ¶ 102.)

allegations, the Court cannot conclude that Defendants recklessly disregarded contrary facts.

Subsequent LTV disclosures do not change this result. In an April 14, 2008 conference call announcing 1Q 2008 results, Wachovia disclosed for the first time that 14% of the Pick-A-Pay portfolio had LTV ratios above 100%. (Eq. Compl. ¶ 287.) Although the *Equity* Plaintiffs characterize this news as "[a]nother new disclosure of an old reality" (*id.*), they fail to plead contemporaneous facts that contradict previous LTV disclosures or suggest that Wachovia should have disclosed the new LTV ratios any earlier. Accordingly, the Court declines to base an inference of recklessness on the LTV ratio statements.

(5) Appraisal Process

Plaintiffs further allege that Wachovia falsely represented its in-house appraisal process as an advantage of the Pick-A-Pay portfolio while instead relying on third-party appraisers. (*See* Pls.' Eq. Opp'n 22; Pls.' Stichting Opp'n 31.) For example, in an April 16, 2007 conference call, Truslow stated that "[m]ost appraisals are completed by in-house appraisers" and characterized the appraisal process as "very robust." (Eq. Compl. ¶ 192; Stichting Compl. ¶ 136; FC Holdings Compl. ¶ 107.)[21] During a January 22, 2008 conference call on 4Q 2008 earnings, Truslow again stressed Wachovia's use of its "own appraisers embedded in the market" as a competitive advantage. (Eq. Compl. ¶ 198.) By contrast, Plaintiffs cite the testimony of CW4, who recounts that "after the acquisition, Wachovia did not follow

Golden West's tradition of utilizing in-house appraisers to value properties for Pick-A-Pay loans, but instead used outside, third-party appraisers." (*Id.* ¶ 199.)

With respect to the appraisal process, Plaintiffs' falsity and scienter allegations both rest squarely on the testimony of CW4. The pleadings identify CW4 as a regional loan operations manager at World Savings and Wachovia from 1996 through October 2008. (*Id.* ¶ 55.) In one regional management role, CW4 supervised loan officer training for 15 branch offices in New York and New Jersey. (*Id.*) Based on this employment history, CW4 alleges that after the Golden West acquisition, Wachovia's in-house appraisers "were relegated to merely reviewing the work done by the outside appraisers." (*Id.* ¶ 199.) According to CW4, the outsourcing rendered appraisals less reliable "because the outside appraisers had a reputation for assigning higher value to homes." (*Id.*)

Assuming *arguendo* that falsity is satisfied on the basis of a single confidential source, the CW4 allegations still fail to plead scienter. Plaintiffs allege no direct contact between CW4 and Defendants and provide no evidence that similar reports regarding outside appraisals circulated to senior Wachovia management. Instead, Plaintiffs appeal to CW4's regional management experience, reasoning that he "was in a position to have observed the routine use of third-party appraisers in the fifteen branch offices he supervised." (*See* Pls.' Eq. Opp'n 22.) Plaintiffs' scienter argument reduces to an implicit "core operations" inference. Because CW4 alleges widespread use of outside appraisals at his 15 branch offices, Plaintiffs infer that Defendants must have known or recklessly disregarded the same. But Plaintiffs fail to support the "core operations" inference with

---

[21] The *Stichting* Complaint alternately attributes the same quote to both Wurtz (Stichting Compl. ¶ 136) and Truslow (*id.* ¶ 217).

allegations regarding the significance of in-house appraisal policy relative to core Wachovia business. Nor do Plaintiffs specify the size of the region supervised by CW4 relative to the total number of branch offices. Absent such allegations, the testimony of CW4 could describe the anomalies of a rogue fiefdom rather than company-wide practices that rise to the level of a core operation. Accordingly, the Court declines to make the leap required to impute knowledge of outside appraisals to Defendants.

(6) Subprime Lending

Plaintiffs particularly emphasize a series of alleged misstatements regarding the absence of subprime lending at Wachovia. (Pls.' Eq. Opp'n 14-22.) On four separate occasions, Defendants made statements disclaiming subprime origination and professing an institutional bias against subprime lending. For example, in the May 8, 2006 conference call announcing the Golden West acquisition, Thompson claimed that "[t]hey have no subprime origination at Golden West, so a very conservative portfolio." (Eq. Compl. ¶ 169; Stichting Compl. ¶ 188.) In an October 19, 2007 conference call, Thompson also asserted that "we have an institutional bias against subprime. We avoided it in our origination efforts and we avoided it, for the most part, in our securitization efforts." (Eq. Compl. ¶ 213; Stichting Compl. ¶ 238; FC Holdings Compl. ¶ 140.) Plaintiffs allege that these statements falsely distinguished the Pick-A-Pay portfolio from subprime lending because "Wachovia made large swaths of loans to borrowers with subprime FICO scores." (Pls.' Eq. Opp'n 18.)

The falsity of the subprime lending statements largely turns on the definition of "subprime." The *Equity* Plaintiffs

acknowledge that "[t]he term 'subprime' does not have a singular meaning in the mortgage and lending industry," but nonetheless supply a series of alternate definitions. (Eq. Compl. ¶ 64.) Applied to a borrower, "subprime" generally denotes an individual with a Fair Isaac Credit Organization (FICO) score below 660. (*Id.* ¶ 65.) Plaintiffs therefore assert that "[a] loan made to a subprime borrower *is considered a subprime loan*, regardless of the loan's underwriting standards, because of the risk arising from the borrower's individual creditworthiness." (*Id.* (emphasis added).) Applied to a mortgage, however, Plaintiffs allege that "subprime" describes "one or more underwriting characteristics that render such loans riskier than a conforming prime loan, *irrespective of the creditworthiness of the borrower*." (*Id.* ¶ 66 (emphasis added).)) In this context, Plaintiffs state that the "hallmarks" of subprime lending include high LTVs, no or minimal down payments, teaser adjustable rates, and no documentation of borrower income. (*Id.*)

As an initial matter, the Court questions the degree of predictability afforded by Plaintiffs' gloss on the multiple meanings of "subprime." Although Plaintiffs distinguish a "loan made to a subprime borrower" from a "subprime loan," they imply general overlap between the two categories. (*Id.* ¶¶ 65-67.) Under Plaintiffs' dual definition, it appears that subprime lending can encompass loans with or without subprime FICO scores (as long as subprime "hallmarks" are present) and loans with or without subprime hallmarks (as long as the subprime FICO score is present).[22]

---

[22] "Generally, a loan made to a subprime borrower will bear one or more of the characteristics of a subprime loan described above . . . However, subprime loans include loans with subprime characteristics, even if made to borrowers with FICO scores above the 660 threshold." (Eq. Compl. ¶ 67.)

Moreover, in crafting this expansive definition, Plaintiffs rely heavily on sources published during the financial crisis (including one entitled "Understanding the Subprime Mortgage Crisis"), rather than sources that describe a preexisting industry definition.[23] (*See id.* ¶ 64 n.7; Pls.' Eq. Opp'n 14-15.) Such pleading techniques suggest a tendency to look backward in time and apply the "subprime" label to any loan that defaulted during the mortgage crisis. Plaintiffs now consider any loan that ultimately failed to be a "subprime" loan, while Defendants in 2007 and 2008 were distinguishing between Pick-A-Pay loans (which utilized a multi-factor appraisal process) from "subprime" loans (defined primarily by FICO scores). The fact that Pick-A-Pay loans ultimately failed at rates comparable to those of "subprime" loans is not the same as pleading Defendants' knowledge of that fact during the Class Period. A postmortem consensus, in other words, is not the equivalent of a contemporaneous industry standard.

Even if Plaintiffs had successfully established falsity, however, they still fail to plead a strong inference of scienter with regard to the subprime lending statements. As previously noted, a finding of reckless disregard based on access to contrary facts must specifically identify the contradictory information available at the time of the alleged misstatement. *See Dynex I*, 531 F.3d at 196. In this case, the contrary fact inquiry required the Court to consider the facts available to Defendants on the date of each alleged misstatement distinguishing the Pick-A-Pay portfolio from subprime loans.

The first subprime lending statement is the most straightforward. In the oft-quoted May 8, 2006 conference call announcing the Golden West acquisition, Thompson stated that "[t]hey have no subprime origination at Golden West, so a very conservative portfolio." (Eq. Compl. ¶ 169; Stitching Compl. ¶ 188.) Assuming *arguendo* that Thompson's statement was false, there is nothing in the pleadings to indicate that Thompson had access to contrary information about the composition of the Golden West portfolio at the time of the announcement. The *Equity* Complaint characterizes the statement as false and misleading based on the undated testimony of "multiple percipient witnesses" who claim that 90% of Pick-A-Pay loans were stated income or no documentation loans.[24] (Eq. Compl. ¶ 171.) The *Equity* Complaint also cites a third confidential source (CW9) for the statement that 100% of the Pick-A-Pay loans he reviewed "were openly considered subprime within the company." (*Id.*) Significantly, there is no allegation that CW9 communicated his experience to Defendants or that similar statements were reported to senior management.

The other three statements at issue dissociate Wachovia from subprime lending

---

[23] The one citation that precedes the Class Period lists sub-660 FICO scores among the general characteristics of subprime borrowers, but disclaims that "[t]his list is illustrative rather than exhaustive and is not meant to define specific parameters for all subprime borrowers. Additionally, this definition may not match all market or institution specific subprime definitions . . . ." Office of the Comptroller of the Currency, *et al.*, *Expanded Guidance for Subprime Lending Programs*, at 3 (Jan. 31, 2001), *available at* http://www.fdic.gov/news/news/press/2001/pr0901a.html.

[24] The Court notes that of the two confidential sources (CW1 and CW3) who cite the 90% figure, one was not even hired by Wachovia until after the May 8, 2006 statement. (*See* Eq. Compl. ¶ 52 ("CW1 was a sales strategist and Mortgage Banking Executive for Wachovia Mortgage from 2007 to October 2008." ).)

without denying all subprime origination. In a July 20, 2007 conference call, Defendant Truslow claimed that "we don't have a subprime focus in our business" (Stichting Compl. ¶ 227) and "we've actively managed our business to minimize our exposure to the subprime market" (Eq. Compl. ¶ 205).[25] In an October 19, 2007 conference call, Thompson stated that "we have an institutional bias here against subprime. We avoided it in our origination efforts and we avoided it in, for the most part, in our securitization efforts." (*Id.* ¶ 213.) Finally, in a November 9, 2007 conference call, Truslow stated that "[c]learly we could have done a better job around subprime on – for the company that has had such a negative bias towards subprime. We didn't leap into the origination side." (*Id.* ¶ 229.)

Plaintiffs challenge these statements based on similar allegations by CW1, CW3, and CW9 (*id.* ¶ 210), but fail to identify any meetings, documents, or reports that connect the confidential sources with the Individual Defendants. Instead, the *Equity* Complaint simply asserts that "Wachovia purchased Golden West *knowing* that it specialized in non-traditional subprime lending." (*Id.* ¶¶ 215, 230 (emphasis added); *see* Stichting Compl. ¶¶ 239, 250.) How and when Defendants knew is left for the Court to decipher or assume.

In the absence of specified internal reports or alleged contact with individual Defendants, the "core operations" theory again emerges as the leading instrument to bridge the scienter gap. But Plaintiffs' attempts to delineate what constitutes a "core" Wachovia operation are cursory at best. According to the *Equity* Plaintiffs, the

"core operations" designation is a matter of proportion. (Pls.' Eq. Opp'n 47 ("Clearly, residential real estate lending was part of Wachovia's 'core' business, as it comprised about a third of the company's total assets and accounted for almost a third of income.").) According to the *Stichting* Plaintiffs, the "core operations" theory turns on the absolute size of the asset. (Pls.' Stichting Opp'n 30 ("[T]he Pick-A-Pay loan portfolio was a $120 billion asset that was critical to Wachovia's financial performance and liquidity.").) Neither the comparative nor the numerical approach articulates a cognizable limit to the "core operations" definition. If knowledge of the alleged subprime characteristics of the Pick-A-Pay portfolio can be imputed to the Individual Defendants, so too could knowledge of current LTV ratios, FICO scores, employee compensation packages, and any number of related operational details. Because such a result would eviscerate the cogent and compelling inference of scienter required by *Tellabs*, the Court declines to find an inference of recklessness based on the subprime lending allegations.

### (7) Loan Loss Reserves

Plaintiffs further assert that Class Period statements regarding the adequacy of Wachovia's loan loss reserves were rendered false and misleading by subsequent reserve increases. For example, in a January 23, 2007 conference call, Truslow acknowledged that Wachovia's loss reserves "look[ed] low" by industry standards, but maintained that the "unique" loan mix at Wachovia justified the lower allowance. (Eq. Compl. ¶ 180; Stichting Compl. ¶ 205.) Wachovia later announced a series of loan loss reserve increases, including a "dramatic" increase on July 20, 2007 (Eq. Compl. ¶ 478), a three-fold increase from the previous year on February 28, 2008 (*id.*

---

[25]   Non-defendant Steve Cummings, Wachovia's head of corporate and investment banking, made a similar statement in the July 20, 2007 call. (Eq. Compl. ¶ 206.)

¶ 486), and a $2.8 billion increase on April 14, 2008 (Stichting Compl. ¶¶ 479-80). Based on the timing and magnitude of these reserve increases, Plaintiffs argue that the previous loan loss reserves must have been understated. (*See* Pls.' Eq. Opp'n 36; Pls.' Stichting Opp'n 18.)

As a general matter, loan loss reserves "reflect management's opinion as to the likelihood of future loan losses and their magnitude." *Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 124 (S.D.N.Y. 2010). Such predictions may be actionable under Section 10(b) "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted).[26] However, the fact of a "massive increase" to loan loss reserves "is not, in itself, an indicator that the previous reserve levels were inadequate." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 412 (S.D.N.Y. 2010).

In this case, the *Equity* Plaintiffs allege that "Wachovia was well aware of, or recklessly indifferent to, the fact that their loan reserves were significantly understated in light of the deteriorating real estate market." (Eq. Compl. ¶ 181.) The *Stichting* Plaintiffs similarly argue that "Defendants could not have reasonably concluded that loan loss reserves were set at adequate levels" based on their knowledge of declining property values, Pick-A-Pay loan

features, and rising defaults in peer portfolios. (Pls.' Stichting Opp'n 19.)

Such generalized allegations fail to specify what caused the Defendants to know that the loan loss reserves were insufficient. *See Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 433-34 (S.D.N.Y. 2010). Plaintiffs do not "identify any contemporaneous internal document showing that the loan loss reserves were improperly calculated." *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 559 (S.D.N.Y. 2010). Neither do the CWs claim access to aggregate loan loss data or knowledge of how Wachovia calculated reserve levels. *See id.* In the absence of particularized allegations that Wachovia was experiencing or internally predicting losses exceeding their set reserves, the subsequent disclosures provide no basis to conclude that Defendants recklessly misstated previous reserve levels. Accordingly, the Court declines to base an inference of reckless disregard on the loan loss reserve allegations.

(8) Loan Charge-Off Policy

Plaintiffs also allege that Wachovia misrepresented its policy for charging off non-performing loans. This allegation rests on a single statement from the 2006 Form 10-K: "Generally, consumer loans that become 180 days past due are charged off." (Eq. Compl. ¶ 183; Stichting Compl. ¶ 208; FC Holdings Compl. ¶ 95.) Months later, Defendants would admit to following a contrary practice despite the stated charge-off policy.[27]   At a November 9, 2007 conference, Truslow announced that in 4Q 2007 Wachovia would "bring the Golden

---

[26] *But see Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010) (citing *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150, 1156 (S.D. Cal. 2008) for the proposition that "loan loss allowances are not projections"). In the absence of supporting authority within this jurisdiction, the Court declines to follow the loan loss holding of *Freudenberg*.

[27] Although the parties quibble about the date of the charge-off policy disclosure (*compare* Pls.' Eq. Opp'n 35, *with* Wachovia Consol. Mem. 68), the exact date does not alter the scienter analysis.

West portfolio on to a consistent methodology with the rest of the company" by taking write offs at 180 days past due. (Stichting Compl. ¶ 149.) Thus, prior to 4Q 2007, Wachovia "did not recognize losses on . . . delinquent Pick-A-Pay loans until the time of an actual property sale, which is usually many months after default and even many months after the 180 day threshold." (Eq. Compl. ¶ 22.)

There is no dispute about the falsity of the charge-off statement, since the stated policy clearly diverged from actual Wachovia practice prior to the announced reconciliation. Defendants do contest the materiality of the misrepresentation, arguing that the resulting $63 million increase in charge-offs represented less than .02% of Wachovia's $460 billion loan portfolio. (Wachovia Consol. Reply 45.) If the dollar value of the methodology change was settled, $63 million would fall well beneath the five percent numerical "starting place" for evaluating the materiality of an alleged omission. *ECA*, 553 F.3d at 204. In this case, however, the *Stichting* Plaintiffs challenge that dollar value by attributing an additional $676 million in credit loss allowances to the policy change. (Pls.' Stichting Opp'n 22 n.19.) Defendants, in turn, claim that the $676 million figure is based on an "erroneous reading of a Wachovia public disclosure." (Wachovia Consol. Reply 45 n.49.) Although the parties dispute the quantitative impact of the charge-off misrepresentation, they do not brief the qualitative factors that also contribute to a finding of materiality. *See Litwin v. Blackstone Group, L.P.*, __ F.3d __, 2011 WL 447050, at *8 (2d Cir. Feb. 10, 2011) (holding that "a court must consider both quantitative and qualitative factors in assessing an item's materiality . . . and that consideration should be undertaken in an integrative manner") (internal citation and quotation marks omitted)). For that reason, the Court declines to rest on the issue of material falsity. *See Matrixx Initiatives, Inc. v. Siracusano*, __ S. Ct. __, 2011 WL 977060 (March 22, 2011) (holding that the materiality inquiry "is not limited to statistical significance").

But assuming *arguendo* that the charge-off misrepresentation is material, Plaintiffs nonetheless fail to plead scienter. The *Stichting* Plaintiffs urge that "[a] company's violation of its own internal policies can provide strong support for an inference of scienter." (Pls.' Stichting Opp'n 39.) But the cases cited to support this proposition rely on knowing or reckless violations of company policy. *See Rothman v. Gregor*, 220 F.3d 81, 90-91 (2d Cir. 2000) (describing a "reckless failure to follow an announced policy"); *Novak*, 216 F.3d at 311-12 (holding that defendants "knowingly sanctioned procedures that violated the Company's own markdown policy"). Here, there is no allegation that Defendants "knowingly sanctioned" an alternative charge-off practice in order to deceive investors. Whether Defendants exhibited a "reckless failure" to follow a stated Wachovia policy is a closer question. In finding a violation of a stated policy to constitute proof of recklessness, courts have typically identified what the defendants knew at the time of the violation. *See, e.g.*, *In re Scholastic*, 252 F.3d at 76 ("[T]he second amended complaint contains detailed allegations as to what defendants knew on a daily, weekly and monthly basis . . . while at the same time making public statements that painted a different picture."). Because the pleadings here are devoid of specific allegations or internal insights, the Court cannot conclude that the charge-off misrepresentation supports a compelling inference of recklessness rather than simple negligence.

(9) Employee Incentives

Plaintiffs further allege that Wachovia misrepresented its employee incentives by claiming to reward employees based on the "long-term" quality of the Pick-A-Pay loans they originated. This allegation also rests on a single alleged misstatement.[28] During a November 9, 2007 conference call, Truslow represented that the Pick-A-Pay loan "is a product where people are measured and their performance rewarded or penalized, based upon the long-term quality and value of these loans that are being created." (Eq. Compl. ¶ 218; Stichting Compl. ¶ 243; FC Holdings Compl. ¶ 129.) Plaintiffs assert that these statements were materially misleading because Wachovia provided financial incentives to originate Pick-A-Pay loans and imposed Pick-A-Pay sales quotas. (*See* Eq. Compl. ¶¶ 125-34.)

But the existence of multiple forms of employee compensation neither proves nor disproves the assertion that Wachovia employees were ultimately rewarded based on the long-term quality of the loans they originated. Moreover, the existence of Pick-A-Pay sales incentives was made public in news stories in January, March, June, and December 2008. (*Id.* ¶¶ 129, 131, 133-34.) To the extent that tension existed between Wachovia's short-term sales incentives and long-term performance incentives, the Court cannot conclude that the failure to accompany an isolated conference call remark with a full exposition of Wachovia's various incentive programs represents "an extreme departure from the standards of ordinary care." *South Cherry*, 573 F.3d at

109 (internal quotation marks and alterations omitted).

(10)   CDO Allegations

Plaintiffs devote a significant subset of the pleadings to allegations that Defendants concealed Wachovia's exposure to subprime CDOs while overstating the value of its CDO holdings throughout the Class Period. In a portion of the *Equity* Complaint spanning 31 pages and 60 paragraphs, Plaintiffs supply a technical exposition of CDO tranching structures, followed by a survey of media coverage on the CDO market decline, followed by a summary of the alleged CDO misrepresentations. (Eq. Compl. ¶¶ 296-356; *see* Stichting Compl. ¶¶ 423-29; FC Holdings Compl. ¶¶ 196-221.) The gist of their allegations is that Wachovia "created, structured and underwrote" subprime CDOs totaling $10.11 billion but "concealed" the *fact* of its subprime CDO holdings until October 19, 2007 and the *extent* of its subprime CDO holdings until November 9, 2007. (Eq. Compl. ¶ 339.)

The alleged falsity of the CDO misrepresentations hinges on a "market consensus" about CDO risk and impairment. (*Id.* ¶ 315.) Citing reports from *Bloomberg* and analysis from the American Enterprise Institute (*id.* ¶ 315-38), the *Equity* Plaintiffs assert that "by March 2007, market consensus had recognized that CDOs were the concentrated repository of subprime risk, and CDO values even at the super senior level were already materially impaired" (*id.* ¶ 331). Defendants' disclosures were false and misleading, they conclude, because "[t]he writedowns did not come close to valuing Wachovia's CDOs at current market prices." (*Id.* ¶ 352.) Mindful that "[m]ere allegations that statements in one report should have been made in earlier reports do

---

[28]   Although the *Equity* Plaintiffs cite a similar statement from a June 16, 2008 *Business Week* article (Eq. Compl. ¶ 143), the quotation is attributed to unspecified "Golden West executives" and does not appear among the enumerated materially misleading statements in the *Equity* Complaint.

not make out a claim of securities fraud," *Acito*, 47 F.3d at 53, the Court once again assumes the falsity of the CDO misrepresentations in order to focus on the scienter inquiry.

Plaintiffs principally allege that Wachovia had advance knowledge of material CDO risk and impairment based on declines in the ABX/TABX indices, which track "aggregate market sentiment" regarding the value of representative asset-backed securities. (*Id.* ¶ 317.) Although Plaintiffs characterize these indices as "objective, directly observable indicators" of CDO value generally (*id.*), there is no allegation that ABX/TABX numbers determined the value of particular securities. In the absence of contemporaneous facts regarding the value of Wachovia's own CDO holdings, the Court declines to find an inference of recklessness based on a valuation dispute.[29]

The remaining candidate for a scienter inference based on the alleged CDO misrepresentations is the doctrine of corporate scienter. In *Dynex I*, the Second Circuit articulated the corporate scienter doctrine as follows:

> When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.

*Dynex I*, 531 F.3d at 195. Citing *Dynex I*, at least one court in this District has found corporate scienter for CDO misrepresentations where individual scienter was absent. *See In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010).

The example offered by the Second Circuit in adopting the doctrine illustrates why corporate scienter has no application here. "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero." *Dynex I*, 531 F.3d at 195 (quoting *Makor Issues & Rights v. Tellabs*, 513 F.3d 702, 710 (7th Cir. 2008)). Such a statement would raise a strong inference of corporate scienter, "since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* Of course, the statements here are wholly distinguishable, as Plaintiffs have alleged no contemporaneous facts regarding the "actual" value of the particular CDOs held by Wachovia at the time of the alleged misrepresentations. Accordingly, the Court concludes that Plaintiffs have failed to raise an inference of corporate scienter – or scienter generally – with

---

[29] The Court finds similarly unavailing the argument that Wachovia's court filings in another CDO-related dispute, *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, 07 Civ. 11078 (LTS) (AJP) (S.D.N.Y.), establish scienter in this case. (Pls.' Eq. Opp'n 70-71.) No reference to the *CDO Plus* litigation appears in the *Equity* Complaint, and in any event the selective quotations that appear in the opposition papers are unpersuasive.

respect to the alleged CDO misrepresentations.[30]

### (11)    GAAP Allegations

Finally, Plaintiffs allege that "numerous and egregious" violations of Generally Accepted Accounting Principles ("GAAP") in Class Period financial statements falsely portrayed Wachovia as financially stable in the throes of the subprime mortgage crisis. (Stichting Compl. ¶ 342.)   Although the *Equity* Plaintiffs appear to abandon their voluminous GAAP allegations in their opposition papers, the *Stichting* Plaintiffs continue to assert that the "multitude" of alleged GAAP violations supports a strong inference of scienter.  (Pls.' Stichting Opp'n 34.)

Courts have long recognized that "'generally accepted accounting principles' are far from being a canonical set of rules," but rather "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979). Neither are allegations of GAAP violations, standing alone, sufficient to state a securities fraud claim.  *See Novak*, 216 F.3d at 309. "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.* (internal citation and quotation marks omitted).

In this case, it is clear that the alleged GAAP violations are essentially duplicative of the other alleged misstatements. Plaintiffs allege, *inter alia*, that Wachovia violated GAAP regulations by omitting disclosures regarding the Pick-A-Pay loan

portfolio (Eq. Compl. ¶¶ 370-73), maintaining inadequate loan loss reserves (Stichting Compl. ¶ 372), and failing to properly value its CDO holdings (*id.* ¶¶ 391-92).   Because these claims are no more successful when repackaged as accounting violations, the Court does not find an inference of scienter on the basis of the GAAP allegations.

### (12)    ARS Allegations

Finally, the *Stichting* and *FC Holdings* Plaintiffs offer one substantive addendum to the pleadings by alleging that Wachovia misled investors regarding its underwriting, marketing, and sales of auction rate securities ("ARS").[31]   (*See* Stichting Compl. ¶ 451; FC Holdings Compl. ¶ 222.) Plaintiffs allege that Wachovia represented ARS investments as "near cash equivalents" (Stichting Compl. ¶ 431) while "creating a façade of a liquid ARS market by buying up excess ARS" (*id.* ¶ 438).

In the *Stichting* Complaint, the ARS allegations are simply a variation on the GAAP allegations and fail for the reasons previously stated.    Perhaps sensing the derivative nature of the argument, the *Stichting* Plaintiffs downgrade their ARS allegations to a footnote in the opposition papers.  (Stichting Opp'n 34 n.25.)

The *FC Holdings* Plaintiffs persist in the argument that the ARS allegations support a scienter inference because Wachovia senior management "knew" or "were aware" of problems in the ARS market. (FC Holdings Compl. ¶¶ 229, 237.)   Once again, such

---

[30]    To the extent that Plaintiffs seek to apply a corporate scienter theory to the other allegations discussed above, the Court likewise finds that they have failed to allege contrary facts sufficient to support such an inference.

[31]    "Auction Rate Securities . . .  are municipal bonds, corporate bonds, and/or preferred stocks often with maturity periods of thirty years, with interest rates and dividend yields that are reset and determined regularly through auctions, typically every 7, 28, or 35 days." (Stichting Compl. ¶ 430.)

empty allegations are devoid of factual support and "entitled to no weight" in this jurisdiction. *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 297, 300 (S.D.N.Y. 2010) ("Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight.").

c. *Tellabs* Analysis

Upon careful consideration, the Court finds that a reasonable person would not deem Plaintiffs' purported inference of scienter to be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The allegations of insider stock sales, incentive-based executive compensation, and the use of inflated stock as corporate currency fail to plead a "concrete and personal" benefit that would accrue to Defendants from the alleged fraud. *South Cherry*, 573 F.3d at 110. Despite the litany of alleged misrepresentations outlined above, Plaintiffs also fail to plead access to contrary facts or breach of a duty to monitor that would support an inference of recklessness. *Novak*, 216 F.3d at 308.

Nor do the remaining miscellaneous scienter allegations, taken together, rise to the level of a compelling inference. For example, the magnitude of the alleged fraud alone is not enough. *See In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) ("While certainly a relevant factor, it is well established that the size of the fraud alone does not create an inference of scienter.") Similarly, the existence of risk management structures is insufficient to create a strong inference of scienter. *See Local No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y.

2010) ("Although Risk Management compiled credit and performance data and reported its conclusions through the corporate hierarchy, the existence of channels [of information] is not enough."). Nor are the resignations of Individual Defendants – without factual allegations linking the resignations to the alleged fraud – sufficient to raise the inferences required to establish fraud. *See In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007).

After examining the entirety of Plaintiffs' scienter allegations, the Court finds that Plaintiffs have failed to plead facts giving rise to a strong inference that Defendants acted with the intent "to deceive, manipulate, or defraud." *Tellabs*, 127 S. Ct. at 2504. The more compelling inference, *at least based on the facts as they are alleged in the complaints*, is that Defendants simply did not anticipate the full extent of the mortgage crisis and the resulting implications for the Pick-A-Pay loan portfolio. Although a colossal blunder with grave consequences for many, such a failure is simply not enough to support a claim for securities fraud. Bad judgment and poor management are not fraud, even when they lead to the demise of a once venerable financial institution.

2. Other Section 10(b) Elements

Because the issue of scienter proves fatal to Plaintiffs' Section 10(b) claims, the Court need not reach the remaining elements of securities fraud. Accordingly, the motions to dismiss the Section 10(b) claims in the *Equity*, *Stichting*, and *FC Holdings* Complaints are hereby granted.

### B.  Section 11 and 12(a)(2) Claims

In contrast to the "catchall function" of Section 10(b) and Rule 10b-5, Sections 11 and 12(a)(2) of the Securities Act create liability only for material misrepresentations or omissions in connection with a registered securities offering.[32]  Section 11 applies to registration statements, while Section 12(a)(2) covers prospectuses and oral communications.  *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2).

Section 11 provides a cause of action by the purchaser of a registered security against the issuer, underwriter, and certain other statutorily enumerated parties.  *See* 15 U.S.C. § 77k(a).  To state a claim under Section 11, the plaintiff must allege that (1) he purchased a registered security either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner specified by the statute; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *Id.*; *see In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010).

Section 12(a)(2) provides a similar cause of action where the securities at issue were sold using prospectuses or oral communications containing material misstatements or omissions.  *See In re Morgan Stanley*, 592 F.3d at 359.  To plead a claim under Section 12(a)(2), the plaintiff must allege that (1) the defendant is a "statutory seller"; (2) the sale was effected by means of a prospectus or oral

communication; and (3) the prospectus or oral communication contained a material misstatement or omission.[33]  *Id.*; *see* 15 U.S.C. 77*l*(a)(2).

Although claims under Sections 11 and 12(a)(2) must plead the materiality of the alleged misstatement or omission, Securities Act plaintiffs need not allege scienter, reliance, or causation.  *Rombach*, 355 F.3d at 169 n.4.  "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence."  *In re Morgan Stanley*, 592 F.3d at 359 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).  Thus, by contrast to Section 10(b), liability under Sections 11 and 12(a)(2) is both more narrowly defined and more readily triggered.

In this case, Section 11 claims appear in the *Equity* Complaint and the *Bond/Notes* Complaint, while Section 12(a)(2) claims appear only in the *Bond/Notes* Complaint.  Because Sections 11 and 12(a)(2) are "Securities Act siblings with roughly parallel elements," *In re Morgan Stanley*, 592 F.3d at 359, the Court will analyze the two together.  *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (quoting *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) ("Claims under Sections 11 and 12 are usually evaluated in tandem because if a plaintiff fails to plead a

---

[32]  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202-04 (1976) (describing Section 10(b) as a "catch-all clause to prevent manipulative devices").

[33]  An individual is a "statutory seller" – and therefore a potential Section 12(a)(2) defendant – if he: (1) passed title, or other interest in the security, to the buyer for value; or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner.  *In re Morgan Stanley*, 592 F.3d at 359 (citing *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)).

cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a).").).

### 1. Standing

As a threshold matter, the Underwriter Defendants contend that the *Bond/Notes* Plaintiffs lack standing to sue on 18 of the 30 securities offerings at issue.[34]   With respect to 16 of the challenged offerings, Defendants allege constitutional and statutory standing defects. (UD B/N Mem. 4-11.) Defendants allege further standing deficiencies because Livonia is not a proper plaintiff in this action and the claims of the Additional Plaintiffs are barred by the statute of limitations.[35]   (*Id.* at 12-15.) Finally, Defendants challenge claims based on two additional offerings identified as "Supplemental" offerings in the appendix to the *Bond/Notes* Complaint.

#### a. Constitutional and Statutory Standing

To satisfy constitutional standing requirements, a plaintiff must allege, *inter alia*, that he has suffered an "injury in fact" which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Because a plaintiff cannot claim a personal injury in connection with a security he did not purchase, he "lacks standing to sue on claims arising from . . . offerings which he did not purchase." *N.J. Carpenters Health*

*Fund v. DLJ Mortgage Capital, Inc.*, No 08 Civ. 5653 (PAC), 2010 WL 1473288, at *3 (S.D.N.Y. Mar. 29, 2010); *see In re Lehman Bros. Sec. & Erisa Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010).

In this case, the pleadings contain no allegation that the *Bond/Notes* Plaintiffs purchased securities in or traceable to 16 of the 30 offerings identified in the appendix to the amended *Bond/Notes* Complaint.[36]   (*See* B/N Compl., App'x.) Instead, the *Bond/Notes* Plaintiffs characterize the standing inquiry as premature in a putative class action, arguing that "courts routinely defer resolution of similar [standing] arguments until [the] class certification stage." (Pls.' B/N Opp'n 61-62.) In their view, challenges based on the purchase histories of the named Plaintiffs implicate questions of typicality under Rule 23 of the Federal Rules of Civil Procedure rather than Article III standing. (*Id.* at 61.)

But Plaintiffs cannot bypass the injury requirement by simply invoking Rule 23, since "it is black letter law that a rule of procedure cannot create standing." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 480 (S.D.N.Y. 2010). "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class

---

[34]   Defendant KPMG briefly echoes the standing argument, but focuses primarily on issues particular to auditor liability. (KPMG Mem. 22-23.)

[35]   The amended *Bond/Notes* Complaint added three new Plaintiffs: Livonia; Iron Workers Locals 40, 361, 417 Union Security Funds ("Iron Workers"); and Hawaii Sheet Metal Workers Pension Fund ("Hawaii") ( together, the "Additional Plaintiffs").

[36]   The motion papers contain a minor discrepancy regarding the total number of offerings in which the *Bond/Notes* Plaintiffs purchased securities. The Underwriter Defendants allege that no *Bond/Notes* Plaintiff purchased or acquired securities in 16 of the 30 offerings (UD B/N Mem. 6), while the *Bond/Notes* Plaintiffs allege that they *did* purchase or acquire securities in 16 of the 30 offerings (Pls.' B/N Opp'n 61 n.23), leaving one offering in dispute. After comparing the offerings index appended to the *Bond/Notes* Complaint with the certifications on record (Doc. Nos. 13, 103), it appears that Defendants have calculated correctly, since certifications are absent for 16 of the 30 securities.

must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Carey*, 518 U.S. 343, 357 (1996) (internal quotation marks omitted).   Because standing is a question antecedent to class certification that requires plaintiffs to suffer personal injury, the *Bond/Notes* Plaintiffs have no standing to assert claims in relation to "funds in which they did not personally invest." *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008); *see Pub. Emps.' Ret. Sys. of Miss.*, 714 F. Supp. 2d at 480.

The text of Sections 11 and 12(a)(2) also precludes the *Bond/Notes* Plaintiffs from bringing claims for losses in securities they never purchased or acquired.   Section 11 expressly limits recovery to "any person acquiring such security," 15 U.S.C. § 77k(a), while Section 12(a)(2) similarly applies to "the person purchasing such security," 15 U.S.C. § 77*l*(a)(2). Accordingly, statutory standing under Sections 11 and 12 is limited to plaintiffs who purchased or acquired the securities in question. *See Akerman v. Oryx Commc'ns*, 810 F.2d 336, 344 (2d Cir. 1987) ("Section 12[(a)](2) imposes liability on persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them.");[37] *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be maintained only by one who comes within a narrow class of persons, *i.e.* those who purchase securities that are the direct subject of the prospectus and registration statement.").

Despite the plain language of the Securities Act, the *Bond/Notes* Plaintiffs attempt to manufacture standing for securities they did not purchase or acquire based on shelf registration statements.[38] Quoting *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010), Plaintiffs argue that "'where the actionable part of the registration statement is alleged to be common to all purchasers from the same shelf, then a plaintiff has standing to represent them because they have all suffered from the same injury.'"  (UD B/N Opp'n 64 (quoting *In re Citigroup*, 723 F. Supp. 2d at 584).)  Because they purchased securities pursuant or traceable to the same five shelf registration statements, the *Bond/Notes* Plaintiffs claim to have suffered the same injury as the absent purchasers.

Although the Second Circuit has yet to pass on this precise issue, the Court is persuaded that Plaintiffs' shelf registration argument misreads the relevant statute. Although Section 11 contemplates liability where "any part of the registration statement" contains a material misstatement or omission, the resulting cause of action is still limited to "any person acquiring such security" under the registration statement. 15 U.S.C. § 77k(a).  Thus, the "any part" provision allows the relevant purchaser to sue for misstatements that appear in the shelf registration statement, the supplemental prospectus, or any other filings incorporated therein.  But defining the field of possible misstatements does not thereby enlarge the field of possible plaintiffs beyond the ranks of those who purchased or acquired the securities at issue.  *See In re Lehman Bros.*, 684 F. Supp. 2d at 491

---

[37]   Prior to the passage of the PSLRA, Section 12(a)(2) was known as Section 12(2).

[38]   "A so-called 'shelf registration' pursuant to Form S-3 permits an issuer to register numerous different securities for later issuance in a single SEC filing." (B/N Compl. ¶ 212.)

(rejecting a standing argument based on shelf registration statements where "plaintiffs ha[d] not alleged any injury traceable to the Certificates issued in those offerings").

Because the *Bond/Notes* Plaintiffs have suffered no injury from Defendants' conduct with respect to securities they did not purchase, all claims arising from the 16 offerings in which none of the named Plaintiffs purchased any securities are dismissed for lack of standing.

### b. Additional Plaintiffs

Defendants next argue that the inclusion of three additional *Bond/Notes* Plaintiffs – Livonia, Iron Workers, and Hawaii – in the amended *Bond/Notes* Complaint does not cure the standing deficiencies enumerated above.

### i. Livonia Claims

First, Defendants contend that Livonia is not a proper plaintiff because the Court previously declined to consolidate the separate *Livonia* action, *City of Livonia Employees' Retirement System v. Wachovia Corporation*, 09 Civ. 8268 (RJS), with the *Bond/Notes* class action. (UD B/N Mem. 12.) This argument overreads the Court's Order dated December 11, 2009, which permitted Defendants to defer briefing on any defenses unique to the *Livonia* action at a time when motions to dismiss the prior *Bond/Notes* class action complaint were already pending. The Court subsequently granted leave to amend by Order dated May 3, 2010 and approved a joint briefing schedule. As a result, judicial economy now mitigates in favor of considering the *Livonia* claims in ruling on the renewed motions to dismiss.

### ii. Statute of Limitations

Defendants also argue that the Securities Act claims by Livonia and the majority of the claims by Iron Workers should be dismissed as time-barred. (*Id.* at 12.) Under Section 13 of the Securities Act, claims under Sections 11 or 12(a)(2) are subject to a one-year statute of limitations, which begins to run upon "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Defendants here contend that the Additional Plaintiffs are barred under "inquiry" notice, which arises when "circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Staehr v. Hartford Fin. Serv. Group, Inc.*, 547 F.3d 406, 411 (2d Cir. 2008); (*see* UD B/N Mem. 13; UD B/N Reply 7.)

However, the Supreme Court's decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798 (2010), disparaged the use of inquiry notice and altered the applicable statute of limitations analysis for securities fraud claims. Prior to *Merck*, Second Circuit law provided that "a plaintiff was on 'inquiry notice' when public information would lead a reasonable investor to investigate the possibility of fraud." *Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, __ F.3d __, 2011 WL 677404, at *3 (2d Cir. Feb. 28, 2011). *Merck* overruled this analysis, holding instead "that the limitations period begins to run only after 'a reasonably diligent plaintiff would have discovered the facts constituting the violation . . . .'" *Id.* (quoting *Merck*, 130 S. Ct. at 1798). Reasoning from the *Merck* decision, the Second Circuit recently held that "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient

information about that fact to adequately plead it in a complaint." *Id.* at *4.[39]

In this case, the event that allegedly triggered the statute of limitations was the September 2008 bailout announcement. The *Bond/Notes* Complaint alleges that "[t]he extent of the decay at Wachovia relating to its mortgage-related assets" was revealed on September 28, 2008, "when the Government brokered a deal in which Wachovia agreed to sell its banking operations to Citigroup for a mere $1 per share." (B/N Compl. ¶ 6.) Under the old inquiry notice standard, such an event would surely have prompted the reasonable investor to investigate. *See Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006). Given the widespread media coverage of Wachovia's deterioration in the weeks preceding the bailout announcement, it seems likely that the same event would have equipped a reasonable investor to adequately plead Securities Act liability. Assuming *arguendo* that the bailout announcement suffices, a timely claim should have been filed no later than September 28, 2009. The additional Plaintiffs were not added to the *Bond/Notes* Complaint until May 28, 2010 – after the one-year statute of limitations would have expired.

Although the parties appear to assume that the limitations period expired prior to the filing of the amended *Bond/Notes* Complaint, they dispute whether the *American Pipe* doctrine tolled the statute of limitations in the interim. In *American Pipe*, the Supreme Court held that the filing of a class action suit tolled the statute of limitations for class members who sought to intervene after the class certification motion was denied. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). The Court noted that a contrary rule would undermine the policies of "efficiency and economy of litigation" underlying Rule 23, because "[p]otential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable." *Id.* at 553. In later cases, the *American Pipe* rule was extended to class members who opted out after the certification motion was granted, *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n.13 (1974); class members who filed separate suits after class certification was denied, *see Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983); and class members who filed separate suits before class certification was resolved, *see In re WorldCom Sec. Litig.*, 496 F.3d 245, 254 (2d Cir. 2008).

Here, the relevant question is whether *American Pipe* tolling also extends to cases where a class action complaint or particular class action claims are dismissed for lack of standing. The *Bond/Notes* Plaintiffs argue that their claims should benefit from *American Pipe* tolling, pointing to language in the opinion that articulates the principle in general terms. *Am. Pipe*, 414 U.S. at 554 ("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class . . . .") Defendants contend that *American Pipe* tolling does not apply "'if the original plaintiffs *lacked standing* to bring their claims in the first place.'" (UD B/N Mem. 13 (quoting *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994)).

---

[39] Both *Merck* and *Pontiac* considered inquiry notice in the context of Section 10(b) claims, and the language of the limitations statute for Section 10(b) differs slightly from the limitations statute for Sections 11 and 12(a)(2). *See Merck*, 130 S. Ct. at 1800 (Scalia, J., concurring). But because the rule enunciated in *Pontiac* appears to encompass the meaning of "discovery" in both contexts, the Court will apply the new rule here.

Although the law of the Second Circuit is far from settled on this issue,[40] the failure to apply *American Pipe* tolling to this case would undermine the policies of "efficiency and economy of litigation" that underlie Rule 23. *Am. Pipe*, 414 U.S. at 554; *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 456 (S.D.N.Y. 2005). In parsing the *American Pipe* holding, the Second Circuit has generally stated that "[i]t would not undermine the purposes of statutes of limitations to give the benefit of tolling to all those who are asserted to be members of the class for as long as the class action purports to assert their claims." *In re WorldCom*, 496 F.3d at 255. By contrast, to withhold *American Pipe* tolling in a securities action would "punish class members for relying on the very thing Rule 23 is intended to provide: an efficient method for resolving class claims common to a class of individuals without the need for wasteful and duplicative litigation." *In re Initial Pub. Offering Sec. Litig.*, Nos. 21 MC 92 (SAS), 01 Civ. 9741 (SAS), 01 Civ. 10899 (SAS), 2004 WL 3015304, at *5 (S.D.N.Y. Dec. 27, 2004); *see In re Flag Telecom Holdings*, 352 F. Supp. 2d at 456. Because the additional Plaintiffs should not be punished for their failure to anticipate or timely remedy the standing deficiencies of the original *Bond/Notes* Complaint, the Court applies the *American Pipe* tolling doctrine and concludes that the claims of the additional Plaintiffs are not time-barred.[41]

### c.   Supplemental Offerings

The Underwriter Defendants also challenge two additional offerings (the "Supplemental Offerings") on the grounds that Plaintiffs purchased those securities in the secondary market. Asserting that "Plaintiffs cannot trace their purchases to a particular registration statement" (UD B/N Mem. 15-16), the Underwriter Defendants argue that the Section 11 and 12(a)(2) claims with respect to the Supplemental Offerings should be dismissed for lack of standing.[42]

To prevail on a Section 11 claim, a plaintiff must be able to "trace" his shares to the defective registration statement. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006). However, "[t]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement." *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007) (internal citation and quotation marks omitted); *see also In re Authentidate Holding Corp.*, No. 05 Civ. 5323 (LTS) (DFE), 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) (holding that Section 11 plaintiffs "are not required to explain how their shares can be traced"). In this case, the *Bond/Notes* Complaint generally alleges that Plaintiffs purchased securities "pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact." (B/N Compl. ¶¶ 10-21.) Although the Underwriter Defendants assert that "there is no set of facts under which Plaintiffs could trace the notes purchased" to the

---

[40] *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, Nos. 08 Civ. 8781 (HB) & 5093 (HB), 2010 WL 5222127, at *5-6 (S.D.N.Y. Dec. 22, 2010) (listing cases).

[41] Because the claims of the Additional Plaintiffs are timely under *American Pipe*, the Court does not reach the issue of relation back. (*See* Pls.' B/N Opp'n 67.)

[42] The two Supplemental Offerings at issue are (1) the 6/19/07 Supplemental Offering of the 4/23/07 Three-Month LIBOR Floating Rate Notes Due April 23, 2012; and (2) the 5/29/08 Supplemental Offering of the 5.50% Fixed Rate Notes. (UD B/N Mem. 15.)

Supplemental Offerings (UD B/N Mem. 18), they supply no binding authority for the proposition that anything more is required to plead a Section 11 claim (*id.* at 16-18). Accordingly, the Court concludes that the general tracing allegation in the *Bond/Notes* Complaint suffices for the Section 11 claims at this stage of the litigation. *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 511 (S.D.N.Y. 2010).

Standing under Section 12(a)(2) is more strictly circumscribed. To recover under Section 12(a)(2), a plaintiff must allege that he purchased shares from an issuer "who offers or sells a security . . . by means of a prospectus." 15 U.S.C. § 77*l*(a)(2). In *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), the Supreme Court interpreted the "prospectus" requirement to mean that Section 12(a)(2) does not apply to a private contract for a secondary market sale of securities. *Id.* at 584. Based on *Gustafson*, the Second Circuit subsequently held that a Section 12(a)(2) action "cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary." *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005); *see In re Fuwei Films*, 634 F. Supp. 2d at 445 (dismissing Section 12(a)(2) claims for purchases "traceable to" the registered offering).

In this case, the Section 12(a)(2) claims in the *Bond/Notes* Complaint allege that Plaintiffs "purchased or otherwise acquired Wachovia securities issued in the Offerings." (B/N Compl. ¶¶ 303, 313.) Defendants challenge the Section 12(a)(2) claims with respect to the offerings labeled "(Supplemental)" in the *Bond/Notes* appendix. (B/N Compl., App'x.) Although an allegation that Plaintiffs purchased "pursuant or traceable to" the offering documents would be insufficient, *see In re*

*Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011), the Court cannot conclude that a "(Supplemental)" parenthetical in an appendix table conclusively negates the purchase allegation in the text of the Complaint. After drawing the requisite inferences in favor of Plaintiffs, the Court concludes that the Section 12(a)(2) claims also survive.

d.   Section 12(a)(2) Standing

Finally, the Underwriter Defendants move to dismiss the Section 12(a)(2) claims on the ground that "Plaintiffs fail to allege that they purchased securities *from* any of the Underwriter Defendants." (UD B/N Mem. 19.) Section 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988) (citing 15 U.S.C. §77l). For that reason, this Court has previously dismissed Section 12(a)(2) claims that fail to satisfy the "immediate seller" requirement. *See In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009).

Here, the *Bond/Notes* Complaint alleges that the Underwriter Defendants "were sellers of the Bond Class Securities within the meaning of the Securities Act because they (i) transferred title to Plaintiffs and other members of the Class who purchased in the Offerings; and (ii) solicited the purchase of the Bond Class Securities by Plaintiffs and other members of the Class . . . ." (B/N Compl. ¶ 310.) In addition, the appendix to the *Bond/Notes* Complaint lists the Underwriter Defendants who sold in each offering, and the attached certifications indicate the securities purchased by each

Plaintiff. Although the Underwriter Defendants protest that the Complaint "entirely fails" to identify which Underwriter Defendants sold particular securities to the named Plaintiffs (UD B/N Mem. 20), they cite no authority for the proposition that the immediate seller requirement demands such particularity in the pleadings. Accordingly, the Court finds that the *Bond/Notes* Plaintiffs have successfully pled Section 12(a)(2) standing.

### 2. Pleading Standards

With these threshold matters resolved, the Court now returns to the issue of pleading standards in the context of Plaintiffs' Securities Act claims. As a general matter, a plaintiff bringing Securities Act claims need not comply with the heightened pleading standard imposed by Rule 9(b) because "[f]raud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)." *Rombach*, 355 F.3d at 171. Accordingly, Rule 9(b) will apply to Securities Act claims only "insofar as the claims are premised on allegations of fraud." *Id.* Because determining whether Securities Act claims sound in fraud "necessarily requires a case-by-case analysis of particular pleadings," *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007), the Court will examine the *Equity* and *Bond/Notes* Complaints in turn.

### a. *Equity* Action

The *Equity* Complaint includes a Section 11 claim against Wachovia, Individual Defendants Thompson and Wurtz, and the Underwriter Defendants. (*See* Eq. Compl. ¶ 550-56.) The parties dispute whether the heightened pleading standard imposed by Rule 9(b) or the more lenient pleading standard under Rule 8 should apply.

Defendants first contend that the Section 11 claim sounds in fraud because the *Equity* Complaint "makes no effort to differentiate facts underlying the Section 11 claim from those forming the basis for the fraud claims." (UD Eq. Mem. 9.) This argument overreaches. Plaintiffs do, in fact, segregate their Securities Act claims into the final portion of the *Equity* Complaint (*see* Eq. Compl. ¶¶ 530-65), thereby drawing a distinction between negligence and fraud claims. *See In re Refco*, 503 F. Supp. 2d at 632. Although the Court cannot characterize the *Equity* Complaint as "carefully structured," *see id.*, Plaintiffs have nonetheless attempted to draft a separable two-part complaint.[43] *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 117 (S.D.N.Y. 2010). The fact that the *Equity* Complaint elsewhere alleges that Wachovia and the Individual Defendants engaged in massive fraud actionable pursuant to Section 10(b) does not strip Plaintiffs of the right to plead negligence in the alternative under Sections 11 and 12(a)(2). *See id.* at 116.

Defendants further allege that the *Equity* Plaintiffs' Section 11 claim contains "wording and imputations . . . classically associated with fraud." (Wachovia Consol. Mem. 36 (quoting *Rombach*, 355 F.3d at 172); *see* UD Eq. Mem. 8 n.6.) Citing *Rombach*, Defendants urge that phrases such as "materially false or misleading" and "untrue statements of material fact" sound in fraud and therefore trigger the application of Rule 9(b). (*See* Wachovia Consol. Mem. 36 n.42; UD Eq. Mem. 8 n.6.) But the wording of the *Equity* Complaint merely tracks the language of Section 11, which requires a

---

[43] "To avoid (unfounded) argument by Defendants that the claims below somehow 'sound in fraud,' it is necessary to state or summarize facts also stated above." (Eq. Compl. ¶ 530.)

plaintiff to allege materially untrue statements or omissions that render a document false or misleading.  *See* 15 U.S.C. § 77k(a).  Because "[i]t is clear that the Second Circuit did not intend *Rombach* as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard," *In re Refco*, 503 F. Supp. at 632, "mere use of the statutory language is itself insufficient to render a complaint one that 'sounds in fraud,'" *In re Citigroup*, 723 F. Supp. 2d at 586.  Accordingly, the Court finds that the Section 11 claim in the *Equity* Complaint does not sound in fraud, and that the standard Rule 8 pleading requirements apply.

### b.  *Bond/Notes* Action

The *Bond/Notes* Complaint also includes a series of Section 11 claims against Wachovia, Wells Fargo (as successor-in-interest), the Individual Defendants, the Underwriter Defendants, and KPMG.  (See B/N Compl. ¶¶ 265-96.)   Although "a complaint may sound in fraud even where, as here, no fraud claims under [section 10(b) of] the Exchange Act are asserted," Defendants again fail to identify averments of fraud in the pleadings.  *In re Fuwei Films*, 634 F. Supp. 2d at 436.

The Wachovia Defendants reprise the argument that these Section 11 claims sound in fraud because the pleadings are "replete with the same wording and imputations" associated with fraud.  (Wachovia Consol. Mem. 37.)  But instead of describing the offending words and phrases in any detail, Defendants characterize the pleadings with a series of suspect adverbs.  Defendants read the *Bond/Notes* Complaint as alleging that Wachovia acted "intentionally," "purposefully," and "consciously" – words that never actually appear in the pleadings.  (*See id.*)  The supporting citations proffered

by Defendants offer no support for the proposition that the *Bond/Notes* Complaint taints the Section 11 claims with allegations of fraudulent intent.

The Underwriter Defendants make a similar argument for the application of Rule 9(b) to the *Bond/Notes* Complaint, asserting that "the factual basis for [the *Bond/Notes*] claims is clearly grounded on assertions of fraud."  (UD B/N Mem. 21-22.)  To support this view, Defendants point to allegations regarding widespread falsification of borrower income, reliance on tainted appraisals, and other dubious Pick-A-Pay underwriting practices.  (*Id.* at 22 (citing B/N Compl. ¶ 111.)   However, the *Bond/Notes* Complaint includes no allegation that improper underwriting practices in various field offices were reviewed or approved by any Defendant.  Nor do Plaintiffs allege that any Defendant knew about or secretly condoned reckless underwriting policies while making contrary public representations.  In the absence of allegations that suggest fraud by any Defendant in the preparation of any offering materials, the Court finds that the gravamen of the *Bond/Notes* Complaint is plainly negligence and that Rule 8 governs.

### 3.  Actionable Misstatements or Omissions

Having identified the relevant pleading standards, the Court now proceeds to evaluate the sufficiency of the Securities Act claims.  Sections 11 and 12(a)(2) together create three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; and (3) a material omission of information that is necessary to prevent existing disclosures from being misleading.  *See Litwin*, 2011

WL 447050, at *6. "The definition of materiality is the same for these [Securities Act] provisions as it is under section 10(b) of the Exchange Act: [W]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley*, 592 F.3d at 360 (internal quotation marks omitted). "However, because the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *Id.* (citing *ECA*, 553 F.3d at 197).

### a. *Equity* Action

The *Equity* Plaintiffs purport to invoke all three categories of Section 11 liability outlined above. For the reasons that follow, they fail to state a Section 11 claim even under the liberal pleading standards of Rule 8.

With regard to the first potential basis for Section 11 liability, the only alleged misrepresentations in the Securities Act portion of the *Equity* Complaint constitute statements of corporate optimism. For example, Plaintiffs challenge the statement in the June 2006 offering documents characterizing Golden West's financial condition and asset quality as "very sound." (Eq. Compl. ¶ 539.) The opposition papers list a series of similar affirmative statements, excerpted from the 2006, 2007, and 2008 offering documents, regarding Wachovia's "prudent" lending practices, "conservative" underwriting, and "strong" credit risk management.[44] (Pls.' Eq. Opp'n 82 & n.90.) For the reasons previously stated, the Court

is unconvinced that these adjectives are sufficiently specific "to cause a reasonable investor to rely upon them." *ECA*, 553 F.3d at 206. Accordingly, the Court finds that these alleged misrepresentations constitute corporate puffery rather than actionable statements.

The *Equity* Plaintiffs also fail to state a Section 11 claim by identifying material omissions in violation of affirmative disclosure obligations. To that end, the *Equity* Plaintiffs primarily rely on GAAP provisions as the basis for Wachovia's disclosure obligations.[45] But instead of specifying the allegedly omitted information, Plaintiffs supply a series of conclusory bullet points. Without definition or explanation, the Securities Act pleadings repeatedly allege that Defendants "omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding the concentrations of credit risk created by its loan portfolio," "omitted the disclosures required by SOP 94-6 for significant estimates in violation of GAAP and SEC rules," and "failed to properly present VIEs."[46] (*See* Eq. Compl. ¶¶ 538, 543, 548.) Such scattershot pleadings fail to afford proper notice, much less provide facially plausible factual allegations. *Iqbal*, 129 S. Ct. at 1949. For that reason, the Court cannot conclude that the relevant offering documents contained material omissions in violation of affirmative disclosure obligations.

---

[44] Although a complaint is deemed to include any document incorporated by reference or otherwise integral to the pleading, *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006), the Court notes that these statements are neither quoted nor pincited in the Securities Act portion of the *Equity* Complaint.

[45] Plaintiffs briefly raise Item 303 of SEC Regulation S-K in their opposition papers (Pls.' Eq. Opp'n 82), but there is no mention of Item 303 disclosure duties or violations in the *Equity* Complaint.

[46] Although these terms and regulations are defined elsewhere in the *Equity* Complaint, the definitions are neither incorporated nor cross-referenced in the Securities Act portion of the Complaint.

Finally, the *Equity* Plaintiffs also fail to allege material omissions in violation of the statutory duty not to make misleading statements. *See* 15 U.S.C. § 77k(a). For example, the Securities Act pleadings allege that the offering documents omitted to disclose that Wachovia "did not follow strict underwriting and loan-origination practices" (Eq. Compl. ¶¶ 544(a), 549(a)), and that "a material portion of the Company's loans were made on a 'low documentation' basis" (*id.* ¶¶ 544(b), 549(b)). But although Plaintiffs profess their intent "to state or summarize facts also stated above" (*id.* ¶ 530), the "discrete" Securities Act portion of the *Equity* Complaint contains no facts supporting these and similar allegations (Pls.' Eq. Opp'n 79). The only cross-references included in the Securities Act pleadings appear to be typographical errors, a fact that further indicates a lack of care in drafting the *Equity* Complaint.[47] The Court declines to sift the preceding 529 paragraphs of the *Equity* Complaint in order to decipher what factual allegations, if any, support the existence and materiality of each alleged omission at the time of each offering. Accordingly, the Court finds that the *Equity* Plaintiffs have failed to state a Section 11 claim.

### b. *Bond/Notes* Action

As previously noted, the *Bond/Notes* Complaint includes claims under Sections 11 and 12(a)(2), which the Court will evaluate in tandem. *See In re Fuwei*, 634 F. Supp. 2d at 438. Specifically, the *Bond/Notes* Plaintiffs allege that the offering documents contained material misrepresentations and omissions regarding: (1) the risk profile and "pristine" quality of the residential mortgage portfolio; (2) the "conservative in-house appraisal and underwriting approach" to the Pick-A-Pay portfolio; (3) the accuracy of reported loan-to-value ratios; (4) the inadequacy of reported loan loss reserves; (5) the impaired value of Wachovia's CDO holdings; (6) the impaired value of the Golden West franchise and related goodwill; (7) the impaired value of Wachovia's net income, assets, and Tier 1 capital rating; and (8) Wachovia's GAAP compliance. Plaintiffs also allege material misrepresentations and omissions in the audit opinions provided by Defendant KPMG, a claim the Court will separately address.

At a minimum, the *Bond/Notes* Plaintiffs have stated a material misrepresentation claim based on the LTV ratios reported in the offering documents. In a series of three financial statements – the 2006 Form 10-K, 1Q 2007 Form 10-Q, and 3Q 2007 Form 10-Q – Wachovia represented that, of the assets contained in the consumer real estate portfolio, "83 percent has a loan-to-value ratio of 80 percent or less" and "95 percent has a loan-to-value ratio of 90 percent or less." (B/N Compl. ¶¶ 224, 238.) The 2Q 2007 Form 10-Q and 2007 Form 10-K made nearly identical representations. (*Id.* ¶¶ 224, 246.) Plaintiffs allege that these stated LTV ratios for the residential mortgage portfolio were materially inaccurate "because the appraisers used by Golden West and later Wachovia . . . reported inflated appraisal values." (B/N Compl. ¶¶ 226, 239.)

Although no Plaintiff has alleged facts demonstrating that Defendants internally approved the debasement of appraisal standards, the *Bond/Notes* Plaintiffs supply

---

[47]   Paragraph 530 asserts Securities Act claims on behalf of the subclasses "as defined in ¶¶ 463-470 above," but the subclass definitions actually appear at ¶¶ 510-17. (Eq. Compl. ¶ 530.) Paragraph 550 repeats and realleges "each and every allegation in ¶¶ 483-502 relating to the Securities Act claims," but the Securities Act allegations in fact begin at ¶ 530. (*Id.* ¶ 550.)

ample allegations that the appraisal process was manipulated to produce inflated appraisal values. The *Bond/Notes* Complaint relates detailed CW reports that other Wachovia employees "regularly called and harassed [appraisers] to 'get the value they wanted'" (*id.* ¶ 122(b)); that managers selected appraisers from a prepared list of those who would "hit" the desired values (*id.* ¶ 122(c)); that offices would order a new appraisal if the first attempt yielded a number too low for the loan to be approved (*id.*); and that appraisers "bent the rules" by increasing appraisal values in response to such pressure (*id.* ¶ 122(g)). Because "the properties collateralizing the Company's loans . . . were worth materially less than their appraised values" (*id.* ¶ 226), Plaintiffs allege that the corresponding LTV ratios were similarly distorted. Given these allegations about the appraisal process, the Court cannot conclude that the offering document statements regarding LTV ratios are immaterial as a matter of law. *See ECA*, 553 F.3d at 197 (holding that statements are immaterial only if they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").[48] Accordingly, the Court finds that the *Bond/Notes* Plaintiffs have stated claims under Sections 11 and 12(a)(2).

---

[48] In *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, Judge Kaplan characterized both property appraisals and corresponding LTV ratios as "subjective opinion[s]" that are "actionable under the Securities Act only if the amended complaint alleges that the speaker did not truly have the opinion at the time it was made." 692 F. Supp. 2d 387, 393-94 (S.D.N.Y. 2010). But whether or not the appraisal values at issue are properly designated "opinions," the alleged appraisal misconduct surely distorted the resulting LTV ratios, which were then featured in the Offering Documents. Accordingly, the Court declines to dismiss claims involving the alleged misstatements regarding LTV ratios under a blanket "subjective opinion" rule.

c.  Auditor Liability

Finally, the *Bond/Notes* Complaint also includes a Section 11 claim against KPMG for preparation of allegedly false audit reports and certification of allegedly false financial statements. Section 11 provides that if a registration statement contains a material misstatement or omission, liability will lie against:

> [E]very accountant . . . who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him . . . .

15 U.S.C. § 77k(a)(4). Section 11 "impos[es] a stringent standard of liability on the parties who play a direct role in a registered offering," *Huddleston*, 459 U.S. at 381-82, a design that "reflects Congress' sense that underwriters, issuers, and accountants bear a 'moral responsibility to the public [that] is particularly heavy.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 657 (S.D.N.Y. 2004) (quoting *Gustafson*, 513 U.S. at 581)). Nevertheless, although issuers are subject to "virtually absolute" liability under Section 11, *In re Morgan Stanley*, 592 F.3d 347, 359, "experts such as accountants who have prepared portions of the registration statement are accorded a 'due diligence' defense." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976).

In this case, the claim against KPMG is premised on the allegation that both the

2006 and 2007 audit reports prepared by KPMG and the 2006 and 2007 financial statements audited by KPMG were materially false and misleading. (B/N Compl. ¶¶ 233-35, 251-52, 291.) For the reasons previously stated, *see* Part III.B.3.b, the Court has identified material misrepresentations in the 2006 and 2007 financial statements at issue. Although KPMG may ultimately avoid Section 11 liability by demonstrating reasonable grounds to believe that these statements were true, *see Ernst & Ernst*, 425 U.S. at 208, due diligence is an affirmative defense and therefore unavailing on a motion to dismiss, *see In re Morgan Stanley*, 592 F.3d at 360 n.7. Accordingly, the motion to dismiss the Section 11 claim against KPMG is hereby denied.

## C.  Secondary Liability Claims

In addition to the primary counts addressed above, Plaintiffs collectively allege a variety of secondary liability claims. The *Equity*, *Stichting*, and *FC Holdings* Plaintiffs each allege control person liability under Section 20(a) of the Exchange Act. The *Equity* and *Bond/Notes* Plaintiffs allege control person liability under Section 15 of the Securities Act. Finally, the *Equity* Plaintiffs also allege insider trading liability under Section 20A of the Exchange Act.

### 1.  Section 20(a) Claims

To state a claim for control person liability under Section 20(a) of the Exchange Act, a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quotation marks omitted). Because the

Plaintiffs have failed to state a primary violation under Section 10(b), they cannot establish control person liability under Section 20(a).

### 2.  Section 15 Claims

To state a claim for control person liability under Section 15 of the Securities Act, a plaintiff must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *Citiline*, 701 F. Supp. 2d at 517. "Control entails 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re Refco*, 503 F. Supp. 2d at 637 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)). In this case, only the *Bond/Notes* Plaintiffs have stated a primary violation under Section 11. The *Bond/Notes* Complaint further alleges that Thompson, Truslow, and Wurtz exercised control over the contents of the offering documents (B/N Compl. ¶ 326) and the actions of the issuers (*id.* ¶ 327). Accordingly, the Court finds that (1) the *Equity* Plaintiffs have failed to state a Section 15 claim for lack of a primary violation; but (2) insofar as the *Bond/Notes* Plaintiffs have stated Section 11 claims under the standing limitations previously discussed, their Section 15 claim also survives.

### 3.  Section 20A Claims

To state a claim for derivative insider trading liability under Section 20A of the Exchange Act, a plaintiff "must plead as a predicate an independent violation of the [Exchange] Act." *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994). Accordingly, the Court's conclusion that the *Equity* Plaintiffs

have failed to state a Section 10(b) claim precludes relief under Section 20A as well.

### D.  Common Law Claims

Finally, the *Stichting* Plaintiffs bring separate common law claims for fraud, negligent misrepresentation, and civil conspiracy.

A common law fraud claim in New York requires the plaintiff to plead scienter.[49] *See Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (holding that a New York fraud claim requires "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff").  The scienter element for common law fraud "is essentially the same as that under federal securities laws." *Saltz v. First Frontier, LP*, No. 10 Civ. 964 (LBS), 2010 WL 5298225, at *8 (S.D.N.Y. Dec. 23, 2010).  Although the heightened pleading requirements of

Rule 9(b) and the PSLRA do not apply to common law fraud, the Court finds that for the reasons previously stated, the *Stichting* Plaintiffs fail to plead scienter, and therefore fail to plead common law fraud.

To state a claim for negligent misrepresentation, the plaintiff must allege that "(1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given." *Saltz*, 2010 WL 5298225, at *15.

Defendants argue that the negligent misrepresentation claims are preempted by New York's Martin Act.  N.Y. Gen. Bus. L. §352 *et seq.*  Although "the New York Court of Appeals has not explicitly addressed preemption of non-fraud common law claims that fall within the scope of the Martin Act . . . the overwhelming majority of courts to consider the issue have found that such claims are preempted." *In re Beacon Assocs. Litig.*, __ F. Supp. 2d __, No. 09 Civ. 777 (LBS), 2010 WL 3895582, at *35 (S.D.N.Y. Oct. 5, 2010).  Plaintiffs urge a contrary result based on the recent decision in *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354 (S.D.N.Y. 2010), which argued that statutory interpretation and legislative history speak against Martin Act preemption.  (*See* Pls.' Stichting Opp'n 55-57.)  But unless and until the New York Court of Appeals adopts such a rule, this Court is bound to apply the result in the only Second Circuit case to address the subject of Martin Act preemption, *Castellano v. Young & Rubicam*, 257 F.3d 171, 190 (2d Cir. 2001). *See In re JP Jeanneret Assocs., Inc.*, No. 09 Civ. 3907 (CM), 2011 WL 335594, at *33 (S.D.N.Y. Jan. 31, 2011).  Because *Castellano* recognized Martin Act preemption of common law claims

---

[49]  The *Stichting* Plaintiffs purport to "reserve the right to brief the Court on applicable foreign laws" in the event of a determination that their common law claims are insufficient under New York law.  (Pls.' Stichting Opp'n 49 n.35.)  However, Rule 44.1 of the Federal Rules of Civil Procedure states that "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."  Fed. R. Civ. P. 44.1.  "This rule has been interpreted to mean that the party invoking non-U.S. law bears at least the modest burden of notifying an opposing party and the court that non-U.S. law will be at issue." *Trabucco v. Intesa Sanpaolo, S.p.A.*, 695 F. Supp. 2d 98, 107 n.1 (S.D.N.Y. 2010) (internal citation and quotation marks omitted).  Because the *Stichting* Plaintiffs cite New York law in their opposition papers and fail to identify relevant differences between New York and Dutch, German, Swedish, or other law, the Court finds that a conclusory footnote is insufficient to give notice pursuant to Rule 44.1.

involving securities, the negligent misrepresentation claims at issue are preempted as well.[50]

Finally, it is well settled under New York law that "a claim for civil conspiracy requires an independent actionable tort." *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 613 (S.D.N.Y. 2007); *see Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008). Because no actionable tort remains, there can be no civil conspiracy.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1) The Wachovia Defendants' Motion to Dismiss the *Equity* Complaint is HEREBY GRANTED;

2) The Underwriter Defendants' Motion to Dismiss the *Equity* Complaint is HEREBY GRANTED;

3) The Wachovia Defendants' Motion to Dismiss the *Stichting* Complaint is HEREBY GRANTED;

4) The Wachovia Defendants' Motion to Dismiss the *FC Holdings* Complaint is HEREBY GRANTED;

5) The Wachovia Defendants' Motion to Dismiss the *Bond/Notes* Complaint is HEREBY GRANTED IN PART and DENIED IN PART;

6) The Underwriter Defendants' Motion to Dismiss the *Bond/Notes* Complaint is HEREBY GRANTED IN PART and DENIED IN PART; and

7) Defendant KPMG's Motion to Dismiss the *Bond/Notes* Complaint is HEREBY DENIED.

The Clerk of the Court is respectfully directed to terminate the following motions:

1) Doc. Nos. 75 and 78 in *In re Wachovia Equity Securities Litigation* (No. 08 Civ. 6171);

2) Doc No. 37 in *Stichting Pensioenfonds ABP v. Wachovia Corp.* (No. 09 Civ. 4473);

3) Doc. No. 31 in *FC Holdings AB v. Wells Fargo & Co.* (No. 09 Civ. 5466); and

4) Doc. Nos. 105, 108, and 111 in *In re Wachovia Preferred Securities and Bond/Notes Litigation* (No. 09 Civ. 6351).

---

[50] Plaintiffs suggest in a footnote that the geographic prong of the Martin Act precludes its application here. (Pls.' Stichting Opp'n 57 n.44.) "To satisfy the Martin Act's geographic prong, the acts must be 'within or from' New York, meaning that a substantial portion of the events giving rise to the claim must have occurred in New York." *In re Beacon*, 2010 WL 3894482, at *37. Although none of the parties are New York entities, the *Stichting* Complaint alleges that Wachovia has a "substantial" New York presence (Stichting Compl. ¶ 32), that Plaintiffs acquired Wachovia shares through purchases on the New York Stock Exchange (*id.* ¶ 36), and that "many of the acts and transactions giving rise to the violations of law complained of" occurred in New York (*id.* ¶ 32). Coupled with Plaintiffs' admission that "the majority of the conduct alleged in the Complaint occurred in New York" (Pls.' Stichting Opp'n 57 n.44), these allegations suffice to plead the necessary geographic nexus.

The Clerk of the Court is also respectfully directed to close the following cases:

1) *In re Wachovia Equity Securities Litigation* (No. 08 Civ. 6171);

2) *Stichting Pensioenfonds ABP v. Wachovia Corp.* (No. 09 Civ. 4473);

3) *FC Holdings AB v. Wells Fargo & Co.* (No. 09 Civ. 5466).[51]

IT IS FURTHER ORDERED THAT the *Bond/Notes* parties shall (1) submit a joint proposed discovery schedule no later than May 2, 2011; and (2) appear for a status conference on Friday, May 13, 2011, at 3:30 p.m.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 31, 2011
   New York, New York

* * *

The *Equity* Plaintiffs are represented by Ira M. Press, Andrew Martin McNeela, and Roger W. Kirby of Kirby McInerney LLP, 825 Third Avenue, 16th Floor, New York, NY 10022.

The *Stichting* Plaintiffs are represented by Geoffrey Coyle Jarvis, Jay W.

Eisenhofer, and Michele S. Carino of Grant & Eisenhofer, P.A., 485 Lexington Avenue, 29th Floor, New York, NY 10017; and James Richard Banko of Grant & Eisenhofer, PA, Chase Manhattan Centre 1201 North Market Street, Wilmington, DE 19801.

The *FC Holdings* Plaintiffs are represented by Daniel Arthur Cohen, Daniel Joseph Kornstein, and Amy Christine Gross of Kornstein Veisz Wexler & Pollard, LLP, 757 Third Avenue, New York, NY 10017; Jeffrey H. Squire of Bracewell & Patterson, LLP, 2000 K Street, NW, Suite 500, Washington, DC 20006; and Paul D. Wexler of Bragar, Wexler & Eagel, P.C. 885 Third Avenue, Suite 3040, New York, NY 10022.

The *Bond/Notes* Plaintiffs are represented by John J. Gross, Christopher L. Nelson, David Kessler, John Anthony Kehoe, and Benjamin J. Sweet of Barroway Topaz Kessler Meltzer & Check, LLP, 280 King of Prussia Road, Radnor, PA 19087; Nichole Browning and Eric Donald Peterson of Barroway Topaz Kessler Meltzer & Check, LLP, 580 California Street, Suite 1750, San Francisco, CA 94104; Ramzi Abadou, Maureen Elizabeth Mueller, Lucas F. Olts, and John J. Rice of Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101; David Avi Rosenfeld of Robbins Geller Rudman & Dowd LLP, 58 South Service Road, Suite 200, Melville, NY 11747; John Patrick Coffey, William Curtis Fredericks, Kurt Michael Hinciker, Christopher Chad Johnson, John James Rizio-Hamilton, and Jeroen Van Kwawegen of Bernstein Litowitz Berger & Grossmann LLP, 1285 Avenue of the Americas, 38th Floor, New York, NY 10019; Jack Gerald Fruchter of Abraham Fruchter & Twersky LLP, One Penn Plaza, Suite 1910, New

---

[51] As required by the PSLRA, the Court notes that all parties and attorneys have complied with the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. *See* 15 U.S.C. § 78u-4(c)(1); *Rombach*, 355 F.3d at 178.

York, NY 10119; Lionel Z. Glancy of Glancy & Binkow, LLP, 1801 Avenue of the Stars, Los Angeles, CA 90067; Michael Max Goldberg of the Law Offices of Michael Goldberg, 332 E. 73rd St. 4A, New York, NY 10021; Marc Ian Gross and Fei-Lu Qian of Pomerantz Haudek Block Grossman & Gross LLP, 100 Park Avenue, 26th Floor, New York, NY 10017.

The Wachovia Defendants are represented by Douglas H. Flaum, Eric A. Hirsch, Israel David, and John W. Brewer of Fried, Frank, Harris, Shriver & Jacobson, One New York Plaza, New York, NY 10004.

The Underwriter Defendants are represented by Alfred Robert Pietrzak, Patrick Michael McGuirk, Owen Harris Smith, and Saima S. Ahmed of Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019.

Defendant KPMG is represented by Emmet Thomas Flood of Williams & Connolly LLP, 725 12th Street N.W., Washington, DC 20005; and Marshall Beil of McGuireWoods LLP, 1345 Avenue of the Americas, 7th Floor, New York, NY 10105.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/11